HUESTON HENNIGAN LLP
John C. Hueston (164921; jhueston@hueston.com)
Alison Plessman (250631; aplessman@hueston.com)
Jeff Wilkerson (284044; jwilkerson@hueston.com)
620 Newport Center Drive, Suite 1300
Newport Beach, California 92660-6420
Telephone:  (949) 229-8640
Facsimile:  (888) 775-0898

STATE COMPENSATION INSURANCE FUND
Linda S. Platisha (195281; lsplatisha@scif.com)
1750 E. Fourth St., 5th Floor
Santa Ana, California 92705
Telephone:  (714) 347-6130
Facsimile:  (714) 347-6145

Attorneys for Plaintiff STATE COMPENSATION
INSURANCE FUND, a Public Enterprise Fund
and Independent Agency of the State of California

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| STATE COMPENSATION INSURANCE FUND,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL CAPEN, an individual; SOUTHWESTERN ORTHOPEDIC MEDICAL CORP. D/B/A DOWNEY ORTHOPEDIC MEDICAL GROUP, a California corporation; SOUTHWESTERN ORTHOPEDIC MEDICAL CORPORATION, D/B/A CHANNEL ISLANDS ORTHOPEDIC, a California corporation; DANIEL CAPEN MD, A PROFESSIONAL CORPORATION, a California corporation; WESTLAKE SURGICAL MEDICAL ASSOCIATES, INC., a California corporation; JOHN LARSEN, an individual; JOHN LARSEN, MD, A PROFESSIONAL CORPORATION, a California Corporation; ANDREW JARMINSKI, an individual; INLAND INCARE MEDICAL ASSOCIATES, INC., a California corporation; INLAND INCARE OF SAN BERNARDINO MEDICAL GROUP, INC., a California corporation; ARJ MEDICAL, INC., a California corporation; JEFFREY CATANZARITE, an individual; | Case No. 8:15-cv-01279<br><br>**COMPLAINT OF PLAINTIFF STATE COMPENSATION INSURANCE FUND FOR:**<br><br>**(1)  18 U.S.C. § 1962(d) (CIVIL RICO CONSPIRACY);**<br><br>**(2)  FRAUD; AND**<br><br>**(3)  UNFAIR COMPETITION (Bus. & Prof. Code § 17200)**<br><br>**[JURY TRIAL DEMANDED]** |

CENTER FOR BETTER HEALTH, A
MEDICAL GROUP, INC., D/B/A
SOUTHLAND SPINE AND
REHABILITATION, a California
corporation; KHALID B. AHMED, an
individual; KHALID BASHIR AHMED,
M.D., A PROFESSIONAL CORPORATION,
a California corporation; AHMED POMONA
MEDICAL GROUP, INC., a California
corporation; TRISTAR MEDICAL GROUP,
PROFESSIONAL CORP., a California
corporation; THOMAS HAIDER, an
individual; HAIDER SPINE CENTER
MEDICAL GROUP, INC., a California
corporation; SALMA JASON MONICA, LP,
a California limited partnership; CATALINO
DUREZA, an individual; CATALINO D.
DUREZA, M.D., INC., a California
corporation; CALIFORNIA
NEUROSURGICAL AND SPINE
ASSOCIATES, A MEDICAL
CORPORATION, a California corporation;
MAXIMUS MEDICAL GROUP, A
MEDICAL CORPORATION, a California
corporation; TRI-COUNTY MEDICAL
GROUP, INC., a California corporation;
RICHARD MULVANIA, an individual;
RICHARD L. MULVANIA, MD, INC., a
California corporation; SERGE OBUKHOFF,
an individual; SERGE OBUKHOFF, MD,
PROFESSIONAL CORPORATION, a
California corporation; DAVID PAYNE, an
individual; DAVID H. PAYNE, M.D., INC.,
a California corporation; HAMID RAHMAN,
an individual; ROGER SHORTZ, an
individual; ISMAEL SILVA, an individual;
STARBASE, INC., a California corporation;
HEALTHPOINTE MEDICAL GROUP,
INC., a California corporation; ISRAEL
CHAMBI, an individual; RUSSELL
NELSON, an individual; NELSON SPINE
INSTITUTE, INC., a California corporation;
PROGRESSIVE ORTHOPEDIC
SOLUTIONS, LLC, a California corporation;

Defendants.

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF ACTION ................................................................. 1

   A.   *State Fund v. Drobot Sr., et al.*, No. 13-00956 (USDC), and Drobot
        Sr.'s Plea Agreement.................................................................. 3

   B.   Overview of the Surgical Entity Enterprise ............................. 8

   C.   Overview of the Pharmacy Entity Enterprise ......................... 9

   D.   Connections Between the Surgical and Pharmacy Enterprises ........... 11

   E.   Defendants' Knowing Agreement to and Participation in the
        Enterprises ................................................................................ 18

   F.   The Drobots, Dr. Bernadett, Entity Conspirators and Control
        Allegations ................................................................................ 20

II.  THE PARTIES ............................................................................... 27

   A.   Plaintiff ...................................................................................... 27

   B.   Defendants.................................................................................. 27

   C.   Marketer Defendant ................................................................... 49

   D.   DOE Defendants ........................................................................ 50

III. JURISDICTION AND VENUE.................................................... 51

IV.  STATE FUND AND ITS CLAIMS PROCESS ......................... 51

V.   FRAUDULENT SCHEMES BY THE SURGICAL ENTITY
     ENTERPRISE .............................................................................. 54

   A.   Billing State Fund for Treatments and Services That Were the Product
        of Illegal Kickbacks and Referral Fees .................................... 67

VI.  FRAUDULENT SCHEMES BY THE PHARMACY ENTITY
     ENTERPRISE .............................................................................. 71

   A.   Lack of Licenses, Corporate Practice of Medicine, and Payment of
        Illegal Referral Fees ................................................................. 72

        1.   Lack of Licenses ............................................................. 72

        2.   Corporate Practice of Medicine...................................... 77

        3.   Payment of Referral Fees and Fee-Splitting Agreements ........ 81

   B.   Overbilling and Pricing Manipulation ..................................... 84

        1.   Background on Drug Pricing ........................................... 84

- i -

# TABLE OF CONTENTS (cont.)

**Page**

2. Conspirators' Pricing Manipulation Schemes ........................... 86

3. 2001-2007 Overbilling Through AWP Manipulation ............... 87

4. Specific Examples ................................................... 90

C. The Global Settlements with Certain Pharmacy Entities .................... 93

VII. STATE FUND UNCOVERS THE CONSPIRATORS' WELL-CONCEALED FRAUD ................................................................. 95

FIRST CAUSE OF ACTION (Civil RICO 18 U.S.C. § 1962(d)) .......................... 97

A. Drobots and Dr. Bernadett, Surgical Entities, and Administrative Entities Formed an Association-in-Fact Enterprise ............................ 97

1. The Drobots and Dr. Bernadett, Surgical Entities, and Administrative Entities Each Conducted the Enterprise's Affairs ............................................................ 99

2. The Surgical Entity Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail and Wire Fraud Violations .................................................... 100

3. The Surgical Entity Enterprise Affected Interstate Commerce 101

4. State Fund Relied on the Surgical Entity Enterprise's Misrepresentations and Suffered Financial Injury As a Result 102

B. Defendants' Liability for Civil RICO Conspiracy Under 18 U.S.C. § 1962(d) ........................................................... 104

1. Each Defendant Knew of and Agreed to Facilitate the Surgical Entity Enterprise's Criminal Purpose ...................................... 104

2. Each Defendant Committed Predicate Acts In Furtherance of the Enterprise's Criminal Purpose ................................... 104

3. State Fund Suffered Injury From the Predicate Acts Committed In Furtherance of the Enterprise's Criminal Purpose ............. 106

SECOND CAUSE OF ACTION (Civil RICO Conspiracy 18 U.S.C. § 1962(d)). 106

A. The Drobots, Dr. Bernadett, Pharmacy Entities, and Administrative Entities Formed an Association-in-Fact Enterprise .......................... 107

1. The Pharmacy Conspirators Each Conducted the Affairs of the Enterprise ....................................................... 108

2. The Pharmacy Entity Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail and Wire Fraud Violations .................................................... 109

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS (cont.)

**Page**

3.   The Pharmacy Entity Enterprise Affected Interstate Commerce ............................................................................... 111

4.   State Fund Relied on the Pharmacy Entity Enterprise's Misrepresentations and Suffered Financial Injury as a Result 112

C.   Defendants' Liability for Civil RICO Conspiracy Under 18 U.S.C. § 1962(d) ................................................................................... 113

1.   Each Defendant Knew of and Agreed to Facilitate the Pharmacy Entity Enterprise's Criminal Purpose ...................................... 113

2.   Each Conspirator and Defendant Committed Predicate Acts In Furtherance of the Enterprise's Criminal Purpose .................. 114

3.   State Fund Suffered Injury From the Predicate Acts Committed In Furtherance of the Enterprise's Criminal Purpose .............. 115

THIRD CAUSE OF ACTION (Fraud) .................................................... 115

FOURTH CAUSE OF ACTION (Business & Professions Code § 17200) ........... 118

PRAYER FOR RELIEF ...................................................................... 120

5018471

1    Plaintiff State Compensation Insurance Fund ("State Fund") alleges as
2  follows in this federal question action, over which this court has jurisdiction
3  pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

4  **I.    <u>SUMMARY OF ACTION</u>**

5    1.    State Fund provides workers' compensation insurance to California
6  employers, with no financial obligation to the public, and is the largest provider of
7  workers' compensation insurance in California.  When a covered employee suffers
8  an on-the-job injury, State Fund's primary goal is to insure that the injured worker
9  receives proper medical treatment by a provider.  The provider is then supposed to
10 bill State Fund for the procedures performed or medicine supplied under the
11 appropriate workers' compensation guidelines.

12   2.    Defendants conspired to subvert this process and defraud State Fund in
13 connection with the submission and collection of fraudulent insurance bills for
14 medical services, medical hardware, and medications.  Through two connected
15 enterprises, Defendants and their co-conspirators engaged in an elaborate kickback
16 scheme designed to game the workers' compensation system and cheat State Fund
17 out of many millions of dollars.  The scheme inflicted damage not only on State
18 Fund, but on California's workers, who were used as pawns to maximize ill-gotten
19 profits, and California's employers, forced to pay not only inflated medical costs but
20 higher workers' compensation insurance rates.

21   3.    The illegal kickback scheme was carried out through a complex web of
22 interconnected businesses and individuals, including medical providers, pharmacies,
23 medical management companies, repackagers, distributors, healthcare "marketers,"
24 and others.  Central to the conspiracy was Michael D. Drobot, Sr., whom at various
25 times, owned and/or operated, among other related entities, Healthsmart Pacific, Inc.
26 ("Healthsmart"), Healthsmart Pacific, Inc. d/b/a Pacific Hospital of Long Beach
27 ("Pacific Hospital"), Long Beach Pain Center Medical Clinic, Inc. ("Long Beach
28 Pain"), and International Implants, LLC ("International Implants") (collectively, the,

1   "Surgical Entities"), at least until October 2013, when he has indicated that he sold

2   Pacific Hospital's assets to College Health Enterprises ("CHE").  Also central to the

3   scheme was co-conspirator Michael D. Drobot, Jr., who owns and operates, among

4   other related entities, California Pharmacy Management LLC ("CPM"), Industrial

5   Pharmacy Management LLC ("IPM"), Long Beach Prescription Pharmacy

6   ("LBPP"), Coastal Express Pharmacy, Inc. ("Coastal"), and Meds Management

7   Group LLC ("MMG") (the "Pharmacy Entities").  The Drobots' co-conspirator Dr.

8   Faustino Bernadett, at various times, owned and/or operated, among other related

9   entities, Healthsmart, Pacific Hospital, and Long Beach Pain.

10         4.      As described below, the Surgical and Pharmacy Entities are connected

11   not only through shared patients and doctors, but through Pacific Specialty

12   Physician Management, Inc. ("PSPM") and First Medical Management, Inc.

13   ("FMM") (collectively the "Administrative Entities").  The Administrative Entities

14   coordinated the activities between the Surgical and Pharmacy Entities, medical

15   providers including Defendants, and suppliers, among others.  Together, the

16   Surgical, Pharmacy, and Administrative Entities will be referred to herein as the

17   "Entity Conspirators."

18         5.      The named Defendants in this action are healthcare providers,

19   associated entities, and marketers that conspired with the Drobots and Dr. Bernadett,

20   and are referred to collectively herein as the "Defendants."  They are Dr. Daniel

21   Capen; Southwestern Orthopedic Medical Corp. d/b/a Downey Orthopedic Medical

22   Group; Southwestern Orthopedic Medical Corp. d/b/a Channel Islands Orthopedic;

23   Daniel Capen MD, a Professional Corporation; Westlake Surgical Medical

24   Associates, Inc.; Dr. John Larsen; John Larsen MD, a Professional Corporation;

25   Dr. Andrew Jarminski, Inland Incare Medical Associates, Inc.; Inland Incare of San

26   Bernardino Medical Group, Inc.; ARJ Medical, Inc.; Jeffrey Catanzarite, D.C.;

27   Center for Better Health, a Medical Group, Inc. d/b/a Southland Spine and

28   Rehabilitation; Dr. Khalid B. Ahmed; Khalid Bashir Ahmed, M.D., a Professional

5018471

1  Corporation; Ahmed Pomona Medical Group, Inc.; Tristar Medical Group,
2  Professional Corp.; Dr. Thomas Haider; Haider Spine Center Medical Group, Inc.;
3  Salma Jason Monica, LP; California Neurosurgical and Spine Associates, a Medical
4  Corporation; Maximus Medical Group, a Medical Corporation; Newport Coast
5  Spine, Inc.; Tri-County Medical Group, Inc.; Dr. Richard Mulvania; Richard L.
6  Mulvania MD, Inc.; Dr. Serge Obukhoff; Serge Obukhoff, MD, Professional
7  Corporation; Dr. David Payne; David H. Payne, M.D., Inc.; Dr. Hamid Rahman; Dr.
8  Roger Shortz; Dr. Ismael Silva; Starbase, Inc.; Healthpointe Medical Group, Inc.;
9  Dr. Israel Chambi; Dr. Russell Nelson; Nelson Spine Institute, Inc.; and Progressive
10 Orthopedic Solutions, LLC.

11     A.     ***State Fund v. Drobot Sr., et al.*, No. 13-00956 (USDC), and Drobot**
12            **Sr.'s Plea Agreement**

13            6.     State Fund filed its initial complaint in *State Compensation Insurance*
14 *Fund v. Michael Drobot Sr., et al.*, Case No. 13-00956 ("*State Fund v. Drobot Sr., et*
15 *al.*") in this Court in June 2013, alleging causes of action pursuant to the Racketeer
16 Influenced and Corrupt Organizations Act ("RICO") for civil violations and
17 conspiracy, common-law fraud, and California's Unfair Competition Law ("UCL,"
18 or California Business and Professions Code section 17200, *et seq.*).  The case is
19 currently pending before Hon. Andrew J. Guilford.  In *State Fund v. Drobot Sr., et*
20 *al.*, State Fund alleged that the defendants conspired to defraud State Fund by,
21 among other things, entering into illegal agreements designed to inflate the costs of
22 certain medical procedures and medications, paying or receiving kickbacks for
23 referring patients to preferred facilities and for using preferred products or
24 medications, engaging in illegal fee-sharing agreements, and facilitating the
25 overbilling of State Fund for medical charges.  State Fund further alleged that it had
26 been defrauded into paying illegally inflated costs for spinal surgeries through
27 defendants' use of fraudulent invoices for medical hardware issued by companies
28 controlled by the defendants.

7.      After the filing of the First Amended Complaint in *State Fund v. Drobot Sr., et al.*, Drobot Sr. pled guilty to workers' compensation fraud against State Fund and others.  On February 20, 2014, Drobot Sr. signed a guilty plea agreement with the U.S. Attorney's Office ("Plea Agreement"), admitting to much of the conduct alleged in State Fund's First Amended Complaint, including the payment of illegal kickbacks through the use of shell entities, "co-schemers," and conspiracy to commit fraud upon insurers, including State Fund.  *See USA v. Drobot* ("Plea Agreement"), 8:14-cr-000034-JLS-DOC-7, at 8-18 (C.D. Cal. Feb. 21, 2014). This Plea Agreement was entered on April 24, 2014, before the Honorable Josephine L. Staton.  *USA v. Drobot*, 8:14-cr-000034-JLS-DOC-20 (C.D. Cal. Apr. 24, 2014).

8.      Drobot Sr. admitted in the Plea Agreement that, beginning in or around 1998 and continuing through in or around November 2013, he "conspired with dozens of doctors, chiropractors, marketers and others to pay kickbacks in return for those persons to refer thousands of patients to Pacific Hospital for spinal surgeries and other medical services including "other types of surgeries, magnetic resonance imaging, toxicology, durable medical equipment, and other services" paid for primarily through the Federal Employees' Compensation Act ("FECA") and the California Workers' Compensation System ("CWCS").  Plea Agreement at 15.

9.      Drobot Sr. further admitted: "To help generate the monies for the kickback payments, defendant used a co-schemers company or his own company International Implants ("I2"), located in Newport Beach, California, to fraudulently inflate the price of medical hardware purchased by Pacific Hospital to be used in the spinal surgeries."  *Id*. at 14.  "In paying the kickbacks, inflating the medical hardware costs, and submitting the resulting claims for spinal surgeries and medical services, defendant and his co-conspirators acted with the intent to defraud workers' compensation insurance carriers and to deprive the patients of their right to honest services."  *Id*.

10.     To conceal the illegal kickbacks from workers' compensation insurance carriers, including State Fund, Drobot Sr. admitted that he and his co-conspirators "entered into bogus contracts under which the kickback recipients purported to provide services to defendant's companies to justify the kickback payments.  The services and other items of value discussed in those contracts were, in fact, generally not provided to Pacific Hospital or were provided at highly inflated prices.  The compensation to the kickback recipient was actually based on the number and type of surgeries they referred to the hospital.  These contracts included, among others, the following: collection agreements, option agreements, research and development agreements, lease and rental agreements, consulting agreements, marketing agreements, and management agreements." *Id.* at 17.

11.     The Plea Agreement also confirms, much as State Fund had alleged in *State Fund v. Drobot Sr., et al.*: "As defendant and his co-conspirators knew, federal and California law prohibited paying or receiving the aforementioned kickbacks for the referral of patients for medical services.  Defendant and his co-conspirators also knew that the insurance carriers would be unwilling to pay claims for medical services that were obtained through such illegal kickbacks.  Moreover, defendant and his co-conspirators knew that the insurance carriers would be unwilling to pay claims for spinal surgery hardware that were artificially inflated and substantially above the manufacturer's price.  However, defendant and his co-conspirators deliberately did not disclose to the insurance carriers the kickbacks, the inflation of the medical hardware, or the fact that I2 was owned and controlled by defendant and was not a manufacturer of such hardware.  Rather, at some point, defendant and his co-conspirators included on I2's invoices stamps falsely stating that I2 was an 'FDA registered manufacturer.'" *Id.* at 16-17.

12.     Third-party discovery in *State Fund v. Drobot Sr., et al.* has confirmed the use of the "bogus" contracts described in the Plea Agreement by the conspirators in furtherance of their conspiracy.  In fact, discovery thus far has revealed the

1  existence of numerous such agreements between the Surgical, Pharmacy, and

2  Administrative Entities, on the one hand, and the Defendants on the other.

3      13.    For example, Drobot Sr., through PSPM, entered into an "Option

4  Agreement" with Defendant Dr. Serge Obukhoff on or around March 15, 2010.  The

5  Option Agreement purports to grant PSPM the exclusive right or "option" to

6  purchase the unspecified assets of Dr. Obukhoff's orthopedic medical practice.

7  Pursuant to the agreement, PSPM was to make monthly payments to Dr. Obukhoff

8  of $50,000 in "readily accessible cash" as purported consideration for the grant of

9  the option.  It was contemplated that PSPM would make, in the aggregate, payments

10 equal to $10,000,000 for the "Option," "taking into account the Option Payments

11 previously made to [Dr. Obukhoff]."  On information and belief, payments

12 contemplated by this agreement were not really "Option Payments" but illegal

13 kickbacks to be paid to Dr. Obukhoff for performing spinal implant surgeries at

14 Pacific Hospital using devices from International Implants or another coschemer's

15 company and/or for the referral of patients to the Surgical or Pharmacy Entities.

16 Drobot Sr. admitted in the Plea Agreement that he paid a kickback to "S.O." in

17 connection with a spinal surgery performed by "S.O." on at least one occasion.  In

18 fact, according to payment records produced by Dr. Obukhoff, PSPM paid such

19 kickbacks to Dr. Obukhoff on numerous occasions, paying Dr. Obukhoff at least

20 $2,307,500 in purported "option payments" between April 10, 2010 and March 18,

21 2013.

22     14.    Similarly, the Drobots, through the Pharmacy Entities, entered into

23 "Physician Office Dispensing Management Agreements" or similar agreements with

24 physicians, including many of the Defendants, pursuant to which the physicians

25 purportedly engaged the Pharmacy Entities to "implement and maintain a Pharmacy

26 Program in Physician's various offices and places of practice for Physician's

27 patients covered under the California Workers' Compensation Program."  In reality,

28 these "Physician Office Dispensing Management Agreements" were fee-splitting

agreements through which the Pharmacy Entities paid kickbacks to physicians for referring patients to the Surgical Entities and to the pharmacies run by Pharmacy Entities and for prescribing the most lucrative medications to their patients.  While the agreements provided that the physicians were responsible for purchasing the product necessary for the pharmacy programs, financials statements and other discovery produced in *State Fund v. Drobot Sr., et al.* show that, in practice, the physicians committed almost nothing in the way of financial, capital, or human resources to the pharmacy program.  Instead, the Pharmacy Entities purchased the drugs, provided the pharmacy techs and other employees for the pharmacies, and controlled which drugs would be listed on the formularies.  If drugs listed on the formularies were not lucrative enough, they were removed by Drobot Jr.  The Pharmacy Entities' "management fee" was calculated as a percentage of "gross collections after deducting the costs of drugs sold and other direct pharmacy costs, including collections and advances."  Thus, the physicians never bore any financial risk and were paid simply for prescribing medications to their patients and referring them to the pharmacies run by the Pharmacy Entities.

15.    For example, under his "management agreement" with Pharmacy Entity CPM, Defendant Dr. Daniel Capen was paid $2,434,211.06 in 2006 after CPM recovered more than $6 million in cash collections.  CPM (not Dr. Capen) incurred drug costs of less than $500,000, but billed over $8 million for those drugs.  Dr. Capen purportedly wrote over 30,000 prescriptions in 2006, and averaged 123 prescriptions *per day* in March alone.  CPM also "loaned" Dr. Capen another $115,000 for the year to cover his "Air Charter Expenses," $55,463 in "advancements," and $21,000 in "other reductions."  CPM distributed to itself $2,149,988.87 for the year.

16.    As detailed below with regard to particular providers, the "Pharmacy Management Agreements" were also used as vehicles to pay kickbacks for medical services performed at or referred to Pacific Hospital or other preferred facilities.

- 7 -

1   Doctors that performed surgeries or other services at, or referred patients to other

2   doctors to perform surgeries or other services at, Pacific Hospital or other preferred

3   facilities were often paid "advances" under their purported "management"

4   agreements with Pharmacy Entities in exchange for such referrals. These advances

5   were often "written off" later—they were never reasonably expected to be repaid.

6        17.   As detailed below, many medical providers, including Defendants,

7   have (or had) contracts with both Pacific Hospital and CPM/IPM, as well as with

8   PSPM, International Implants, and other co-conspirator entities.[1]

9        B.   **Overview of the Surgical Entity Enterprise**

10       18.   Below, State Fund articulates the schemes conducted by the Surgical

11   Entity Enterprise to defraud State Fund while simultaneously concealing the

12   misconduct. The schemes are:

13       (a)   As admitted in the Plea Agreement, forming and using shell

14       corporations, or using a co-schemer's company, to grossly and fraudulently

15       increase the bills to State Fund for medical hardware used in Pacific

16       Hospital's surgeries. For example, Drobot Sr. created International Implants

17       and represented it as an implant manufacturer. In reality, International

18       Implants simply bought implants from other manufacturers across the country

19       and then grossly inflated the price at which it resold the implants to Pacific

20

21

[1] In *State Fund v. Drobot Sr., et al.,* several Defendants named in this Complaint, including, but not limited to, Dr. Daniel Capen and Dr. Andrew Jarminski, have refused to produce their agreements and communications with other conspirators and Defendants, invoking their Fifth Amendment rights against self-incrimination. Defendant Dr. Richard Mulvania was deposed, and invoked the Fifth Amendment and refused to provide testimony in response to any questions relating to his relationship with the Drobots and Dr. Bernadett, agreements with the Surgical and Pharmacy Entities, or his work with (or even knowledge of the existence of) any other Defendant. Likewise, Dr. John Larsen invoked his Fifth Amendment right during his deposition on nearly every question relating to his relationship with CPM, IPM, PSPM, and Pacific Hospital. And Messrs. Drobot Sr. and Drobot Jr. have invoked their Fifth Amendment rights and refused to testify about most of the allegations in *State Fund v. Drobot Sr., et al.*, including agreements with medical providers.

5018471                          COMPLAINT OF PLAINTIFF STATE FUND

Hospital, which Pacific Hospital then billed to State Fund as the implant's actual cost.

(b)     As further admitted in the Plea Agreement, conspiring with dozens of doctors, chiropractors, marketers, and others, including Defendants, to pay kickbacks in return for those persons to refer thousands of patients to Pacific Hospital and other preferred facilities for spinal surgeries and other medical services including "other types of surgeries, magnetic resonance imaging, toxicology, durable medical equipment, and other services," and/or in exchange for the medical providers agreeing to use certain equipment or devices, including devices from International Implants.

19.     With Defendants' assistance and facilitation, the Drobots, Dr. Bernadett, and the Surgical Entities concealed this course of conduct for over a decade (although Long Beach Pain and International Implants were formed later), by falsifying invoices and purchase orders, submitting fraudulent bills, hiding the common ownership of the entities in the enterprise, concealing the true nature of the business relationship with providers, and obstructing State Fund's attempts to investigate any issues.

C.     **Overview of the Pharmacy Entity Enterprise**

20.     The Drobots and Dr. Bernadett also conducted many of the same fraudulent schemes using pharmacies and the medication management companies that they formed and operated. As discussed in Paragraphs 33, 54-55, *supra*, Drobot Sr. owned and created CPM and IPM, while Drobot, Jr. ran the companies on a day-to-day basis. Dr. Bernadett worked with Drobot Sr. and Drobot Jr. to funnel monies through the Pharmacy Entities to doctors that performed services at, or referred patients to, Pacific Hospital or other preferred facilities—approving of

and facilitating the use of the Pharmacy Entities as vehicles for kickback payments. [2]
According to the Pharmacy Entities' discovery responses in *State Fund v. Drobot Sr., et al.*, Drobot Jr. purchased CPM and IPM from his father in mid-2010, after being President of these entities for a number of years.  Drobot Jr. is also the CEO and a director of the other Pharmacy Entities, including Coastal, MMG and LBPP.  LBPP is a subsidiary of CPM/IPM.  The Pharmacy Entity Enterprise is responsible for orchestrating at least the following schemes designed to defraud State Fund:

> (a)    Engaging in activity with respect to prescribed medications without having the licenses required by law, violating the prohibitions against the corporate practice of medicine, and paying kickbacks through sham agreements, all the while concealing the unlawful conduct from State Fund and misrepresenting the nature of their businesses.

> (b)    Overbilling State Fund through a variety of schemes, including billing for medications at rates up to ten times the prices at established retail pharmacies, and well above workers' compensation guidelines.  For example, to maximize their profits prior to March 1, 2007, the Drobots and Pharmacy Entities fraudulently manipulated drug pricing benchmarks through their

---

[2] For example, in a July 2008 email from Drobot Jr. to Dr. Bernadett, Drobot Jr. notes that IPM has made $60,000 in payments on behalf of Pacific Hospital and PSPM, including "$10,000 for two spine procedures performed at PHLB [in] July," "$20,000 for [Alan] Ivar for February" and "$30,000 made up of $18,000 [to Defendant Jeffrey] Catanzarite and $12,000 [to Alan] Ivar was paid by IPM in May."  Drobot Jr. also noted that "[Dr. Ian] Armstrong did a spine at Pacific last week and IPM need to recover $5000" and that Defendant Dr. David Payne "did/or is doing a spine this week with International Implant equipment, thus will need $8k.  IPM is the legal conduit to this agreement until something else takes its place."  In another email, Drobot Jr. writes to, among others, Dr. Bernadett, noting that he will "hold all IPM checks to [Defendant] Capen . . . until we receive the 85k for the month"; an IPM employee responds noting that IPM has "received the July $25k PSPM today.  We've also received the August $60k from International Implants."

5018471

COMPLAINT OF PLAINTIFF STATE FUND

1    ownership interests in (or other associations with) drug repackagers.  When

2    the opportunity for such manipulation closed in 2007, the Drobots and their

3    related entities looked for other ways to game the system; for example, by

4    focusing more heavily on compound or other lucrative medications, ancillary

5    services, and urine drug testing.

6    21.    In conspiring with the Drobots, Dr. Bernadett and their associated

7    entities to accomplish these schemes, each of the Defendants violated, among other

8    laws, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et*

9    *seq.* ("RICO") with their many predicate acts.

10    D.    **Connections Between the Surgical and Pharmacy Enterprises**

11    22.    Defendants, Drobots, and Dr. Bernadett, as well as their associated

12    entities and co-conspirators, acted together with a common purpose to obtain more

13    money from State Fund than was rightfully owed.  While the Surgical Entity

14    Enterprise and Pharmacy Entity Enterprise provided somewhat different services to

15    workers' compensation claimants, both Surgical and Pharmacy Entities were

16    connected through a well-orchestrated kickback scheme and aimed to defraud State

17    Fund through fraudulent billing practices.  The Drobots and Dr. Bernadett often

18    coordinated their activities through the Administrative Entities.

19    23.    Among other things, PSPM entered into contracts with medical groups

20    and providers, including some Defendants (and medical provider co-conspirators

21    named as defendants in *State Fund v. Drobot Sr. et al.*) and also provided

22    information technology support.  FMM acted as an out-sourced human resources

23    department for the Surgical and Pharmacy Entities, supplying employees, generating

24    payroll, and providing information technology services.  FMM and PSPM both

25    facilitate the payment of illegal kickbacks by controlling the flow of human as well

26    as monetary capital between the Surgical and Pharmacy Entity Enterprises.

27

28

24.     Coordination between and among the entities was used to increase profits and ensure a steady stream of income to the conspirators and entities at the expense of workers' compensation insurers and employers.  The document shown below, produced by Essence Group Holdings, Inc., a company in which Drobot Sr. invested and which acquired pharmaceutical repackaging companies DRx and Wellinx, demonstrates the interconnected fee-splitting arrangement among the conspirators, including Defendants.



25.     This suggests that PSPM was to act as the management company for both CPM/IPM and Pacific Hospital, coordinating the efforts of CPM/IPM and Pacific Hospital and facilitating payments to "MDs" of $20,000 per month or more and splitting profits with them.  The goal of the overarching enterprise was to increase the number of patients flowing through this connected group of co-conspirators and to thereafter submit fraudulent bills to State Fund in connection with the medical services provided to them (often those services offering the highest profit margins).  The entity co-conspirators and Defendants pursued and accomplished their goals under the direction of the Drobots using a variety of methods: inflating bills (sometimes through "middleman" or shell companies),

- 12 -

1    concealing the true cost and nature of the services or medications provided, and

2    concealing the true nature of their businesses and contractual relationships with

3    medical providers and groups in order to hide their illegal activities.[3]

4              26.    As a specific example of PSPM's control over the practices of

5    contracting physicians (and corporate practice of medicine), PSPM wrote a letter to

6    doctors in 2006 reminding them that PSPM controlled all referrals from the doctors,

7    including surgeries, pain management, pharmaceuticals, and psychiatric evaluations.

8    The letter explicitly states that "[a]ccording to our management agreement all

9    referrals from your office are to be coordinated by PSPM."  PSPM then went on to

10   specifically demand referrals for: pain management physicians, psychological and

11   psychiatric consultations, MRIs, and durable medical equipment.  The paragraph on

12   psychological and psychiatric consultation referrals demands that all referrals be

13   "through PSPM to Dr. Zubrick," no matter the patient's wishes nor the physician's

14   judgment, because referring to other specialists "severely reduces the revenue from

15   our management contracts."  The letter makes clear that PSPM "need[s] this revenue

16   in order to survive and [ ] must take an aggressive approach to ensure [PSPM]

17   capture[s] all revenues that are available."

18             27.    The letter, signed by Drobot Sr., also directs the physician to complete

19   "an accounts receivable purchase agreement" in order for CPM to be able to collect

20   payments from State Fund under its own tax identification number for

21   pharmaceuticals prescribed through its in-office physician dispensing programs.

22   Then, despite instructing physicians to sign those purchase agreements, PSPM

23   ────────────────────

24   [3] The document also references "DME" and "MRI."  In his deposition on
     October 24, 2014, Matthew Umbs—Pharmacy Entities' CFO and/or economic

25   consultant—testified that another Drobot Jr. entity, Advanced Pharmacy Services,
     received "commissions" from durable medical equipment ("DME") companies in

26   connection with DME sales to certain customers.  Drobot Sr. also has a DME
     company, PSPM-DME, Inc., to which State Fund has paid over $4 million.  In his

27   Plea Agreement, Drobot Sr. admitted to paying kickbacks for DME and MRIs.  Plea

28   Agreement at 15.

assures physicians that "we can proceed as normal to collect a significant amount of receivable from State Fund" and that nothing would change from the existing management agreements in which physicians were to receive a percentage of the collections.  The letter asks the physician to fax the sham agreement to Drobot Jr.'s attention, and closes with an exhortation to "Help Us Keep The Pharmacy Alive."

28.    In another example of PSPM's control over the physicians' practices, Drobot Sr. sends an email on January 4, 2010 to Defendant Dr. Mulvania, who had a dispensing agreement with IPM, stating "PSPM cannot survive without a reduction in expenses . . . what we need to accomplish with your office is the elimination of paying your PA and your malpractice insurance.  This is a $20,000 per month reduction in our costs and a $20,000 increase in yours."  Thus, the physician assistants ("PAs") who often prescribed medications under CPM/IPM's dispensing agreements with medical providers were, on information and belief, hired and paid by PSPM or FMM.

29.    To assist in coordinating the scheme, the Drobots, Pharmacy Entities, and Surgical Entities share the same offices, the same addresses, and the same personnel.  For example, in a prior case, Drobot Jr. submitted a sworn declaration admitting that: "CPM does not employ or pay pharmacy technicians.  The pharmacy technicians are obtained through a third-party registry, First Medical Management ("FMM"), owned by Michael Drobot, Sr., my father."[4]  The coordination and oversight of the Drobots, along with Dr. Bernadett, facilitated the conspirators' efforts towards the common goal of defrauding State Fund.  The Drobots and Dr. Bernadett helped ensure the participation of medical providers and groups, including Defendants, in the fraud schemes and coordinated the payment of illegal kickbacks, referral fees, and fee-splitting arrangements between medical providers

---

[4] Declaration of Michael Drobot in Support of Special Motion to Strike Complaint ¶ 9, *Zenith Ins. Co. v. CPM*, Los Angeles Superior Court, Case No. BC406917.

1 and groups and marketers and other referrals sources (including Defendants), and

2 the Entity Conspirators.

3        30.    Moreover, corporate formalities were often ignored by the Entity

4 Conspirators.  For example, in a series of emails produced by Seaspine, Inc., a

5 "Staff Accountant" for PSPM represented International Implants in communications

6 to Seaspine, Inc., using a "@healthsmartcorp.com" email address.[5]  Then, only a

7 few months later, the same employee represented International Implants as a "Staff

8 Accountant" for FMM, using the same email address.

9        31.    Similarly, Vonda Ray, another FMM employee, simultaneously

10 represented IPM, CPM, LBPP, and Advanced Practice Services (another entity

11 owned by Drobot Jr.), as shown in an email produced by the defendants in *State

12 Fund v. Drobot Sr., et al.*

13        32.    Thus, FMM and PSPM, as with other entities run by the Drobots, were

14 conduits for the conduct of the other entities and individuals in the Surgical and

15 Pharmacy Entity Enterprises.[6]

16        33.    Furthermore, the Surgical and Pharmacy Entities are connected through

17 the Drobots, all of whom were involved in both enterprises.  The Drobots admit that

18 Drobot Sr. concurrently owned and managed the Surgical Entities and the Pharmacy

19 Entities at least until 2010.  While Drobot Sr. owned the Pharmacy Entities, Drobot

20 Jr. ran them, serving as Chief Operating Officer of CPM and IPM since around the

21 _____

22        [5] On information and belief, Healthsmart Corporation was the "corporate
23 umbrella" or "corporate office" under which other Drobot-controlled entities were
   created and/or managed, including CPM and IPM.  In 2001, Healthsmart
24 Corporation changed its name to First Medical Staffing, Inc., and in 2002, the name
   was changed to First Medical Management, Inc.  Thus, California Secretary of State
25 records suggest that Healthsmart Corporation and FMM are the same entity.

26        [6] In his deposition on October 15, 2014 in *State Fund v. Drobot Sr., et al.*,
27 Drobot Sr. invoked his Fifth Amendment right against self-incrimination nearly
   every time he was questioned about the conduct of PSPM and FMM, resulting in
28 over fifty invocations during his deposition on topics relating to PSPM and FMM.

1   time of their formation in 2002 and 2003, respectively.  On information and belief,

2   Drobot Jr. also served as President of CPM at least as early as 2006.  According to

3   CPM and IPM, Drobot Sr.'s ownership interests in CPM and IPM were transferred

4   to Drobot Jr. in 2010.

5          34.     Drobot Jr. was also involved in the Surgical Entity Enterprise.  For

6   example, documents produced in *State Fund v. Drobot Sr., et al.* show Drobot Jr.

7   facilitating the referral of patients to Pacific Hospital while encouraging doctors to

8   contract with CPM/IPM.  In an email to Defendant Dr. Richard Mulvania dated

9   November 10, 2010, Drobot Jr. states, "attached above you will find the original 4

10  Spine cases that I faxed… with a confirmed delivery notice.  Like the 5 I gave you

11  today, please do what you can to make sure that the cases go to Pacific if there is a

12  need for surgery.  If you engage [IPM] again I believe I can send 10-15 of these a

13  month."  Two days later the spinal surgeon responds to Drobot Jr., declining to

14  engage IPM despite Drobot Jr.'s promise that IPM would "guarantee" a minimum

15  payment of $40,000 for the surgeon's pharmaceutical business, but assuring, "[o]n

16  the patients you referred, if you still want me to see them, I will be sure to do

17  surgery at Pacific Hospital if they come to surgery."  Drobot Jr. replies, "please see

18  them and send them to Pacific."

19         35.     Similarly, other emails show Drobot Jr. facilitating the payment of

20  monthly "rent" to Dr. Jacob Tauber, a physician who referred patients to Pacific

21  Hospital, pursuant to what appears to be a sham sublease agreement between the

22  physician and PSPM (an agreement signed by Drobot Sr.).  The documents further

23  suggest that Drobot Jr. arranged for monthly payments of at least $15,000 to be

24  made to Dr. Tauber for his pharmaceutical referrals under a purported dispensing

25  agreement with CPM.  When asked about the purported "rent" payments to this

26  physician, Drobot Jr.'s role in facilitating those payments, and CPM's dispensing

27  agreement with the physician, Drobot Sr. invoked his Fifth Amendment right

28  against self-incrimination and refused to respond.

36.     Furthermore, according to Pacific Hospital testimony during a Rule 30(b)(6) deposition on September 26, 2014, Drobot Jr. also worked at Pacific Hospital in the Purchasing Department for at least some period of time, focusing on the supply chain "because that was his specialty."  According to this testimony, this department was responsible for negotiating purchases and discounts of "every supply that's used in the hospital."  Drobot Sr. himself confirmed during his deposition on October 15, 2014 that Drobot Jr. worked for Pacific Hospital, including that he negotiated some contracts on behalf of the hospital.

37.     Drobot Jr. also had a Pacific Hospital email address (*i.e.*, michaelr.drobot@phlb.org) and a Healthsmart Corporation email address (*i.e*., michaelr.drobot@healthsmartcorp.com).

38.     Additionally, around 2011, Drobot Jr. started Advanced Lab-Services, Inc. ("Advanced Lab"), which billed State Fund for lab services performed on patients of physicians who had agreements with one of the Pharmacy Entities and/or patients who were scheduled for surgery at Pacific Hospital or treatment at Long Beach Pain.  Another Drobot Jr. entity, Advanced Practice Services, coordinated the lab services for the physicians.  When the Pharmacy Entities' CFO, Matthew Umbs, was questioned about these entities during his deposition on October 24, 2014, counsel for the Pharmacy Entities instructed him not to answer.

39.     The Drobots, Dr. Bernadett, and their associated entities were further joined in these schemes by Defendants and other health care providers and their associated entities, who have been named as defendants in *State Fund v. Drobot Sr.*, *et al*.  They are Dr. Jack H. Akmakjian; Jack H. Akmakjian, M.D., Inc.; Dr. Gerald Alexander; Dr. Ian Armstrong; Ian I.T. Armstrong, M.D., Inc.; Michael E. Barri, D.C.; Dr. Mitchell G. Cohen; Mitchell G. Cohen, M.D., Inc.; Dr. Timothy Hunt; Allied Medical Group, Inc.; Alan C. Ivar, D.C.; Griffin Medical Group, Inc.; South Coast Rehabilitation Center, Inc.; Edward Komberg, D.C.; Dr. Philip A. Sobol; Sobol Orthopedic Medical Group, Inc.; Dr. Randy Rosen; Dr. Lokesh S. Tantuwaya;

1  Dr. Lokesh S. Tantuwaya M.D., Inc.; Dr. Jacob Tauber; Jacob E. Tauber, M.D., a
2  Professional Corporation; and Dr. Assad Michael Moheimani (collectively, the
3  "Provider Co-Conspirators").

4      40.    Thus, the conspirators are connected through a vast network of entities
5  owned or controlled by the Drobots and Dr. Bernadett.  State Fund records indicate
6  that over 8,700 claims submitted to State Fund for reimbursement involve at least
7  one Surgical Entity and one Pharmacy Entity, further indicating a connected flow of
8  patients between and among these conspiring groups.

9      E.    **Defendants' Knowing Agreement to and Participation in the**
10           **Enterprises**

11     41.    Defendants knowingly facilitated the schemes of the Drobots and
12  Dr. Bernadett, the Entity Conspirators, and the Provider Co-Conspirators
13  (collectively, "Conspirators").  Defendants did so by accepting illegal kickbacks and
14  referral fees (both for referring patients to the Pharmacy Entities and for performing
15  or referring surgeries and other medical services at or to the Surgical Entities and
16  other preferred facilities), allowing the operation of illegal pharmacy operations in
17  their offices, allowing their names and signatures to be used in bills submitted to
18  State Fund, entering into sham agreements, and providing the medical and surgical
19  services or prescriptions underlying the bills to State Fund with knowledge of the
20  nature of the Conspirators' activities, with the intent to facilitate those illegal
21  activities, and with knowledge and expectation that the fraudulent insurance bills for
22  medical and surgical goods and services provided to these patients would be sent
23  either on paper through the United States mail or electronically through interstate
24  wire.  Defendants also signed bills and reports containing certifications, either
25  explicit or implicit, that the bills and reports submitted were not the product of fraud
26  or illegal referral and kickback fees, and/or did not contain material omissions.
27  These certifications were false, as each Defendant accepted illegal kickbacks from
28  the Conspirators and/or was aware that such bills and reports were the product of

1  fraud or illegal referral and kickback fees.  Defendants had knowledge or
2  expectation that the bills and reports containing these certifications and/or omitting
3  material facts would be sent either on paper through the United States mail or
4  electronically through interstate wire.

5       42.    Many Defendants, including Khalid Ahmed, Daniel Capen, Catalino
6  Dureza, Ismael Silva, Andrew Jarminski, John Larsen, Richard Mulvania, and
7  Hamid Rahman, also signed sham "lien purchase agreements" in 2006 and 2007
8  purporting to sell their pharmaceutical accounts receivables or "liens" to the
9  Pharmacy Entities so that the Pharmacy Entities could collect on the bills they
10 submitted to State Fund.  These defendants did so with knowledge that these
11 agreements would be provided to State Fund to induce State Fund to pay Pharmacy
12 Entities.  In reality, however, the Pharmacy Entities promised Defendants that
13 nothing would change as a result of their signing the "lien purchase agreements"
14 required by State Fund and assured Defendants that the illegal fee-splitting
15 arrangements would remain in place.  Financial documents produced in *State Fund*
16 *v. Drobot Sr., et al.* confirm that, indeed, the lien purchase agreements did not
17 change the financial arrangements between the Pharmacy Entities and Defendants.

18      43.    Defendant Progressive Orthopedic Solutions, LLC, a "marketing"
19 entity, knowingly facilitated the schemes of the Conspirators by negotiating for and
20 accepting illegal kickbacks and referral fees for steering patients to medical facilities
21 owned or managed by the Conspirators.  It did so with knowledge of the nature of
22 the Conspirators' activities, with the intent to facilitate those illegal activities, and
23 with knowledge and expectation that that the fraudulent insurance bills for medical
24 and surgical goods and services provided to these patients would be sent either on
25 paper through the United States mail or electronically through interstate wire.

26      44.    State Fund brought this action to recoup payments it made to the
27 Surgical and Pharmacy Entities, Defendants, and other conspirators, whom with
28 Defendants' knowing assistance and facilitation, concealed the system of illegal

1   kickbacks, fee-splitting, corporate practice of medicine, and other misconduct, as

2   described below, and to prevent future fraudulent activity by the Drobots and their

3   co-conspirators, Defendants and others.

4         F.    **The Drobots, Dr. Bernadett, Entity Conspirators and Control**

5             **Allegations**

6       45.    Drobot Sr.'s links to, and control of, the relevant entities and other

7   conspirators are set forth in detail below, as demonstrated in part through public

8   records, including California Secretary of State records.

9       46.    Drobot Jr. is the son of Defendant Drobot Sr.  His links to, and control

10   of, the relevant entities and other conspirators are also set forth in detail below, as

11   demonstrated in part through public records, including California Secretary of State

12   records.

13       47.    Dr. Faustino Bernadett is an anesthesiologist and pain management

14   specialist who has a long-standing relationship with Drobot Sr. and Drobot Jr.  His

15   links to, and control of, the relevant entities and other Defendants are set forth in

16   detail below, as demonstrated in part through public records, including California

17   Secretary of State Records.  In short, Dr. Bernadett was intimately involved in the

18   conduct alleged in this Complaint.  For example, an April 2010 email produced in

19   *State Fund v. Drobot Sr., et al.* establishes his knowledge of kickback payments to

20   physicians, including Defendants in this case, in connection with spinal surgeries,

21   including one agreement with Dr. Jack Akmakjian (a defendant in *State Fund v.*

22   *Drobot Sr., et al.*) that provided for a payment of $15,000 per surgery, paid only if

23   Dr. Akmakjian used International Implants devices.  A November 2009 email shows

24   his involvement in a conversation about which of the Entity Defendants would pay

25   15% "collection fees" to Alan Ivar for surgeries he referred that used International

26   Implants hardware.  And a July 2008 email produced in this matter shows that Dr.

27   Bernadett was aware of and facilitated payments to medical providers through IPM.

28

1        48.    Healthsmart's principal place of business was at 2776 Pacific Avenue,

2  Long Beach, CA 90806.  In 1996, Drobot Sr. signed the Certificate of Amended

3  Incorporation of Healthsmart, filed with the California Secretary of State on

4  December 24, 1996, as its President, and in 1997, filed a Certificate of

5  Determination for Healthsmart, as Chairman of the Board and President (filed with

6  the California Secretary of State on March 18, 1997).  In the most recent Statements

7  of Information on file with the California Secretary of State, Drobot Sr. was listed as

8  Chief Executive Officer and a Director of Healthsmart.

9        49.    Pacific Hospital was at all relevant times a for-profit hospital that

10  specialized in surgeries in general, and orthopedic and spinal surgeries in particular,

11  with its principal place of business also at 2776 Pacific Avenue, Long Beach, CA

12  90806, up until its assets were purportedly sold around October 2013.  *See* the above

13  paragraph regarding Drobot Sr.'s control of the Healthsmart entity which, on

14  information and belief, mirrored that of Pacific Hospital.  Further, Pacific Hospital

15  filed a corporate disclosure statement in *State Fund v. Drobot Sr., et al*., listing

16  Abrazos Healthcare, Inc. ("Abrazos") as the parent corporation; California Secretary

17  of State records indicate that Abrazos is located at 20377 SW Acacia Street,

18  Newport Beach, CA 92660, which is the headquarters for the Pharmacy Entities

19  described below.  Drobot Sr. is listed as the principal of Abrazos.  The disclosure

20  statement also references Mickey Medical, Inc. as the holding company of Abrazos;

21  California Secretary of State records list Mickey Medical, Inc. as having the same

22  Acacia Street address, with Drobot Sr. as the principal.  Pacific Hospital also

23  occupied 1740 Pacific Avenue, Long Beach, CA 90813, which was owned by

24  Mickey Motors, LLC up until August 2013.  Secretary of State records reflect that

25  Drobot Sr. is the manager of Mickey Motors, LLC.

26        50.    According to financial statements and testimony obtained during

27  discovery in *State Fund v. Drobot Sr., et al*., Pacific Hospital was owned until 2004

28  by (1) a revocable trust established by Drobot Sr.; (2) Healthsmart MSO, an entity

affiliated with Drobot Sr. through direct and indirect ownership interests; and (3) a number of physicians.  In 2004, Pacific Hospital repurchased the shares of common stock held by physicians and was then fully owned by entities owned or controlled by Drobot Sr.  In August 2005, through a complicated purchase transaction, Abrazos became either the sole or majority shareholder of Pacific Hospital (according to financial statements, Abrazos was the sole shareholder; according to testimony from Dr. Bernadett, Drobot Sr. maintained an ownership interest in Pacific Hospital).  At that time, Abrazos was owned by Dr. Bernadett or by entities or trusts that he owned or controlled, although Defendant Dr. Daniel Capen later acquired a 10 percent interest in Abrazos.  In October 2010, the Bernadett Family Trust, the majority shareholder in Abrazos, sold its 90% ownership interest in Abrazos to Michael D. Drobot Revocable Trust and Mickey Medical, Inc., an entity owned by Drobot Sr.

51.     During the time period in which Abrazos was the sole or primary shareholder of Pacific Hospital (and prior to and after the acquisition of Abrazos by Mickey Medical), Drobot Sr. continued to operate as Pacific Hospital's Chief Executive Officer, and maintained significant financial interests in, and control over, Pacific Hospital.  For example, at the time of the Abrazos acquisition, Pacific Hospital executed promissory notes payable over several years to repurchase Drobot Sr.'s common stock in Pacific Hospital.  Also, until December 31, 2009, Future Opportunities, LLC, an entity owned by Drobot Sr.'s revocable trust and the Bernadett Family Trust, provided Pacific Hospital with a revolving line of credit of $8,500,000.  At the close of 2010, Pacific Hospital had a note payable to Future Opportunities of more than $7 million.  Pacific Hospital was also involved in many other related-party transactions with companies owned and/or controlled by Drobot Sr. during this time period.

52.     Many of the employees of Healthsmart and Pacific Hospital were supplied by FMM and many of the properties occupied by Pacific Hospital were purportedly leased by PSPM.  Indeed, documents produced in *State Fund v. Drobot*

1   *Sr., et al.* reveal significant payments made from Pacific Hospital to FMM and

2   PSPM.

3         53.    Long Beach Pain, on information and belief, was physically located at

4   2760 Pacific Avenue, Long Beach, CA 90806 (the same block as Pacific Hospital),

5   and, on information and belief, is associated with Pacific Hospital in terms of patient

6   referrals, doctor privileges, and industry publications.  According to California

7   Secretary of State records, Long Beach Pain headquarters are *also* located at 20377

8   SW Acacia Street, Newport Beach, CA 92660.  According to a Statement of

9   Information on file with the California Secretary of State filed May 18, 2012,

10  Drobot Sr. is listed as Chief Executive Officer, Secretary, and a director of Long

11  Beach Pain.  Further, Long Beach Pain has filed a corporate disclosure statement in

12  this Court noting that PSPM is its parent corporation.  At least until October 2010,

13  Long Beach Pain Center was 100% owned by the Bernadett Family Trust.  As of

14  December 31, 2010 and 2009, Pacific Hospital had an outstanding balance due from

15  Long Beach Pain of approximately $7,556,000 and $5,950,000, which represented

16  "Pain Center patient receivables" purportedly owned by the Hospital pursuant to a

17  "management agreement."

18        54.    International Implants is *also* located at 20377 SW Acacia Street,

19  Newport Beach, CA.  The involvement of International Implants is laid out in the

20  Plea Agreement for Drobot Sr., *USA v. Drobot*, No. 8:14-cr-00034-JLS-DOC-7 at

21  14-16 (C.D. Cal. Feb. 21, 2014).  International Implants was owned and controlled

22  by Drobot Sr. according to the Plea Agreement, and, on information and belief, was

23  not only staffed with employees from FMM, but was also involved with PSPM

24  (both Drobot Sr.-controlled entities).  In particular, according to the 2009 and 2010

25  financial statements of Abrazos, International Implants was 100% owned by SI

26  Venture Partners, LLC, which in turn was owned 47.5% by Drobot Sr., 47.5% by

27  PSPM (which in turn was majority owned by the Bernadett Family Trust and by

28  Drobot Sr.), and 5% by the Chief Compliance Officer of the Hospital.

55.    At the time the original Complaint was filed in *State Fund v. Drobot Sr., et al.*, IPM's website stated that it helps dispense medications to patients in doctor's offices, and, according to California Secretary of State records, was *also* located at 20377 SW Acacia Street, Newport Beach, CA, although it states that IPM also has a sales office located in Baltimore, Maryland.  IPM also leased property from Mickey Motors, LLC through at least 2013, while Drobot Sr. served as manager of Mickey Motors, LLC.  In the Statement of Information filed with the California Secretary of State on September 7, 2007, Drobot Sr. was listed as the sole manager for IPM.  In its May 31, 2011 Statement of Information, Drobot Jr. was listed as the sole manager.  Drobot Jr. acted as an officer of IPM since around the time of its formation in 2003.  IPM was also staffed with employees from FMM.

56.    CPM underwent a merger in or around 2010 and became IPM, on information and belief.  Following the merger, CPM was no longer a valid California entity and had no right to conduct business, on information and belief.  CPM nonetheless continued to bill State Fund for prescription medications well into 2012.  According to California Secretary of State records, CPM is (or was) *also* located at 20377 SW Acacia Street, Newport Beach, CA 92660.  In the Certificate of Merger on file with the California Secretary of State, dated January 28, 2010 but filed August 17, 2010, Drobot Sr. signed as the manager of both the surviving entity (IPM) *and* the disappearing entity (CPM).  Drobot Jr. served as Chief Operating Officer of CPM since around the time of its formation in 2002.  Drobot Jr. also served as President of CPM at least as early as 2006.  Drobot Jr.'s role included, for example, representing CPM at a Public Hearings before the State of California Department of Industrial Relations (*see* Transcript of Public Hearing at 74-76, Workers' Compensation Proposed Regs., Official Medical Fee Schedule – Pharmaceuticals, Oct. 31, 2006) and negotiating and entering contracts on behalf of CPM.  According to Drobot Sr.'s deposition testimony, Drobot Jr. "ran the operation on a day-to-day basis underneath [Drobot Sr.'s] direction," including entering into

5018471

COMPLAINT OF PLAINTIFF STATE FUND

1  contracts on behalf of CPM.  Furthermore, both Drobots simultaneously held an

2  ownership interest in CPM before it merged into IPM.  Drobot Sr.'s ownership

3  interests in CPM were transferred to Drobot Jr. in 2010.  CPM was also staffed with

4  employees from FMM.

5       57.     According to California Secretary of State records, Coastal's principal

6  executive office is *also* located at 20377 SW Acacia Street, Newport Beach, CA

7  92660, with an additional street address of 2632 Pacific Avenue in Long Beach.  In

8  the most recent Statement of Information with the California Secretary of State

9  (October 29, 2010), Drobot Jr. is listed as the Chief Executive Officer, Chief

10  Financial Officer and a director of Coastal.  Coastal also leased property from the

11  Drobot Sr.'s entity Mickey Motors, LLC, through at least mid-2013.

12       58.     According to California Secretary of State records, MMG is *also*

13  located at 20377 SW Acacia Street, Newport Beach, CA 92660.  In MMG's Articles

14  of Incorporation, filed with the California Secretary of State on March 21, 2011,

15  Drobot Jr. is listed as the initial agent for service of process, and in the Statement of

16  Information filed on April 13, 2011, Drobot Jr. is listed as the sole manager for

17  MMG.  On information and belief, MMG was also staffed with employees from

18  FMM.

19       59.     PSPM's principal place of business is also at 20377 SW Acacia Street,

20  Newport Beach, CA 92660.  PSPM is the parent entity of Long Beach Pain and

21  holds a significant ownership interest in International Implants.  In PSPM's Articles

22  of Incorporation, filed with the California Secretary of State on May 1, 1998, Drobot

23  Sr. is listed as the initial agent for service of process, and on PSPM's Statement of

24  Information filed on May 31, 2011 Drobot Sr. is the only officer listed (the

25  subsequent Statement of Information filed on May 19, 2013 indicates that there was

26  no change in the preceding statement).  According to financial statements produced

27  in *State Fund v. Drobot Sr., et al.* from August 31, 2005 to January 1, 2008, PSPM

28  was 47% owned by the Bernadett Family Trust, 36% owned by Drobot Sr., and 17%

owned by "three other parties affiliated with the Company."  In 2007 and 2006 alone, PSPM received approximately $5,350,000 and $4,300,000, respectively, for purported "management services" provided to Pacific Hospital's orthopedic surgery program.  As described below, on information and belief, the Drobots and Dr. Bernadett used PSPM to enter into fraudulent agreements with medical providers and medical groups, including, but not limited to, option and rental agreements, in order to conceal the payment of kickbacks for the medical providers' participation in the Defendants' fraud schemes.  Upon information and belief, PSPM was the alter ego of the Drobots and Dr. Bernadett and a conduit of CPM, IPM, Healthsmart, International Implants, and LB Pain.

60.     FMM is *also* located at 20377 SW Acacia Street, Newport Beach, CA 92660.  According to Secretary of State records, FMM was formerly First Medical Staffing, Inc., which was formerly Healthsmart Corporation.  Drobot Sr. signed as the President and Secretary of FMM on the October 9, 2002 Certificate of Amendment to the Articles of Incorporation.  The April 15, 2014 Statement of Information for FMM indicates that Drobot Sr. is the Chief Executive Officer, Randolph Taylor is the Secretary, and G. William Hammer is the Chief Financial Officer of FMM.  FMM entered into various agreements with the Pharmacy Entities and Surgical Entities, pursuant to which they, among other things, supplied employees to those entities.  Moreover, according to the recent deposition testimony of Matthew Umbs, FMM not only supplied employees, but it also provided information technology services to the Pharmacy and Surgical Entities.  Upon information and belief, FMM was the alter ego of the Drobots and a conduit of the other Drobot-controlled entities.

61.     Collectively, these entities are referred to herein as the "Entity Conspirators."

62.     The overlap in ownership, officers, personnel, management, addresses, and operations demonstrate that the Entity Conspirators and the Drobots—along

1  with Dr. Bernadett—are alter egos of each other.  Corporate formalities were often

2  ignored.  On information and belief, many of the entities did not maintain corporate

3  meeting minutes or regularly elect directors.  Furthermore, the Drobots and Dr.

4  Bernadett acted with disregard for the separate nature of each entity.  On

5  information and belief, the Drobots owned and/or controlled several other entities

6  that similarly functioned as mere conduits through which the overall scheme was

7  implemented.  The Drobots' network of shell companies ensured that their unlawful

8  acts remain hidden and victims and the courts are unable to easily identify the

9  responsible party or track the flow of money.

10  **II.    THE PARTIES**

11        A.    **Plaintiff**

12        63.    State Fund is a self-supporting, non-profit public enterprise fund that

13  was established by the California Legislature pursuant to California Insurance Code

14  §§ 11770 *et seq.*  State Fund provides workers' compensation insurance to

15  California employers with no financial obligation to the public and is the largest

16  provider of workers' compensation insurance in California.

17        B.    **Defendants**

18        64.    **Dr. Capen.**  Defendant Dr. Daniel Capen is, on information and belief,

19  a resident of Los Angeles County, CA.  He is an orthopedic spine surgeon who has

20  had a longstanding relationship with the Drobots and Dr. Bernadett.  He held a

21  financial ownership interest in Abrazos Healthcare, Inc., the parent company of

22  Healthsmart, until the sale of Pacific Hospital in October 2013.  Dr. Capen

23  performed spinal surgeries at Pacific Hospital, using hardware ordered from

24  International Implants and other co-schemers' companies, that were billed to State

25  Fund both by Pacific Hospital and by Dr. Capen.  Dr. Capen performed and billed

26  for such surgeries starting no later than 2004 and ending no earlier than 2012.

27  Dr. Capen also referred patients for surgeries to be performed at Entity Conspirator

28  Long Beach Pain.  Dr. Capen received illegal kickback payments from the Entity

1   Conspirators and/or other co-conspirators for these surgeries and referrals, and for

2   using International Implants hardware, and knowingly received patient referrals

3   from marketers who were paid kickbacks for those referrals.  Two examples of

4   surgeries performed at Pacific Hospital by Dr. Capen using devices from

5   International Implants, and billed to State Fund, are included in Exhibit 1.

6          65.    Dr. Capen also had agreements with CPM and IPM, including a 2009

7   IPM "Financial Asset Agreement," a 2006 CPM "Medical Lien Purchase &

8   Financial Services Agreement," and a 2008 IPM "Physician Office Dispensing

9   Program Management Agreement Oral and Compounded Medications."  Under

10  these agreements with CPM and IPM, Dr. Capen knowingly allowed the Drobots to

11  control and operate illegal pharmacy operations out of his practices in exchange for

12  payments.  CPM and IPM, with Dr. Capen's cooperation, billed large volumes of

13  pharmaceuticals to State Fund at prices greatly in excess of actual cost, beginning no

14  later than 2005 and ending no earlier than 2012.[7]  Dr. Capen was paid kickbacks for

15  referring patients to the pharmacies, for referring patients to Pacific Hospital or

16  other preferred facilities including but not limited to Long Beach Pain, and for using

17  certain hardware distributors and suppliers, including International Implants.  He

18  also signed bills and reports (and/or allowed the Entity Conspirators to sign bills on

19  his behalf), which were submitted to State Fund, and which contained certifications,

20  either explicit or implicit, that the bills and reports submitted were not the product of

21

22

_____

23        [7] The dates provided here, and in subsequent paragraphs discussing billing by
    the Pharmacy Entities with the cooperation of the various Defendants, are not
24  intended to delimit entirely the period in which Defendants facilitated or engaged in
    fraudulent billing by or with the Pharmacy Entities.  Instead, these dates reflect the
25  dates of the *initial* billings identified in financial records produced by Pharmacy
    Entities in this matter.  Those records may not be complete, and additional
26  fraudulent billing occurred after the initial bills were sent.  Additionally, payments
    by State Fund on such fraudulent bills occurred subsequent to the billings
27  themselves.

28

1  fraud or illegal referral and kickback fees, and/or did not contain material

2  misrepresentations or omissions.

3        66.    Since the filing of State Fund's original complaint, Dr. Capen has been

4  indicted on charges of receiving kickbacks for prescribing compound medications in

5  excess of $2,500,000, accepting rebates for patient referrals, and filing false claims

6  with numerous insurers including State Fund in connection with a separate scheme

7  organized by Kareem Ahmed.  *State of California v. Charbonnet*, Case No.

8  14ZF0334 (Cal. Sup. Ct. June 17, 2014).

9        67.    Dr. Capen practiced at Defendant Southwestern Orthopedic Medical

10 Corp. d/b/a Downey Orthopedic Medical Group ("Downey Ortho") where

11 Defendants Dr. Catalino Dureza, Dr. John Larsen, Dr. Richard Mulvania,

12 Dr. Andrew Jarminski, Dr. Russell Nelson, and co-conspirator Dr. Faustino

13 Bernadett also practiced.  Downey Ortho is located at 7700 Imperial Hwy., Ste. R,

14 Downey, CA 90242.  This practice was "managed" by PSPM.  Dr. Capen also

15 practiced at Defendant Southwestern Orthopedic Medical Corp. d/b/a Channel

16 Islands Orthopedic ("Channel Islands") where Defendants Dr. Jarminski and

17 Dr. John Larsen also practiced.  Channel Islands is located at 1700 Lombard St., Ste.

18 110, Oxnard, CA 93030.  Dr. Capen also practiced at Provider Co-conspirator Allied

19 Medical Group, Inc. ("Allied"), located at 15901 Hawthorne Blvd., Ste. 250,

20 Lawndale, CA 90260 and 4237 Atlantic Ave., Long Beach, CA 90807 with

21 Defendant Dr. Jarminski and Provider Co-conspirator Dr. Timothy Hunt.  He also

22 practiced at Intercommunity Medical Group ("Intercommunity"), which, upon

23 information and belief, is now dissolved, with Defendant Drs. Jarminski and Larsen

24 and Provider Co-conspirator Dr. Gerald Alexander.  Dr. Capen knowingly submitted

25 fraudulent bills to State Fund through Defendants Downey Ortho, Channel Islands,

26 Provider Co-conspirator Allied, Daniel Capen MD, a Professional Corporation, and

27 Westlake Surgical Medical Associates, Inc., which, according Secretary of State

28

1  records, is located at 20377 SW Acacia St., Ste. 110, Newport Beach, CA 92660
2  along with most of the Entity Conspirators.

3      68.     Dr. Capen received referrals of patients for services to be performed by
4  him at Pacific Hospital from numerous sources, including Provider Co-conspirators
5  Dr. Randy Rosen, Dr. Philip Sobol, and Dr. Timothy Hunt, co-conspirator Jason
6  Bernard, and Defendant Jeffrey Catanzarite.  When subpoenaed for documents in
7  *State Fund v. Drobot Sr., et al.*, Dr. Capen refused to produce any documents under
8  his Fifth Amendment Right against self-incrimination.

9      69.     **Dr. Larsen.**  Defendant Dr. John Larsen is, on information and belief, a
10 resident of Los Angeles County, CA.  He is an orthopedic spine surgeon.
11 Dr. Larsen performed spinal surgeries at Pacific Hospital, using hardware ordered
12 from International Implants and other co-schemers' companies, that were billed to
13 State Fund both by Pacific Hospital and by Dr. Larsen.  Dr. Larsen performed and
14 billed for such surgeries starting no later than 2004 and ending no earlier than 2011.
15 Dr. Larsen received illegal kickback payments from the Entity Conspirators and/or
16 other conspirators for these surgeries and for using International Implants hardware.
17 Dr. Larsen entered into multiple agreements with PSPM under which he received
18 illegal kickback payments, including but not limited to an "Asset Purchase
19 Agreement," a "Management Agreement," and a "Sublease Agreement."  Two
20 examples of surgeries performed at Pacific Hospital by Dr. Larsen using devices
21 from International Implants, and billed to State Fund, are included in Exhibit 1.

22     70.     Dr. Larsen also had agreements with CPM and IPM, including a 2006
23 "Medical Lien Purchase and Financial Services Agreement" with CPM, a 2002
24 "Physician Office Pharmacy Program Management Agreement" with CPM, and a
25 2005 "Physician Office Pharmacy Program Management Agreement" with IPM.
26 Under these agreements with CPM and IPM, Dr. Larsen knowingly allowed the
27 Drobots to control and operate illegal pharmacy operations out of his practices in
28 exchange for payments.  CPM and IPM, with Dr. Larsen's cooperation, billed large

1   volumes of pharmaceuticals to State Fund at prices greatly in excess of actual cost,

2   beginning no later than 2005 and ending no earlier than 2010.  Dr. Larsen was paid

3   kickbacks through his agreements with Pharmacy Entities for referring patients to

4   the pharmacies, for referring patients to Pacific Hospital or other preferred facilities,

5   for performing surgeries at Pacific Hospital, and for using International Implants

6   hardware.  He also signed bills and reports (and/or allowed the Entity Conspirators

7   to sign bills on his behalf), which were submitted to State Fund, and which

8   contained certifications, either explicit or implicit, that the bills and reports

9   submitted were not the product of fraud or illegal referral and kickback fees, and/or

10  did not contain material misrepresentations or omissions.

11        71.    Dr. Larsen practiced at Downey Ortho where Defendants Dr. Daniel

12  Capen, Dr. Catalino Dureza, Dr. Richard Mulvania, Dr. Andrew Jarminski,

13  Dr. Russell Nelson, and co-conspirator Dr. Faustino Bernadett also practiced.  He

14  also worked at Channel Islands where Dr. Capen, and Dr. Jarminski also practiced.

15  Dr. Larsen also practiced at Intercommunity with Drs. Capen, Jarminski, and

16  Provider Co-conspirators Drs. Gerald Alexander and Timothy Hunt.  Dr. Larsen

17  submitted fraudulent bills to State Fund through Downey Ortho and Channel

18  Islands, and Defendant John Larsen, MD, a Professional Corporation, which,

19  according to Secretary of State records, is located at 32107 Lindero Canyon Rd.,

20  Ste. 235, Westlake Village, CA 91361.  He also received patient referrals for

21  services to be performed at Pacific Hospital from Provider Co-conspirators Dr.

22  Philip Sobol and co-conspirator Jason Bernard.  When Dr. Larsen was deposed he

23  invoked his Fifth Amendment right against self-incrimination on most subjects

24  relating to the Drobots, Pacific Hospital, and PSPM.

25        72.    **Dr. Jarminski.**  Defendant Dr. Andrew Jarminski is, on information

26  and belief, a resident of Los Angeles County, CA.  He specializes in general surgery

27  and occupational medicine.  Dr. Jarminski received kickbacks from the Entity

28  Conspirators for referring patients to Pacific Hospital or other preferred facilities for

1  spinal surgeries and other services, often using hardware from International
2  Implants or another co-schemer's company, that were billed to State Fund.
3  Dr. Jarminski was often the assistant surgeon for spinal surgeries billed to State
4  Fund.  Dr. Jarminski referred or assisted in, and billed for, such surgeries starting no
5  later than 2005 and ending no earlier than 2012.  Two examples of surgeries
6  performed at Pacific Hospital using devices from International Implants, and billed
7  to State Fund, in which Dr. Jarminski was the assistant surgeon, are included in
8  Exhibit 1.

9       73.    Dr. Jarminski also had agreements with CPM and IPM, including a
10 2010 IPM "Medical Lien Purchase and Financial Services Agreement," a 2007 IPM
11 "Physician Office Dispensing Program Management Agreement," a 2006 CPM
12 "Medical Lien Purchase and Financial Services Agreement," and a 2006 CPM
13 "Physician Office Dispensing Program Management Agreement."  Under these
14 agreements with CPM and IPM, Dr. Jarminski knowingly allowed the Drobots and
15 Dr. Bernadett to control and operate illegal pharmacy operations out of his practices
16 in exchange for payments.  CPM and IPM, with Dr. Jarminski's cooperation, billed
17 large volumes of pharmaceuticals to State Fund at prices greatly in excess of actual
18 cost, beginning no later than 2005 and ending no earlier than 2012.  Dr. Jarminski
19 was paid kickbacks through his agreements with Pharmacy Entities for referring
20 patients to the pharmacies, for assisting in spinal surgeries, and for referring patients
21 to Pacific Hospital or other preferred facilities.  He also signed bills and reports
22 (and/or allowed the Entity Conspirators to sign bills on his behalf), which were
23 submitted to State Fund, and which contained certifications, either explicit or
24 implicit, that the bills and reports submitted were not the product of fraud or illegal
25 referral and kickback fees, and/or did not contain material misrepresentations or
26 omissions.

27       74.    Since the filing of State Fund's original complaint, Dr. Jarminski has
28 been indicted on charges of receiving kickbacks of $1.9 million for prescribing

compound medications, accepting rebates for referrals, submitting false claims to numerous insurers including State Fund, and involuntary manslaughter in connection with a separate scheme organized by Kareem Ahmed. *State of California v. Charbonnet*, Case No. 14ZF0334 (Cal. Sup. Ct. June 17, 2014); *State of California v. Ahmed*, Case No. 14ZF0335 (Cal. Sup. Ct. June 17 2014).

75. Dr. Jarminski practiced at Downey Ortho where Defendants Dr. Daniel Capen, Dr. John Larsen, Dr. Catalino Dureza, Dr. Richard Mulvania, Dr. Russell Nelson, and co-conspirator Dr. Faustino Bernadett also practiced. He practiced at Channel Islands where Dr. Daniel Capen and Dr. John Larsen also practiced. He also practiced at Provider Co-conspirator Allied where Defendant Dr. Capen and Provider Co-conspirator Dr. Timothy Hunt also practiced. Prior to practicing at Allied, he practiced at Intercommunity, with Defendant Drs. Capen and Larsen and Provider Co-conspirators Drs. Hunt and Gerald Alexander. He also worked with Defendant Dr. Thomas Haider at Haider Spine Center Medical Group, Inc. He also worked with Defendant Dr. Richard Mulvania and Provider Co-conspirator Michael Barri at TriStar Medical Group, a Professional Corporation ("Tristar"). He submitted fraudulent bills to State Fund through Downey Ortho, Channel Islands, Provider Co-conspirator Allied, ARJ Medical, Inc., Inland Incare Medical Associates, Inc., and Inland Incare of San Bernardino Medical Group, Inc. Defendants Inland Incare Medical Associates, Inc. and ARJ Medical, Inc. are located, according to Secretary of State records, in Orange County, CA. Defendant Inland Incare of San Bernardino Medical Group, Inc. is located, according to Secretary of State records, at 155 West Hospitality Lane, Ste. 175, San Bernardino, CA, 92408.

76. **Jeffrey Catanzarite, D.C.** Defendant Jeffrey Catanzarite, D.C. is, on information and belief, a resident of Orange County, CA. He is a chiropractor who is the principal at Defendant The Center for Better Health, a Medical Group, Inc. d/b/a Southland Spine and Rehabilitation, Inc. ("Southland Spine"). As numerous

documents produced in *State Fund v. Drobot Sr., et al.* reflect, Catanzarite received kickbacks for referring patients to Pacific Hospital or other preferred facilities for spinal surgeries or other services, often using hardware from International Implants or another co-schemer's company, that were billed to State Fund, and performed by surgeons, among others, who are Defendants in either this matter or *State Fund v. Drobot Sr., et al.* Pacific Hospital billed State Fund for multiple such surgeries, including but not limited to procedures using International Implants hardware in September 2010 and June 2012.

77.   Catanzarite also had numerous agreements with several Drobot-related entities, including conspirators CPM, IPM, and MMG.  These agreements include, but are not limited to, a 2008 IPM "Physician Office Dispensing Program Management Agreement - Oral and Topical Compounds" through Southland Spine; a 2003 CPM "Physician Office Dispensing Program Management Agreement," and a 2011 MMG "Physician Office Dispensing Program Claims Purchase and Assignment Agreement."  Under these agreements, Catanzarite knowingly allowed the Drobots to control and operate illegal pharmacy operations out of his practices in exchange for payments.  CPM and IPM, with Catanzarite's cooperation, billed large volumes of pharmaceuticals to State Fund at prices greatly in excess of actual cost, beginning no later than 2003 and ending no earlier than 2012.  Catanzarite was paid kickbacks through his agreements with Pharmacy Entities for referring patients to the pharmacies and for referring patients to Pacific Hospital or other preferred facilities.[8]  He also influenced and facilitated the submission of fraudulent bills and reports by licensed physicians operating out of the medical practices he owned and operated.  These bills and reports were submitted to State Fund, and contained

---

[8] As discussed below, Catanzarite was also involved with another Drobot Jr. entity that provided toxicology tests, and emails show Drobot Jr. encouraging Catanzarite to perform more tests.  On information and belief, Catanzarite is also the "J.C." referenced as making an unlawful referral to "C.D.," who is believed to be Dr. Catalino Dureza, in Overt Act No. 1 in Drobot Sr.'s Plea Agreement.

5018471

1  certifications, either explicit or implicit, that the bills and reports submitted were not
2  the product of fraud or illegal referral and kickback fees, and/or did not contain
3  material misrepresentations or omissions.

4       78.    Co-conspirator Dr. Jack Akmakjian practiced with Catanzarite out of
5  Southland Spine.  Catanzarite submitted or facilitated the submission of fraudulent
6  bills to State Fund through Southland Spine.  Southland Spine, according to
7  Secretary of State Records, is located at 1520 Nutmeg Place, Ste. 260, Costa Mesa,
8  CA 92626.

9       79.    **Dr. Ahmed.**  Defendant Dr. Khalid B. Ahmed is, on information and
10 belief, a resident of Los Angeles County, CA.  He is an orthopedic spine surgeon.
11 Dr. Ahmed performed spinal surgeries at Pacific Hospital, using hardware ordered
12 from International Implants and other co-schemers' companies, that were billed to
13 State Fund both by Pacific Hospital and by Dr. Ahmed.  Dr. Ahmed performed and
14 billed for such surgeries starting no later than 2004 and ending no earlier than 2008.
15 Dr. Ahmed received illegal kickback payments from Entity Conspirators and/or
16 other conspirators for those surgeries and for using International Implants hardware,
17 and knowingly received patient referrals from, among others, marketers who were
18 paid kickbacks for those referrals.  Dr. Ahmed entered into contracts with PSPM
19 under which he received some of the illegal kickback payments, including a 2005
20 "Management Agreement" and 2008 and 2010 "Option" agreements.  Two
21 examples of surgeries performed at Pacific Hospital by Dr. Ahmed using devices
22 from International Implants, and billed to State Fund, are included in Exhibit 1.

23      80.    Dr. Ahmed also entered into agreements with CPM and IPM, including
24 a 2003 CPM "Physician Office Pharmacy Program Management Agreement" and a
25 2013 IPM "Physician Office Dispensing Program Management Services
26 Agreement."  Under these agreements with CPM and IPM, Dr. Ahmed knowingly
27 allowed the Drobots and Dr. Bernadett to control and operate illegal pharmacy
28 operations out of his practices in exchange for payments.  CPM and IPM, with

1    Dr. Ahmed's cooperation, billed large volumes of pharmaceuticals to State Fund at

2    prices greatly in excess of actual cost beginning no later than 2005 and ending no

3    earlier than 2012.  Dr. Ahmed was paid kickbacks through his agreements with

4    Pharmacy Entities for referring patients to the pharmacies, for referring patients to

5    Pacific Hospital or other preferred facilities, for performing surgeries or other

6    procedures at Pacific Hospital or other preferred facilities, and for using

7    International Implants hardware.  He also signed bills and reports (and/or allowed

8    Entity Conspirators to sign bills on his behalf), which were submitted to State Fund,

9    and which contained certifications, either explicit or implicit, that the bills and

10   reports submitted were not the product of fraud or illegal referral and kickback fees,

11   and/or did not contain material misrepresentations or omissions.

12        81.    Dr. Ahmed owns and operates Defendants Khalid Bashir Ahmed, MD,

13   a Professional Corporation and Defendant Ahmed Pomona Medical Group, Inc.,

14   through which he submitted fraudulent bills for pharmaceutical and surgical services

15   to State Fund and which, according to Secretary of State Records, are located at

16   4511 Rosemead Blvd., Pico Rivera, CA 90660.  Dr. Ahmed has also submitted bills

17   through Defendant Healthpointe Medical Group, Inc. ("Healthpointe"), which is

18   owned and operated by Defendant Dr. Ismael Silva.  On information and belief,

19   Dr. Ahmed also worked with Defendant Dr. Daniel Capen out of a practice located

20   in San Diego, California.  When Dr. Ahmed was subpoenaed for documents in *State*

21   *Fund v. Drobot Sr., et al.*, he objected to the production of certain documents based

22   on his Fifth Amendment right against self-incrimination.

23        82.    **Dr. Chambi.**  Defendant Dr. Israel Chambi is, on information and

24   belief, a resident of Orange County, CA.  On information and belief, he is a

25   neurological surgeon specializing in brain, spine, and nerve surgeries.  Dr. Chambi

26   performed spinal surgeries at Pacific Hospital, using hardware ordered from

27   International Implants and other co-schemers' companies, that were billed to State

28   Fund both by Pacific Hospital and by Dr. Chambi.  These surgeries were performed

5018471

COMPLAINT OF PLAINTIFF STATE FUND

starting no later than 2010 and ending no earlier than 2011.  Dr. Chambi received

illegal kickback payments from the Entity Conspirators and/or other conspirators for

the surgeries and for using International Implants hardware.  The payments were

made through agreements between Dr. Chambi and the Entity Conspirators,

including 2009 and 2012 "Outsourced Collection" agreements with Healthsmart

Pacific, Inc. under which Dr. Chambi was specifically promised a percentage

payment for all collections for International Implants devices, and a 2009 agreement

purportedly for backup emergency room services that promised Dr. Chambi $20,000

a month.  Two examples of surgeries performed at Pacific Hospital by Dr. Chambi

using devices from International Implants, and billed to State Fund, are included in

Exhibit 1.

83.    Dr. Chambi also signed bills and reports (and/or allowed the Entity

Conspirators to sign bills on his behalf), which were submitted to State Fund, and

which contained certifications, either explicit or implicit, that the bills and reports

submitted were not the product of fraud or illegal referral and kickback fees, and/or

did not contain material misrepresentations or omissions.

84.    **Dr. Haider.**  Defendant Dr. Thomas Haider is, on information and

belief, a resident of Riverside County, CA.  He is an orthopedic spine surgeon who

formerly owned implant manufacturer Seaspine, Inc., which sold implants to

International Implants that were then used in surgeries at Pacific Hospital.

Dr. Haider himself performed spinal implant surgeries at Pacific Hospital, which

were billed to State Fund by both Pacific Hospital and Dr. Haider, using Seaspine

devices that Pacific Hospital "purchased" through International Implants.  The

prices at which International Implants invoiced these Seaspine devices to Pacific

Hospital (which invoices were included in the bills sent to and paid by State Fund)

were grossly inflated over the prices actually paid.  Dr. Haider received illegal

kickback payments from the Entity Conspirators and/or other co-conspirators for the

surgeries and for using International Implants hardware.  Dr. Haider performed such

surgeries beginning no later than 2010 and ending no later than 2012.  Dr. Haider entered into multiple agreements with Entity Conspirators under which he received these illegal kickback payments, including but not limited to a "Health Facility Enterprise Lease."  Two examples of surgeries performed at Pacific Hospital by Dr. Haider using devices from International Implants, and billed to State Fund, are included in Exhibit 1.

85.    Dr. Haider had agreements with IPM, including a 2010 IPM "Physician Office Dispensing Program Management Agreement - Oral and Topical Medications."  Under this agreement with IPM, he knowingly allowed the Drobots to control and operate illegal pharmacy operations out of his practices in exchange for payments.  IPM, with Dr. Haider's cooperation, billed large volumes of pharmaceuticals to State Fund at prices greatly in excess of actual cost, beginning no later than 2010 and ending no later than 2012.  He also signed bills and reports (and/or allowed the Entity Conspirators to sign bills on his behalf), which were submitted to State Fund, and which contained certifications, either explicit or implicit, that the bills and reports submitted were not the product of fraud or illegal referral and kickback fees, and/or did not contain material misrepresentations or omissions.

86.    Dr. Haider owns and operates Defendant Haider Spine Center Medical Group, Inc. ("Haider Spine"), located at 6276 Rivercrest Dr., Riverside, CA 92507. Defendant Dr. Andrew Jarminski worked with Dr. Thomas Haider at Haider Spine, where Provider Co-conspirators Dr. Gerald Alexander and Dr. Randy Rosen also practiced, and each of them submitted fraudulent bills to State Fund through Haider Spine.  Dr. Haider also owns and operates Defendant Salma Jason Monica, LP, located at 4500 Brockton Avenue, Ste. 201, Riverside, CA 92501, which was used to receive illegal kickback payments on behalf of Dr. Haider, and which also entered into a "Health Facility Enterprise Lease" with Pacific Hospital.

87.     **Dr. Dureza.**   Defendant Dr. Catalino Dureza is, on information and belief, a resident of Kern County, CA.  He is an orthopedic spine surgeon. Dr. Dureza performed spinal surgeries at Pacific Hospital, using hardware ordered from International Implants and other co-schemers' companies, that were billed to State Fund both by Pacific Hospital and by Dr. Dureza.  Dr. Dureza performed these surgeries beginning no later than 2004 and ending no later than 2009.  Dr. Dureza received illegal kickback payments from the Entity Conspirators and/or other conspirators for the surgeries and for using International Implants hardware. Dr. Dureza received these kickback payments under various agreements with the Entity Conspirators.  Two examples of surgeries performed at Pacific Hospital by Dr. Dureza using devices from International Implants, and billed to State Fund, are included in Exhibit 1.  Documents produced in *State Fund v. Drobot Sr., et al.,* show Dr. Dureza conspiring with Drobot Sr. and Dr. Bernadett to bring authorized "spine cases" to Pacific Hospital.

88.     Dr. Dureza had agreements with CPM and IPM, including a 2006 "Medical Lien Purchase and Financial Services Agreement" with CPM.  Under these agreements with CPM and IPM, he knowingly allowed the Drobots to control and operate illegal pharmacy operations out of his practices in exchange for payments.  CPM and IPM, with Dr. Dureza's cooperation, billed large volumes of pharmaceuticals to State Fund at prices greatly in excess of actual cost beginning no later than 2005 and ending no earlier than 2010.  Dr. Dureza was paid kickbacks through his agreements with Pharmacy Entities for referring patients to the pharmacies, for performing surgeries or other procedures at Pacific Hospital or other preferred facilities, and for using International Implants hardware.  He also signed bills and reports (and/or allowed Entity Conspirators to sign bills on his behalf), which were submitted to State Fund, and which contained certifications, either explicit or implicit, that the bills and reports submitted were not the product of fraud

1  or illegal referral and kickback fees, and/or did not contain material

2  misrepresentations or omissions.

3      89.   Dr. Dureza submitted fraudulent bills to State Fund through his medical

4  corporations Defendant Catalino D. Dureza, M.D., Inc., which, according to

5  Secretary of State records, is located at 2323 16th Street, Ste. 303, Bakersfield, CA

6  93301, and California Neurosurgical and Spine Associates, a Medical Corporation,

7  which, according to Secretary of State records, is located in Riverside County, CA.

8  Dr. Dureza also owns and controls Defendant Maximus Medical Group, a Medical

9  Corporation, which according to Secretary of State records, is located in Riverside

10 County, CA, and through which Dr. Dureza was paid kickback payments.  Dr.

11 Dureza practiced at Downey Ortho where Defendants Dr. Capen, Dr. John Larsen,

12 Dr. Andrew Jarminski, Dr. Russell Nelson, and co-conspirator Dr. Faustino

13 Bernadett also practiced.

14     90.   **Dr. Mulvania.**  Defendant Dr. Richard Mulvania is, on information

15 and belief, a resident of Orange County, CA.  He is an orthopedic spine surgeon.

16 Dr. Mulvania performed spinal surgeries at Pacific Hospital, using hardware ordered

17 from International Implants and other co-schemers' companies, that were billed to

18 State Fund both by Pacific Hospital and by Dr. Mulvania.  Dr. Mulvania performed

19 these surgeries beginning no later than 2004 and ending no earlier than 2012.  On

20 information and belief, Dr. Mulvania entered into agreements with Entity

21 Conspirators, including but not limited to an option agreement, through which he

22 received illegal kickback payments from Entity Conspirators and/or other

23 conspirators for the surgeries and for using International Implants hardware.

24 Dr. Mulvania performed multiple spinal surgeries on patients referred from

25 Defendant Dr. Hamid Rahman.  He also received referrals from co-conspirator

26 Jason Bernard.  Two examples of surgeries performed at Pacific Hospital by Dr.

27 Mulvania using devices from International Implants, and billed to State Fund, are

28 included in Exhibit 1.

- 40 -

91.    Dr. Mulvania had agreements with CPM and IPM, including a 2006 "Medical Lien Purchase and Financial Services Agreement" with CPM, a 2010 "Financial Asset Agreement" with CPM, and, upon information and belief, a "Physician Office Dispensing Program Management Agreement" with IPM.  Under these agreements with CPM and IPM, he knowingly allowed the Drobots to control and operate illegal pharmacy operations out of his practices in exchange for payments.  CPM and IPM, with Dr. Mulvania's cooperation, billed large volumes of pharmaceuticals to State Fund at prices greatly in excess of actual cost beginning no later than 2005 and ending no later than 2011.  He also signed bills and reports (and/or allowed Entity Conspirators to sign bills on his behalf), which were submitted to State Fund, and which contained certifications, either explicit or implicit, that the bills and reports submitted were not the product of fraud or illegal referral and kickback fees, and/or did not contain material misrepresentations or omissions.

92.    Dr. Mulvania submitted fraudulent bills to State Fund through Defendant Richard L. Mulvania, MD, Inc., which, according to Secretary of State records, is located at 9930 Research Dr., Ste. 100, Irvine, CA 92648.  Dr. Mulvania also practiced at Downey Ortho where Defendants Dr. Catalino Dureza, Dr. Daniel Capen, Dr. John Larsen, Dr. Andrew Jarminski, and Dr. Russell Nelson, and co-conspirator Dr. Faustino Bernadett also practiced.  He also practiced with Provider Co-conspirator Michael Barri and Defendant Dr. Andrew Jarminski at Tristar Medical Group, a Professional Corporation.  On information and belief, Dr. Mulvania also practice at Pacific Coast Spine and Orthopedic Group, where Provider Co-conspirator Dr. Gerald Alexander also practiced.

93.    **Dr. Obukhoff.**  Defendant Dr. Serge Obukhoff is, on information and belief, a resident of Los Angeles County, CA.  He is an orthopedic spine surgeon.  Dr. Obukhoff performed spinal surgeries at Pacific Hospital, using hardware ordered from International Implants and other co-schemers' companies, that were billed to

1  State Fund both by Pacific Hospital and by Dr. Obukhoff.  Dr. Obukhoff performed

2  multiple surgeries at Pacific Hospital on patients referred by Provider Co-

3  Conspirator Dr. Jacob Tauber.  Dr. Obukhoff performed surgeries beginning no later

4  than 2004 and ending no earlier than 2012.  Under agreements such as a 2010

5  "Option Agreement" with PSPM, Dr. Obukhoff received illegal kickback payments

6  from the Entity Conspirators and/or other conspirators for the surgeries and for

7  using International Implants hardware.  Two examples of surgeries performed at

8  Pacific Hospital by Dr. Obukhoff using devices from International Implants, and

9  billed to State Fund, are included in Exhibit 1.

10  94.    Dr. Obukhoff had agreements with CPM, including a 2006 "Physician

11  Office Dispensing Program Management Agreement."  Under these agreements

12  with CPM, he knowingly allowed the Drobots to control and operate illegal

13  pharmacy operations out of his practices in exchange for payments.  CPM, with Dr.

14  Obukhoff's cooperation, billed large volumes of pharmaceuticals to State Fund at

15  prices greatly in excess of actual cost beginning no later than 2006 and ending no

16  earlier than 2007.  He also signed bills and reports (and/or allowed the Entity

17  Conspirators to sign bills on his behalf), which were submitted to State Fund, and

18  which contained certifications, either explicit or implicit, that the bills and reports

19  submitted were not the product of fraud or illegal referral and kickback fees, and/or

20  did not contain material misrepresentations or omissions.

21  95.    Dr. Obukhoff submitted fraudulent bills to State Fund through

22  Defendant Serge Obukhoff, MD, Professional Corporation, which is located,

23  according to Secretary of State records, in Santa Monica, CA.

24  96.    **Dr. Payne.**  Defendant Dr. David Payne is, on information and belief, a

25  resident of Orange County, CA.  He is an orthopedic spine surgeon.  Dr. Payne

26  performed spinal surgeries at Pacific Hospital, using hardware ordered from

27  International Implants and other co-schemers' companies, that were billed to State

28  Fund both by Pacific Hospital and by Dr. Payne.  Dr. Payne performed these

1   surgeries beginning no later than 2006 and ending no earlier than 2011.  Dr. Payne
2   received illegal kickback payments from Entity Conspirators and/or other
3   conspirators for the surgeries and for using International Implants hardware.  Two
4   examples of surgeries performed at Pacific Hospital by Dr. Payne using devices
5   from International Implants, and billed to State Fund, are included in Exhibit 1.

6          97.    Dr. Payne had agreements with IPM, including a 2008 "Physician
7   Office Dispensing Program Management Agreement."  Under these agreements
8   with IPM, he knowingly allowed the Drobots to control and operate illegal
9   pharmacy operations out of his practices in exchange for payments.  IPM, with Dr.
10  Payne's cooperation, billed large volumes of pharmaceuticals to State Fund at prices
11  greatly in excess of actual cost beginning no later than 2008 and ending no later than
12  2009.  Dr. Payne was paid kickbacks through his agreements with Pharmacy Entities
13  for referring patients to the pharmacies, for performing surgeries or other procedures
14  at Pacific Hospital or other preferred facilities, and for using International Implants
15  hardware.  He also signed bills and reports (and/or allowed Entity Conspirators to
16  sign bills on his behalf), which were submitted to State Fund, and which contained
17  certifications, either explicit or implicit, that the bills and reports submitted were not
18  the product of fraud or illegal referral and kickback fees, and/or did not contain
19  material misrepresentations or omissions.

20         98.    Dr. Payne submitted fraudulent bills through his business entity,
21  Defendant David H. Payne, MD, Inc., which, according to Secretary of State
22  Records, is located in Orange County, CA.

23         99.    **Dr. Rahman.**  Defendant Dr. Hamid Rahman is, on information and
24  belief, a resident of Riverside County, CA.  On information and belief, he is an
25  orthopedic surgeon specializing in knee, hand, and shoulder surgery.  Dr. Rahman
26  referred patients to Pacific Hospital or other preferred facilities for spinal surgeries
27  or other services, some of which were to be performed using hardware ordered from
28  International Implants and other co-schemers' companies, that were billed to State

1   Fund, including multiple surgeries performed by Defendant Dr. Richard Mulvania.
2   These surgeries included, but are not limited to, a spinal surgery performed in
3   March 2007 using International Implants hardware for which a bill was submitted to
4   State Fund, and a spinal surgery performed in October 2005 for which a bill was
5   submitted to State Fund.  Dr. Rahman received illegal kickback payments from
6   Entity Conspirators or other conspirators for his referrals.

7       100.   Dr. Rahman had agreements with CPM, including a 2003 "Physician
8   Office Pharmacy Program Management Agreement."  Under these agreements with
9   CPM, he knowingly allowed the Drobots to control and operate illegal pharmacy
10  operations out of his practices in exchange for payments.  CPM, with Dr. Rahman's
11  cooperation, billed large volumes of pharmaceuticals to State Fund at prices greatly
12  in excess of actual cost beginning no later than 2005 and ending no earlier than
13  2007.  He also signed bills and reports (and/or allowed Entity Conspirators to sign
14  bills on his behalf), which were submitted to State Fund, and which contained
15  certifications, either explicit or implicit, that the bills and reports submitted were not
16  the product of fraud or illegal referral and kickback fees, and/or did not contain
17  material misrepresentations or omissions.

18      101.   **Dr. Shortz.**  Defendant Dr. Roger Shortz is, on information and belief,
19  a resident of Contra Costa County, CA.  He is an orthopedic surgeon.  Dr. Shortz
20  performed spinal surgeries at Pacific Hospital, using hardware ordered from
21  International Implants and other co-schemers' companies, that were billed to State
22  Fund both by Pacific Hospital and by Dr. Shortz.  Dr. Shortz performed these
23  surgeries beginning no later than 2008 and ending no earlier than 2010.  Dr. Shortz
24  received illegal kickback payments from Entity Conspirators and/or other
25  conspirators for the surgeries and for using International Implants hardware.  Under
26  agreements such as a 2010 "Option Agreement" with PSPM, Dr. Shortz received
27  illegal kickback payments from the Entity Conspirators and/or other conspirators for
28  the surgeries and for using International Implants hardware.  Two examples of

1  surgeries performed at Pacific Hospital by Dr. Shortz using devices from
2  International Implants, and billed to State Fund, are included in Exhibit 1.

3      102.   Dr. Shortz also signed bills and reports (and/or allowed the Entity
4  Conspirators to sign bills on his behalf), which were submitted to State Fund, and
5  which contained certifications, either explicit or implicit, that the bills and reports
6  submitted were not the product of fraud or illegal referral and kickback fees, and/or
7  did not contain material misrepresentations or omissions.

8      103.   **Dr. Silva.**   Defendant Dr. Ismael Silva is, on information and belief, a
9  resident of Orange County, CA.  He is an orthopedic surgeon.  Through Defendant
10 Healthpointe Medical Group, Inc. ("Healthpointe"), Dr. Silva caused patients to be
11 referred to Pacific Hospital or other preferred facilities for spinal surgery or other
12 procedures, including some performed using hardware ordered from International
13 Implants and other co-schemers' companies.  Two such spinal surgeries took place
14 in August 2007 and February 2008, for which bills were submitted to State Fund.
15 Dr. Silva received illegal kickback payments from Entity Conspirators or other
16 conspirators for the referrals.  Dr. Silva received these kickbacks, at least in part,
17 through a 2007 "marketing" agreement between PSPM and Defendant Starbase, Inc.
18 ("Starbase"), which, according to Secretary of State records, is located at 2244
19 Faraday Ave., Carlsbad, CA 92008.  On information and belief, Starbase also
20 operated as a spinal implant distributor, much like International Implants.

21     104.   Dr. Silva had agreements with CPM, including a 2004 "Physician
22 Office Pharmacy Program Management Agreement" and a 2006 "Medical Lien
23 Purchase and Financial Services Agreement" through Healthpointe.  Under these
24 agreements with CPM he knowingly allowed the Drobots to control and operate
25 illegal pharmacy operations out of his practices in exchange for payments.  CPM,
26 with Dr. Silva's cooperation, billed large volumes of pharmaceuticals to State Fund
27 at prices greatly in excess of actual cost beginning no later than 2005 and ending no
28 later than 2007.  Dr. Silva was paid kickbacks through his agreements with

Pharmacy Entities for referring patients to the pharmacies and for referring patients to Pacific Hospital or other preferred facilities. He also signed bills and reports (and/or allowed Entity Conspirators to sign bills on his behalf), which were submitted to State Fund, and which contained certifications, either explicit or implicit, that the bills and reports submitted were not the product of fraud or illegal referral and kickback fees, and/or did not contain material misrepresentations or omissions.

105.   Dr. Silva operates a network of clinics under Healthpointe, which has locations throughout Southern California. Dr. Ahmed also practiced with Dr. Silva at Healthpointe. Dr. Silva submitted fraudulent bills to State Fund through Healthpointe.

106.   **Dr. Nelson.** Defendant Dr. Russell Nelson is, on information and belief, a resident of Ventura County, CA. He is an orthopedic spine surgeon. Dr. Nelson performed spinal surgeries at Pacific Hospital that were billed to State Fund both by Pacific Hospital and by Dr. Nelson. These surgeries were performed beginning no later than 2003 and ending no earlier than 2007. Dr. Nelson received illegal kickback payments from Entity Conspirators and/or other conspirators for performing these surgeries or other procedures at Pacific Hospital or other preferred facilities. These kickbacks were paid through multiple agreements with the Entity Conspirators. Two examples of surgeries performed at Pacific Hospital by Dr. Nelson, and billed to State Fund, are included in Exhibit 1.

107.   Dr. Nelson had agreements with CPM, including at least two "Financial Asset" agreements. Under these agreements with CPM, he knowingly allowed the Drobots to control and operate illegal pharmacy operations out of his practices in exchange for payments. CPM, with Dr. Nelson's cooperation, billed large volumes of pharmaceuticals to State Fund at prices greatly in excess of actual cost. He also signed bills and reports (and/or allowed Entity Conspirators to sign bills on his behalf), which were submitted to State Fund, and which contained certifications,

1  either explicit or implicit, that the bills and reports submitted were not the product of

2  fraud or illegal referral and kickback fees, and/or did not contain material

3  misrepresentations or omissions.

4      108.   Dr. Nelson submitted fraudulent bills to State Fund through Defendant

5  Nelson Spine Institute, Inc., which, according to Secretary of State records, is

6  located at 110 Jensen Ct., Ste. 1-C, Thousand Oaks, CA 91360.  Dr. Nelson also

7  practiced at Downey Ortho where Defendants Dr. Daniel Capen, Dr. Richard

8  Mulvania, Dr. Catalino Dureza, Dr. John Larsen, Dr. Andrew Jarminski, and co-

9  conspirator Dr. Faustino Bernadett also practiced.

10     109.   **Tri-County Medical Group**.  Defendant Tri-County Medical Group

11  ("Tri-County") is owned and operated by Edward Komberg, D.C, a defendant in

12  *State Fund v. Drobot Sr., et al.*  On information and belief, Tri-County is located at

13  1200 Wilshire Blvd, Ste. 308, Los Angeles, CA 90017.  Komberg is, on information

14  and belief, a resident of Los Angeles County, CA.  He is a chiropractor.  Komberg

15  referred patients for services and surgeries to be performed at Long Beach Pain,

16  Pacific Hospital, and other preferred facilities, including but not limited to spinal

17  procedures in September 2007 and July 2012 for which Pacific Hospital submitted

18  bills to State Fund.  He received kickback payments for these referrals from the

19  Entity Conspirators and/or other conspirators.  Provider Co-Conspirator Dr. Mitchell

20  Cohen, who performed surgeries at and referred patients to Pacific Hospital in

21  exchange for kickbacks, practiced out of Tri-County.

22     110.   Komberg had agreements with CPM through Tri-County, including a

23  "Medical Lien Purchase and Financial Services Agreement."  Under these

24  agreements with CPM, he knowingly allowed the Drobots to control and operate

25  illegal pharmacy operations out of his practices in exchange for payments.  CPM,

26  with Tri-County's, Komberg's, and Cohen's cooperation, billed large volumes of

27  pharmaceuticals in Tri-County's name to State Fund at prices greatly in excess of

28  actual cost beginning no later than 2005 and ending no earlier than 2007.  Komberg

- 47 -

1  was paid kickbacks through his agreements with Pharmacy Entities for referring

2  patients to dispensing operations run by the Pharmacy Entities and for referring

3  patients to Long Beach Pain, Pacific Hospital, or other preferred facilities.  Tri-

4  County and Komberg influenced and facilitated the submission of fraudulent bills

5  and reports by licensed physicians operating out of the medical practices he owned

6  and operated.  These bills and reports were submitted to State Fund, and contained

7  certifications, either explicit or implicit, that the bills and reports submitted were not

8  the product of fraud or illegal referral and kickback fees, and/or did not contain

9  material misrepresentations or omissions.

10      111.   Komberg also owns and operates Tri-City Health Group, Inc. ("Tri-

11  City").  Komberg submitted fraudulent bills to State Fund through Tri County and

12  accepted kickbacks through Tri-City.

13      112.   **TriStar Medical Group, P.C.**  Defendant TriStar Medical Group, a

14  Professional Corporation ("TriStar"), is owned and operated by Michael E. Barri,

15  D.C., named as a defendant in *State Fund v. Drobot Sr., et al.*  Based on California

16  Secretary of State records, TriStar is located at 876 Mountain Ave., Ste. 200(I),

17  Upland, CA 91786.  Barri is, on information and belief, a resident of Orange

18  County, CA.  He is a chiropractor.  Barri referred patients for surgeries or other

19  services to be performed at Long Beach Pain or other preferred facilities, for which

20  he received illegal kickback payments from Entity Conspirators and/or other

21  conspirators.  Barri also submitted fraudulent bills to State Fund through TriStar.

22  An email produced in *State Fund v. Drobot Sr., et al.*  shows Drobot Jr. touting to

23  Drobot Sr. TriStar's involvement in the scheme.  Defendants Dr. Andrew Jarminski

24  and Dr. Richard Mulvania, who both had CPM agreements, leased offices from

25  PSPM, and assisted or performed spinal surgeries at Pacific Hospital, also practiced

26  at TriStar.  Doctors at Tristar referred patients for and performed spinal surgeries or

27  other procedures at Pacific Hospital or other preferred facilities for which fraudulent

28

5018471

1   bills were submitted to State Fund, including but not limited to Pacific Hospital
2   procedures involving International Implants in December 2008 and December 2010.

3         113.   Through TriStar, Barri entered into agreements with IPM, including a
4   "Physician Office Dispensing Program Management Agreement."  Under these
5   agreements with IPM, TriStar and Barri knowingly allowed the Drobots and Dr.
6   Bernadett to control and operate illegal pharmacy operations out of its participating
7   physicians' practices in exchange for payments made to TriStar.  IPM, with
8   TriStar's cooperation, billed large volumes of pharmaceuticals to State Fund at
9   prices greatly in excess of actual cost beginning no later than 2009 and ending no
10  earlier than 2012.  TriStar and Barri were paid kickbacks through its agreements
11  with Pharmacy Entities for referring patients to the pharmacies and for referring
12  patients to Long Beach Pain, Pacific Hospital, and other preferred facilities.  TriStar
13  also influenced and facilitated the submission of fraudulent bills and reports by
14  licensed physicians operating out of the medical practices Barri owned and operated.
15  These bills and reports were submitted to State Fund, and contained certifications,
16  either explicit or implicit, that the bills and reports submitted were not the product of
17  fraud or illegal referral and kickback fees, and/or did not contain material
18  misrepresentations or omissions.

19        114.   Barri also owns and operates Jojaso Management, Inc., which, based on
20  California Secretary of State records, is located at 999 N. Tustin Ave., Santa Ana,
21  CA 92705.

22        115.   Collectively, the medical providers named herein and their associated
23  medical practices and corporations are referred to as "Defendants."

24        C.   **Marketer Defendant**

25        116.   **Progressive Orthopedic Solutions, LLC.**  Defendant Progressive
26  Orthopedic Solutions, LLC ("Progressive"), according to Secretary of State records,
27  is located in Santa Fe Springs, CA.  Progressive's manager is co-conspirator Jason
28  Bernard, named as a defendant in *State Fund v. Drobot Sr., et al.*, who also engaged

- 49 -

1  in marketing and consulting matters on behalf of a California corporation, Global

2  Service, Inc.  On information and belief, Global Service, Inc. entered into an

3  agreement with PSPM under which Bernard agreed to provide services to PSPM in

4  return for set monthly payments.  Progressive is a supplier of durable medical

5  equipment and medical supplies.  However, on information and belief, Progressive

6  also operated as a spinal implant distributor, not unlike International Implants.

7  Progressive worked as a marketer, referring patients to physicians for services,

8  including spinal fusions surgeries, to be performed at Pacific Hospital and services

9  at Long Beach Pain.  In an email produced in *State Fund v. Drobot Sr., et al.*,

10  Bernard sent Drobot Sr. and Dr. Bernadett two spreadsheets, one showing "a list of

11  85 patients that have been identified by their PTP [Primary Treating Physician], as

12  strong candidates for spine surgery," and the other showing "250+ patients that we

13  have sent to the PSPM network of physicians."  In this same email, Bernard also

14  stated that he "hosted and event with Dr [sic] Larsen and several attorneys" that

15  "went extremely well."  And "[f]rom that meeting Dr [sic] Larsen received 5 cases

16  that same week and a few more cases the following week."  Progressive was paid

17  kickback payments for referrals like these that resulted in surgeries being performed

18  at Pacific Hospital.  These payments were made to Progressive, at least in part,

19  through a "collections" agreement whereby it was a paid a percentage of the amount

20  collected on surgeries Bernard referred.  Bernard referred patients to physicians,

21  including, but not limited to, Defendants Dr. Daniel Capen, Dr. John Larsen, Dr.

22  Andrew Jarminski, Dr. Richard Mulvania, and Provider Co-conspirator Dr. Jack

23  Akmakjian.

24       117.   Progressive will be referred to as "Marketer Defendant."

25       D.   **DOE Defendants**

26       118.   State Fund is unaware of the true names and capacities, whether

27  individual, corporate, associate or otherwise, of those defendants named herein as

28  DOES 1 through 10, inclusive.  State Fund sues DOES 1 through 10 by fictitious

names.  State Fund will seek leave to amend this complaint to show their true names and capacities when the same have been ascertained.  Said defendants are sued as principals, and all of the acts performed by them as agents, servants or employees were performed within the scope and course of their authority and employment.  State Fund is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible for the events, harm, and damages as alleged herein.

119.   State Fund is further informed and believes, and thereon alleges, that each of the defendants was the co-conspirator of each and every other defendant and, in performing the acts herein alleged, was acting within the scope of such conspiracy, and that such actions were reasonably foreseeable to each of the other co-conspirators, and/or were taken with the express or implied consent of each of the other co-defendants.

120.   The named and DOE defendants are occasionally referred to collectively as "Defendants."

**III.   JURISDICTION AND VENUE**

121.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under 18 U.S.C. § 1961 et. seq., the Racketeering Influenced and Corrupt Organizations Act ("RICO").  This Court has supplemental jurisdiction over State Fund's state law claims under 28 U.S.C. § 1367(a).

122.   Venue is proper in the Central District of California under 28 U.S.C. § 1391, because all or almost all Defendants reside in this District, and a substantial portion of the events or omissions giving rise to the claims herein occurred in this District.  Venue is proper in the Southern Division because, based on information from the California Secretary of State and other sources, a majority of Defendants reside in this Division, and Plaintiff State Fund has an office in Santa Ana.

**IV.   STATE FUND AND ITS CLAIMS PROCESS**

123.   State Fund provides workers' compensation insurance policies to employers, under which medical treatment and compensation benefits are provided to employees who are injured or become ill during the course of employment, or due to employment-related injury.  In California, every employer is required to carry insurance to cover the cost of occupational injuries and illnesses.  This is also true for California offices or branches of multistate or multinational corporations, meaning the system itself has a significant impact on interstate commerce.

124.   State Fund pays medical providers for medical services provided to covered workers, including spinal implants, other spinal surgeries, and a wide variety of other procedures.  State Fund also pays medical providers for prescription drugs supplied to injured workers.

125.   In order to receive reimbursement from State Fund for Medical Services, providers submit a Health Insurance Claim Form or other types of bills to State Fund.  The Health Insurance Claim Form includes, among other things, warning language that any person who knowingly files a claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

126.   State Fund does not knowingly pay for fraudulent bills, including: (a) bills for office visits or medical services not provided; (b) bills for unnecessary medical services; (c) bills that are the product of a provider's employment of runners, cappers, or steerers to solicit or obtain patients for the medical provider; (d) bills involving illegal kickbacks; (e) bills that are "upcoded"; (f) bills that are "unbundled"; and (g) bills that are artificially inflated.  State Fund does not knowingly reimburse unlicensed providers or entities, or those who engage in illegal activity such as kickbacks and the corporate practice of medicine, which are

1   violations of the California Labor and Insurance Codes.  State Fund also attempts to

2   adhere to all California guidelines and regulations on costs.[9]

3      127.   State Fund is generally required to pay all bills within a relatively short

4   statutory period of time pursuant to the California Labor Code and attendant

5   regulations, or face large penalties, with some exceptions.  As such, State Fund has a

6   limited ability to review each bill and corresponding claim prior to paying within the

7   requisite time period.  The schemes described in this Complaint are not readily

8   apparent upon the face of the bills, and Defendants and their co-conspirators have

9   actively sought to conceal their various schemes.  This, along with the sheer volume

10  of bills State Fund processes on a daily basis and the fact that State Fund is the

11  largest workers' compensation carrier, makes detection of this fraudulent behavior

12  extremely difficult.  While State Fund was sometimes able to detect certain

13  instances of overbilling, it could not catch them all; Defendants and their co-

14  conspirators knew this and took advantage of it, purposefully overwhelming the

15  system to maximize their chances of getting their fraudulently inflated bills

16  reimbursed.

17     128.   At all times relevant to this Complaint, medical providers or their

18  representatives submitted insurance bills to State Fund manually (on paper) through

19  the United States mail or electronically through interstate wire.  Spreadsheets of

20  representative mailings and/or wire communications for each particular scheme

21  have been lodged with the Court.  For each claim submitted, State Fund would send

22  an explanation of benefits ("EOB") and/or related correspondence to the provider

23  via U.S. Postal Service.  State Fund also reimbursed providers by sending payment

24  through the United States mail.

25  _____

26  [9] Some medical procedures are governed by an Official Medical Fee Schedule ("OMFS"), pursuant to Title 8, Article 5.5, Sections 9790 et seq. of the California

27  Code of Regulations. The OMFS was promulgated by the Administrative Director of the Division of Workers' Compensation to rein in medical costs and generally

28  ties provider reimbursement to a multiplier of Medicare's rates for the same service.

129.   State Fund has paid Pacific Hospital around $125 million (*see* ¶ 133, n. 10) and Long Beach Pain around $7.585 million for services purportedly rendered by Pacific Hospital and Long Beach Pain pursuant to workers' compensation policies, not including sums paid on liens, global settlements and other payments. This includes at least 16,490 bills for services, including spinal surgery and implants.  State Fund has also paid Defendants directly millions in fees for services related to spinal surgeries and other procedures performed at Pacific Hospital while the referral scheme was active.

130.   State Fund has also paid over $60 million to the Pharmacy Entities, not including sums paid on liens, global settlements, and other payments.  Of the over $60 million paid to the Pharmacy Entities, over $30 million related to claims for injured workers who were also treated by the Surgical Entities.

131.   On information and belief, State Fund is one of the largest victims of Defendants and their co-conspirators' unlawful behavior.  State Fund has suffered millions of dollars in damage as a result of the payments it has made to the Surgical Entities, Pharmacy Entities, Provider Co-Conspirators, and Defendants for these procedures, medical services, and prescriptions.  State Fund would not have paid Defendants or their co-conspirators had it known of their unlawful and fraudulent misconduct.

132.   State Fund is informed and believes, and thereon alleges, that the Defendants conspired in the following schemes to defraud, broken out by particular scheme and particular examples of each such scheme.  This information is based on discovery in *State Fund v. Drobot Sr., et al.*, the Plea Agreement, and State Fund's review of bills and internal reports, which was prompted by the reported service of federal warrants on Pacific Hospital's and IPM's offices in April 2013 (below, "State Fund Uncovers Defendants' Conspirators' Well-Concealed Fraud").

## V.    <u>FRAUDULENT SCHEMES BY THE SURGICAL ENTITY ENTERPRISE</u>

## A. <u>Fraudulent Scheme re: Spinal Implants/Surgeries</u>

133.   From 1998 to the present, State Fund has received thousands of bills and claims relating to spinal surgery from Pacific Hospital.  Many of these surgeries were performed, and were also billed, by Defendants—Dr. Daniel Capen, Dr. John Larsen, Dr. Khalid Ahmed, Dr. Thomas Haider, Dr. Israel Chambi, Dr. Catalino Dureza, Dr. Andrew Jarminski (as an assistant surgeon), Dr. Richard Mulvania, Dr. Serge Obukhoff, Dr. David Payne, Dr. Roger Shortz, and Dr. Russell Nelson (collectively, "Implant Provider Defendants").  Co-Conspirators Dr. Gerald Alexander, Dr. Ian Armstrong, Dr. Assad Moheimani, Dr. Mitchell Cohen, Dr. Jack Akmakjian and Dr. Lokesh Tantuwaya (who are defendants in *State Fund v Drobot Sr., et al.*) also performed many such surgeries.  The spinal implant/surgery claims that Pacific Hospital, Defendants, and their co-conspirators submitted to State Fund were fraudulent.[10]

134.   Before January 1, 2013, providers were entitled to reimbursement provided under the Official Medical Fee Schedule for the cost of spinal implants. Because the reimbursement amount depends on how much the provider paid for the implant, Pacific Hospital and Drobot Sr. sought to defraud State Fund by establishing shell entities, and holding them out as manufacturers of spinal implants, according to the Plea Agreement.  The Implant Provider Defendants, Drobot Sr., and Pacific Hospital then arranged to acquire spinal hardware from the shell entities or a "co-schemer's company" at fraudulently excessive costs under the names of the Defendants and the Provider Co-Conspirators.  Defendants knew the fraudulent invoices did not reflect the actual or reasonable cost of the implants, which was significantly lower.

---

[10] State Fund reserves the right to amend this Complaint to add additional claims and increased damages if material is uncovered in discovery or through expert analysis.  State Fund continues to investigate, for example, the approximately $125 million in payments to Pacific Hospital as well as payments made to the Defendants, Pharmacy and Surgical Entities, and related entities.

135.   In or around August of 2007, Drobot Sr. formed International Implants. Pacific Hospital, Drobot Sr., and International Implants represented International Implants as a manufacturer of spinal implants.  Such a manufacturer must be registered with the United States Food and Drug Administration ("FDA").  In fact, many of the International Implants invoices submitted to State Fund included the legend that it was an "FDA registered manufacturer."  *See* Plea Agreement at 17. However, State Fund, pursuant to its investigation, discovered that the FDA lists International Implants as a "repackager," not a manufacturer.

136.   This scheme centers on inflating the prices of implants used in spinal surgery.  Physicians performing surgeries at Pacific Hospital would "order" implants from an implant repackager, including International Implants.  The repackager would purchase the implants from a manufacturer of implants like Seaspine, Inc., Alphatec Spine, Inc., and US Spine, Inc., and then would "sell" the implants to Pacific Hospital at a grossly inflated price.  Pacific Hospital would then typically double the price of the "documented" cost from International Implants and often added an additional charge.  Pacific Hospital then would bill State Fund the grossly inflated prices.  A kickback is paid to the Defendant or Marketer Defendant who referred and/or performed the surgery at Pacific Hospital using the implants from International Implants or another co-conspirator company under the guise of an unrelated contractual agreement.

137.   These charges are fraudulent because Pacific Hospital actually pays only a small percentage of the prices reflected on the invoices or purchase orders submitted to State Fund, in addition to being illegal because of the kickbacks provided.

138.   To create the illusion that Pacific Hospital actually paid the grossly inflated prices, International Implants, for example, transmitted to Pacific Hospital invoices listing the fraudulent prices.  Pacific Hospital then sent these invoices or purchase orders reflecting the same fraudulent prices to State Fund, representing that

5018471

1    it had paid the false wholesale invoice or purchase order amounts.  In reality, the

2    price on the invoice and purchase order is not the actual and reasonable cost of the

3    implant, but is grossly inflated.

4           139.   Pacific Hospital also sent claims forms and progress reports to State

5    Fund with certifications as to the propriety of the bills and underlying procedures.

6    The medical providers who signed these forms, or allowed them to be electronically

7    signed and submitted on their behalf, signed subject to the various certifications,

8    knowing that they were false or recklessly without knowledge of their truth or

9    falsity.

10          140.   By engineering, participating in, and facilitating these sham

11   transactions, the Implant Provider Defendants, the referring Defendants, the

12   Marketer Defendant, Pacific Hospital, and the Drobots and Dr. Bernadett reaped

13   substantial profit from the scheme, as described in more detail below.

14          141.   Pacific Hospital and the Drobots and Dr. Bernadett misrepresented that:

15   (a) the costs Pacific Hospital purportedly incurred in purchasing implants from

16   International Implants or another co-conspirator entity were the actual and

17   reasonable cost of the implants, when in fact the prices reflected on the invoices

18   were much greater than the prices actually paid to manufacturers; (b) the supplies

19   were ordered by a physician based on medical necessity and the independent

20   medical judgment of the physician, when in fact the co-conspirators were

21   influencing the medical decisions of physicians, including the Defendants, by

22   providing them with kickbacks and controlling their medical operations through

23   fraudulent management contracts; and (c) Pacific Hospital and International

24   Implants (or another co-schemer company) were independent companies conducting

25   bona fide business transactions, when in fact the Drobot Sr. owned and/or controlled

26   both Pacific Hospital and International Implants.

27          142.   Defendants and their co-conspirators each knew or believed that these

28   statements were false and/or misleading.  They made the false and/or misleading

5018471

—

1  statements and certifications to induce State Fund and others to overpay for the

2  medical services and supplies provided.

3      143.   Defendants' co-conspirators made use of the United States mail and

4  interstate wires in furtherance of their scheme, by sending the bills and supporting

5  documentation to State Fund through the United States mail or interstate wires.

6  They also collected their checks from State Fund via the U.S. Postal Service.

7      144.   As an example, Exhibit 2.A contains documents from Pacific Hospital

8  and International Implants, sent to State Fund, to commit precisely this type of fraud

9  on State Fund on or shortly after September 2, 2011.

10          a.      On or shortly after September 2, 2011, Pacific Hospital

11  submitted a bill to State Fund (Claim #SP401079) via the U.S. Postal Service for,

12  among other things, spinal implants.  Pacific Hospital billed the spinal implants and

13  related hardware at $161,952.00, which Pacific Hospital and other co-conspirators

14  knew misrepresented the amount of reimbursement to which Pacific Hospital was

15  entitled.  State Fund was also provided, via the U.S. Postal Service, with two

16  invoices from International Implants purportedly showing the prices paid by Pacific

17  Hospital for these items.  The invoices listed prices for spinal implant hardware

18  several times higher than the prices Pacific Hospital actually paid.  Pacific Hospital

19  purchase orders were also submitted with the bills.  The purchase orders listed the

20  same items and the same prices as the International Implants invoices.

21          b.      Both invoices from International Implants represent that

22  "International Implants is an FDA Registered Manufacturer."  One of the invoices,

23  dated August 15, 2011, shows the following supplies were purchased from

24  International Implants, along with the fraudulent prices Pacific Hospital purportedly

25  paid:

26

| Qty | Product ID | Description | I.I. Price Each | Total |
|-----|-----------|-------------|-----------------|-------|

27

28

| 1 | 64715-106 | Novel XS-Peek 5 Degrees Medium Spacer 14mm x 12mm x 5mm | $4,000.00 | $4,000.00 |
|---|---|---|---|---|
| 1 | 64713-106 | 8-5, Novel XS Peek 5mm | $4,000.00 | $4,000.00 |
| 1 | 64713-105 | 8-5, Novel XS Peek 6mm | $4,000.00 | $4,000.00 |
| 1 | 64713-107 | 8-5, Novel XS Peek 7mm | $4,000.00 | $4,000.00 |
| 1 | 61001-014 | Anterior Cervical Plate LVL 1, Assy, 14mm, TI | $3,385.00 | $3,385.00 |
| 1 | 61003-054 | Anterior Cervical Plate Level 3 Assembly, 54mm | $4,407.00 | $4,407.00 |
| 9 | 61340-014 | 4.0mm Variable Angle Self-Tapping Screw 14mm | $692.00 | $6,228.00 |
| 3 | 61345-014 | 4.5mm Variable Angle Self-Tapping Screw 14mm, TI | $786.00 | $2,368.00 |
| 2 | 64715-105 | M-5, Novel XS-Peek 5mm | $4,000.00 | $8,000.00 |

c.      Pacific Hospital represented the prices above as the actual cost of the implants and other hardware, but the prices actually paid for these items, based on the Distribution Agreement between Alphatec and International Implants (*see* Exhibit 2.B), show they were not:

| Qty | Product ID | Description | I.I. Price | Alphatec Price | Spread | % Markup |
|---|---|---|---|---|---|---|
| 1 | 64715-106 | Novel XS-Peek 5 Degrees Medium Spacer 14mm x 12mm x 5mm | $4,000.00 | $875.00 | $3,125.00 | 357% |

| 1 | 64713-106 | 8-5, Novel XS Peek 5mm | $4,000.00 | $875.00 | $3,125.00 | 357% |
|---|---|---|---|---|---|---|
| 1 | 64713-105 | 8-5, Novel XS Peek 6mm | $4,000.00 | $875.00 | $3,125.00 | 357% |
| 1 | 64713-107 | 8-5, Novel XS Peek 7mm | $4,000.00 | $875.00 | $3,125.00 | 357% |
| 1 | 61001-014 | Anterior Cervical Plate LVL 1, Assy, 14mm, TI | $3,385.00 | $873.00 | $2,512.00 | 288% |
| 1 | 61003-054 | Anterior Cervical Plate Level 3 Assembly, 54mm | $4,407.00 | $1,136.00 | $3,271.00 | 288% |
| 9 | 61340-014 | 4.0mm Variable Angle Self-Tapping Screw 14mm | $692.00 | $178.00 | $514.00 | 289% |
| 3 | 61345-014 | 4.5mm Variable Angle Self-Tapping Screw 14mm, TI | $786.00 | $202.00 | $584.00 | 289% |
| 2 | 64715-105 | M-5, Novel XS-Peek 5mm | $4,000.00 | $875.00 | $3,125.00 | 357% |

d.      For each of these items, International Implants listed a price on its invoices that far exceeded what it paid Alphatec—which in these examples represented the actual cost of the implants and other hardware.  On the first invoice, International Implants—and thus, Pacific Hospital—actually paid $9,467.00 for the implants and hardware, not the $40,378.00 represented on the invoice submitted to State Fund.  Similarly, the second invoice from International Implants that was submitted to State Fund, dated August 16, 2011, purports to charge Pacific Hospital $33,621 for implants and hardware that actually cost Pacific Hospital $8,838.

- 60 -

1          e.       When the items listed on the two invoices from International

2    Implants are priced using the Alphatec Distribution Agreement, the total comes to

3    $18,305.  In other words, under the Alphatec Distribution Agreement, Pacific

4    Hospital effectively paid only $18,305 for the items listed on the two invoices from

5    International Implants, yet billed State Fund around $148,148.00 for the same

6    items—more than eight times the amount it paid.  State Fund paid approximately

7    $110,000 for the implants listed on the invoices from International Implants, which

8    is over six times the actual cost.

9          f.       State Fund paid at least $202,660 in total on bills from Pacific

10   Hospital relating to the spinal surgery procedure under this claim, relying on

11   certifications that the bill was not the product of an illegal kickback or other

12   fraudulent activity in addition to the fraudulent purchase orders and invoices

13   submitted by Pacific Hospital.

14       145.  As another example, Exhibit 2.C contains documents from Pacific

15   Hospital and International Implants, sent to State Fund, to commit precisely this

16   type of fraud on or shortly after March 30, 2010.

17          a.       On or shortly after March 30, 2010, Pacific Hospital submitted a

18   bill to State Fund (Claim #01067019) via the U.S. Postal Service for, among other

19   things, spinal implants.  Pacific Hospital billed the spinal implants and related

20   hardware at $90,282.00, which Pacific Hospital and other Defendants knew

21   misrepresented the amount of reimbursement to which Pacific Hospital was entitled.

22   State Fund was also provided, via the U.S. Postal Service, with a Pacific Hospital

23   purchase order and International Implant invoice purportedly showing the prices

24   paid by Pacific Hospital for these items.  The purchase order listed prices for spinal

25   implants and hardware several times higher than the prices Pacific Hospital actually

26   paid.

27

28

1          b.      The purchase order lists the following supplies from

2    International Implants, along with the fraudulent prices Pacific Hospital supposedly

3    paid:

| Qty | Product ID | Description | I.I. Price Each | Total |
|-----|-----------|-------------|-----------------|-------|
| 4 | 62065-45 | 6.5 x 45 Poly Implant Screw | $2,364.00 | $9,456.00 |
| 2 | 62075-40 | 7.5 x 40 Poly Implant | $2,364.00 | $4,728.00 |
| 2 | 64815-012 | 12mm SD Peek | $6,009.00 | $12,018.00 |
| 2 | 64815-014 | 9 x 25 x 14 SD Med Peek | $6,009.00 | $12,018.00 |
| 6 | 22015 | Set Screw | $396.00 | $2,376.00 |
| 2 | 62004-07 | 70mm Rod Curved | $868.00 | $,1,736.00 |
| 1 | 11-2053 | Medium Cross Link | $2,734.00 | $2,734.00 |

12          c.      Pacific Hospital represented the prices above as the actual cost of

13   the implants and other hardware, but the prices actually paid for these items, based

14   on the Distribution Agreement between Alphatec and International Implants

15   (Exhibit 2.B) show they were not:

| Product ID | Description | I.I. Price | Alphatec Price | Spread | % Markup |
|------------|-------------|-----------|----------------|--------|----------|
| 62065-45 | 6.5 x 45 Poly Implant Screw | $2,364.00 | $712.50 | $1,651.50 | 232% |
| 62075-40 | 7.5 x 40 Poly Implant | $2,364.00 | $712.50 | $1,651.50 | 232% |
| 64815-012 | 12mm SD Peek | $6,009.00 | $1,250.00 | $4,759.00 | 381% |
| 64815-014 | 9 x 25 x 14 SD Med Peek | $6,009.00 | $1,250.00 | $4,759.00 | 381% |
| 22015 | Set Screw | $396.00 | $95.00 | $301.00 | 317% |
| 62004-07 | 70mm Rod Curved | $868.00 | $142.50 | $725.50 | 509% |
| 11-2053 | Medium Cross Link | $2,734.00 | $775.00 | $1,959.00 | 252% |

5018471

d.     For each of these items, International Implants listed a price that far exceeded what it paid Alphatec—which in these examples represented the actual cost of the implants and other hardware.

e.     Pacific Hospital billed State Fund $90,282.00 for the items on the March 30, 2010 purchase order.  When the items on the Pacific Hospital purchase order are priced using Alphatec Distribution Agreement, the total comes to $10,905.00.  In other words, under the Alphatec Distribution Agreement, Pacific Hospital effectively paid only $10,905.00 for the items listed on the Pacific Hospital purchase order, yet billed State Fund $90,282.00 for the same items, more than eight times the amount it paid.  State Fund paid around $51,395.94 for the implants listed on the purchase order from International Implants, over four times the actual cost of those implants.

f.     State Fund paid at least $94,352 in total on bills from Pacific Hospital relating to the spinal surgery procedure under this claim, relying on certifications that the bill was not the product of an illegal kickback or other fraudulent activity in addition to the fraudulent invoices and purchases orders submitted by Pacific Hospital.  Another $13,250 was paid directly to the surgeon that billed on this claim, Defendant Dr. Daniel Capen.

146.   As another example, Exhibit 2.D contains documents from Pacific Hospital and International Implants, to commit precisely this type of fraud on State Fund on or shortly after March 17, 2009.

a.     On or shortly after March 17, 2009, Pacific Hospital submitted a bill to State Fund (Claim #01048725) via the U.S. Postal Service for, among other things, spinal implants.  Pacific Hospital billed the spinal implants and related hardware at $83,980.00, which Pacific Hospital and other Defendants knew misrepresented the amount of reimbursement to which Pacific Hospital was entitled. State Fund was also provided, via the U.S. Postal Service, with a Pacific Hospital purchase order, and other supporting documents from International Implants,

1   purportedly showing the prices paid by Pacific Hospital for these items.  The

2   purchase order lists prices for spinal implants and hardware several times higher

3   than the prices Pacific Hospital actually paid.

4          a.      The purchase order lists the following supplies from

5   International Implants, along with the fraudulent prices Pacific Hospital purportedly

6   paid:

| Qty | Product ID | Description | I.I. Price Each | Total |
|---|---|---|---|---|
| 2 | 62004-06 | 80mm Rod Precontoured | $789.00 | $1578.00 |
| 6 | 22015 | Set Screw | $360.00 | $2,160.00 |
| 3 | 62055-45 | 5.5 x 45 Multi Screw | $2,149.00 | $6,447.00 |
| 1 | 62055-40 | 5.5 x 40 Implant Screw | $2,149.00 | $2,149.00 |
| 2 | 62065-40 | 6.5 x 40 Poly Implant Screw | $2,149.00 | $4,298.00 |
| 1 | 11-2053 | Medium Cross Link | $2,485.00 | $2,485.00 |
| 4 | 64113-110 | 10 xx 20 x 10 LCC Peek Cage | $5,485.00 | $21,940.00 |

15          b.      Pacific Hospital represented the prices above as the actual cost of

16  the implants, but the prices actually paid for these items, based on the Distribution

17  Agreement between Alphatec and International Implants (Exhibit 2.B), show they

18  were not:

| Product ID | Description | I.I. Price | Alphatec Price | Spread | % Markup |
|---|---|---|---|---|---|
| 62004-06 | 80mm Rod Precontoured | $789.00 | $118.75 | $670.25 | 564% |
| 22015 | Set Screw | $360.00 | $95.00 | $265.00 | 279% |
| 62055-45 | 5.5 x 45 Multi Screw | $2,149.00 | $712.50 | $1,436.50 | 202% |
| 62055-40 | 5.5 x 40 Implant Screw | $2,149.00 | $712.50 | $1,436.50 | 202% |
| 62065-40 | 6.5 x 40 Poly Implant Screw | $2,149.00 | $712.50 | $1,436.50 | 202% |
| 11-2053 | Medium Cross Link | $2,485.00 | $775.00 | $1,710.00 | 221% |

27

28

- 64 -

COMPLAINT OF PLAINTIFF STATE FUND

| 64113-110 | 10 xx 20 x 10 LCC Peek Cage | $5,485.00 | $1,704.00 | $3,781.00 | 222% |
|---|---|---|---|---|---|

c.      For each of these items, Pacific Hospital listed a price that far exceeded what it paid Alphatec—which in these examples represented the actual cost of the implants.

d.      Defendants billed State fund $83,980.00 for the items supplied on the April 23, 2009 purchase order.  When the items on that purchase order are priced using the Alphatec Distribution Agreement, the total comes to $11,195.00.  In other words, Pacific Hospital effectively paid $11,195.00 for these items, yet billed State Fund $83,980.00—more than seven times what it paid.  State Fund paid around $41,290.00 for the implants from International Implants, which is over three times the actual cost.

e.      State Fund paid at least $87,264 in total on bills from Pacific Hospital relating to the spinal surgery procedure under this claim, relying on certifications that the bill was not the product of an illegal kickback or other fraudulent activity in addition to the fraudulent invoices and purchase orders submitted by Pacific Hospital.  Another $16,018 was paid directly to the surgeon that billed on this claim, Defendant Dr. Richard Mulvania.

147.   Defendants and their co-conspirators created, provided, and/or facilitated the provision of such fraudulent invoices and purchase orders to State Fund when Pacific Hospital billed State Fund for spinal implants and related hardware, including, but not limited to, the bills listed in the document titled "Pacific Hospital – Spinal Hardware," lodged with the Court, in order to induce State Fund to overpay for spinal implants.  Defendants' co-conspirators caused the fraudulent invoices and purchase orders to be mailed and wired to State Fund.  State Fund reasonably relied on the misrepresentations in these fraudulent bills and on the misrepresentations in invoices and purchase orders in issuing payment on the bills.

1   As these Defendants and the co-conspirators expected, payment was delivered via

2   the U.S. Postal Service.

3        148.   Based on State Fund's bill review, International Implants provided

4   around 75% of the spinal implants that Pacific Hospital billed to State Fund since

5   International Implants' formation in 2007.  As Defendants' co-conspirators knew

6   and intended, International Implants fraudulently listed excessive prices for its

7   spinal implants and related equipment.  State Fund relied on these claims and

8   invoices.

9        149.   As described below, Pacific Hospital paid, or caused to be paid through

10  co-conspirator entities or other related entities or individuals, fees to physicians and

11  others, including the Defendants and the Marketer Defendant, for referring patients

12  to Pacific Hospital and certain affiliates and for ordering and using International

13  Implants hardware in performing those surgeries.  Such referral fees are illegal

14  under California and federal law, as admitted and established in the Plea Agreement.

15  Once referred, the hardware could be overbilled in the manner set forth above.

16       150.   Pacific Hospital paid, or caused to be paid through co-conspirator

17  Entities or other related entities or individuals, the illegal referral fees with proceeds

18  from the fraudulently excessive spinal implant and other fees it charged insurers,

19  including State Fund.  These payments were made to medical providers and others,

20  including the Defendants and Marketer Defendant, via fraudulent and illegal

21  contracts, including so-called management agreements, consulting agreements,

22  rental agreements, option agreements, collection agreements, rental agreements,

23  option agreements, collection agreements, research and development agreements,

24  marketing agreements, and pharmacy management agreements.  This illegal scheme

25  allowed Pacific Hospital to acquire additional patients, while further defrauding

26  State Fund.

27       151.   As described further below, the Drobots and Dr. Bernadett were

28  responsible for devising the fraudulent scheme, and received and controlled profits

5018471

from it.  State Fund is informed and believes, and thereon alleges that the Drobots and Dr. Bernadett conducted periodic meetings with medical professionals, staff, and other employees in order to give direction and oversee the scheme.  Drobot Sr. was, according to California Secretary of State records, Chief Executive Officer and a director of Healthsmart d/b/a Pacific Hospital.  Drobot Sr. admitted in the Plea Agreement that he owns International Implants.  Additionally, International Implants is located at the same office as the Pharmacy and the Administrative Defendants.  Abrazos Healthcare, Inc., alleged as Pacific Hospital's parent corporation, and Mickey Medical, Inc., also share the same office address and have Drobot Sr. as the principal, according to California Secretary of State records.  Moreover, documents produced by third parties show that Drobot Jr. not only sent providers spinal surgery patient referrals, requesting that they be performed at Pacific Hospital, but he also facilitated the payment of illegal kickbacks to providers for those surgeries, under the guise of, for example, rent payments and "advances."

152.   Dr. Bernadett is not a spinal surgeon, and the Drobots and the Entity Conspirators have never been licensed medical providers.  Thus, the Drobots and the Entity Conspirators had to conspire with licensed physicians, including Defendants, to perform the surgeries and to generate the fraudulent claims and bills using the providers' names and signatures in order to fraudulently induce State Fund into paying them.  Without the participation of providers such as Defendants, the Drobots, Dr. Bernadett and the Entity Conspirators would not have been able to execute their fraudulent schemes.

A.   **Billing State Fund for Treatments and Services That Were the Product of Illegal Kickbacks and Referral Fees**

153.   As admitted in the Plea Agreement, the Drobots, Dr. Bernadett, and the Entity Conspirators conspired with dozens of doctors, chiropractors, marketers and others to pay kickbacks in return for those persons to refer thousands of patients to Pacific Hospital and other preferred facilities for spinal surgeries and other medical

1   services including "other types of surgeries, magnetic resonance imaging,

2   toxicology, durable medical equipment, and other services," and/or in exchange for

3   the medical providers agreeing to use certain equipment or devices, including

4   devices from International Implants or a co-schemer's company.  The individuals

5   and entities that were paid these kickbacks included the Defendants and the

6   Marketer Defendant.

7        154.   To facilitate and conceal the payment of these kickbacks, Pacific

8   Hospital—often through an Entity Conspirator or other related entities—entered into

9   fraudulent contracts with providers and others, including the Defendants and the

10  Marketer Defendant, under the guise of management agreements, consulting

11  agreements, rental agreements, option agreements, collection agreements, research

12  and development agreements, and marketing agreements.

13       155.   These fraudulent contracts also allowed the Drobots, Dr. Bernadett and

14  the Entity Conspirators to control or influence the medical decisions of the

15  providers, including Defendants, resulting in bills generated by providers that were

16  driven by financial considerations rather than the needs of the patients.

17       156.   California Bus. & Prof. Code § 650(a) forbids this specific conduct in

18  prohibiting "the offer, delivery, receipt, or acceptance" by or to any licensed

19  medical provider or chiropractor "of any rebate, refund, commission, preference,

20  patronage dividend, discount, or other consideration, whether in the form of money

21  or otherwise, as compensation or inducement for referring patients, clients, or

22  customers to any person."  Moreover, California Bus. & Prof. Code §§ 652

23  and 652.5 provide that violations of the article constitute misdemeanors as to any

24  and all persons, whether or not licensed.  California Insurance Code §§ 750 and 754

25  similarly prohibit offering or paying referral fees for services or goods for which

26  reimbursement will or may be made by an insurer.  California Lab. Code § 139.3(f)

27  also provides, "No insurer, self insurer, or other payor shall pay a charge or lien for

28  any goods or services resulting from a referral in violation of this section."

157.   Many of the bills and various reports submitted to State Fund for services, including reports by Defendants, contained representations that the provider had "not offered, delivered, received or accepted any rebate, refund, commission, preference, patronage, dividend, discount or other consideration, whether in the form of money or otherwise, as compensation or inducement for any referred examination or evaluation" or words to similar effect, or that the bills and/or reports contained no material misrepresentations or omissions.  Defendants and their co-conspirators knew and intended that these representations were false, and knew that State Fund would not have paid for goods or services rendered absent such misrepresentations.

158.   Two of the "Overt Acts" that Drobot Sr. admitted to in the Plea Agreement specifically involve Pacific Hospital submitting a fraudulent bill to State Fund.  Drobot Sr. admitted that, "[o]n or about November 10, 2009, defendant caused a check in the amount of $43,650.00 from SCIF to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient J.M. performed by doctor C.D., which claim was induced by the payment of a kickback to J.C." Plea Agreement at 19.  State Fund paid at least $89,624.99 on the fraudulent bills relating to this surgery.  The "C.D." referred to in the plea agreement is Defendant Dr. Catalino Dureza.  "J.C." is Defendant Jeffrey Catanzarite, D.C.

159.   Drobot Sr. also admitted that "[o]n or about April 14, 2010, [he] caused a check in the amount of $90,467.80 from SCIF to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient L.T. performed by doctor M.C., which claim was induced by the payment of a kickback to P.S." Plea Agreement at 20.  State Fund paid at least $141,532.80 on the fraudulent bills relating to this surgery.  The "M.C." referred to in the plea agreement is Provider Co-Conspirator Dr. Mitchell Cohen.  "P.S." is Provider Co-Conspirator Dr. Philip Sobol.

160.   Pacific Hospital, PSPM, FMM, CPM, IPM, and MMG (detailed further below), among other Drobot-related entities, entered into various contractual agreements with medical providers and medical groups and other individuals, including Defendants and Marketer Defendant.  These contractual agreements included rental agreements, management agreements, option agreements, consulting agreements, lending agreements, and pharmaceutical dispensing agreements.  As Drobot Sr. admitted in the Plea Agreement, through these agreements the Entity Conspirators remitted referral fees to medical providers and groups under the guise of contracts for legitimate services.

161.   For example, Drobot Sr., through PSPM, entered into an "Option Agreement" with Dr. Serge Obukhoff on or around March 15, 2010.  The Option Agreement purports to grant PSPM the exclusive right or "option" to purchase the unspecified assets of Dr. Obukhoff's orthopedic medical practice.  Pursuant to the agreement, PSPM was to make monthly payments to the surgeon of $50,000 in "readily accessible cash" as purported consideration for the grant of the option.  It was contemplated that PSPM would make, in the aggregate, payments equal to $10,000,000 for the "Option," "taking into account the Option Payments previously made to [the surgeon]."

162.   On information and belief, payments contemplated by this agreement were not really "Option Payments" but illegal kickbacks to be paid to the surgeon for performing spinal implant surgeries at Pacific Hospital using devices from International Implants or another coschemer's company and/or for the referral of patients to the Surgical or Pharmacy Entities.  Drobot Sr. admitted in the Plea Agreement that he paid a kickback to an individual referred to as "S.O." in connection with a spinal surgery performed by that individual on at least one occasion.  Plea Agreement at 21.  On information and belief, "S.O." refers to Serge Obukhoff.  In fact, according to payment records produced by Dr. Obukhoff, PSPM paid such kickbacks on numerous occasions, paying Dr. Obukhoff at least

1  $2,307,500 in purported "Option Payments" between April 10, 2010 and March 18,
2  2013.  When asked at his deposition whether he or Pacific Hospital paid kickbacks
3  through purported option agreements, Drobot Sr. invoked the Fifth Amendment.

4       163.  Furthermore, as alleged in paragraphs 141, 149-151, *supra*, Drobot Jr.
5  sent spinal surgery patient cases to providers, requesting that the surgeries be
6  performed at Pacific Hospital, and facilitated the payment of the kickbacks for
7  referrals of patients to Pacific Hospital.  Medical providers, including Defendants,
8  also received kickbacks for referrals of patients to Pacific Hospital through CPM
9  and IPM.

10       164.  The Plea Agreement further establishes that this scheme, as well as the
11  scheme in the previous subsection, has operated to defraud State Fund since 1998
12  through at least 2013.

13  **VI.  <u>FRAUDULENT SCHEMES BY THE PHARMACY ENTITY</u>**
14  **<u>ENTERPRISE</u>**

15       165.  The Pharmacy Entity Enterprise shares much in common with the
16  Surgical Entity Enterprise, including the Drobots as operators, owners, officers and
17  directors; offices and addresses; submission of bills for services or pharmaceuticals
18  provided or prescribed by the same medical providers; the provision of employees
19  and management services by the same Administrative Entities; and similar methods
20  of defrauding State Fund, including the referral of spine patients to doctors (for
21  surgeries to be performed at Pacific Hospital) in connection with inducing these
22  doctors to engage CPM/IPM.  The Pharmacy Entities shared many patients with the
23  Surgical Entities; as noted above, of the over $60 million paid to the Pharmacy
24  Entities by State Fund, more than $30 million of it can be traced to patients who
25  received services from the Surgical Entities.

26       166.  The schemes below are all closely related to the Surgery Entity
27  Enterprise schemes, but are broken out separately because they some contain unique
28  elements.

A.     **Lack of Licenses, Corporate Practice of Medicine, and Payment of Illegal Referral Fees**

1.     **Lack of Licenses**

167.   CPM and IPM, entered into "Physician Office Dispensing Program Management Agreements" with physicians and other medical providers, including Defendants, pursuant to which the providers purportedly retained the Pharmacy Entities to "implement and maintain a Pharmacy Program in Physician's various offices and places of practice for Physician's patients covered under the California Workers' Compensation Program." Pursuant to these agreements, CPM and IPM would receive a share of the profits generated by the filling of prescription drugs in return for managing the "Pharmacy Program."

168.   But rather than simply assisting the physicians in the management of their dispensing programs, CPM and IPM controlled nearly every aspect of these programs. They chose the suppliers, purchased the drugs, employed and supervised (through FMM) the pharmacy technicians and other employees who dispensed the drugs, determined which drugs could and could not be listed on the formularies, provided monetary incentives to push providers to overprescribe or to prescribe the most lucrative medications, covered direct pharmacy costs, submitted bills for reimbursement to insurers, and ultimately controlled the flow of money and how much physicians would be paid for their prescriptions. On information and belief, FMM also provided the physicians' assistants to the providers, who would prescribe medications to patients.

169.   Deposition testimony of the Pharmacy Entities' CFO, Matthew Umbs, confirms that CPM and IPM had complete control over the funds paid to pharmaceutical repackagers and over the funds received from insurers in the form of reimbursements. For example, while the dispensing agreements provided that the physicians were responsible for purchasing the medications necessary for the pharmacy programs, instead, CPM and IPM purchased the medications directly

1  from pharmaceutical repackagers with funds held in a "physician lockbox account,"
2  an account controlled by CPM and IPM and to which the physicians had no access.
3  The Pharmacy Entities' "management fee" was generally "50% of gross collections
4  after deducting the costs of drugs sold and other direct pharmacy costs, including
5  collections and advances."  Upon reimbursement from State Fund, Pharmacy
6  Entities would control the funds, determine whether or not to "paydown" or "write
7  off" the advances paid to the medical providers, including Defendants (which were
8  purportedly paid to enable the medical providers to purchase the pharmaceuticals,
9  even though CPM and IPM in fact did the purchasing), and provide the physicians
10 with some portion of the profits from the reimbursements.

11     170.   Thus, the physicians, including Defendants, never bore any significant
12 out-of-pocket financial risk and were paid simply for prescribing medications to
13 their patients and referring them to the pharmacies run by the Pharmacy Entities,
14 which were often exam rooms in the same building as the physicians' office
15 buildings.  The fee-splitting agreements were therefore simply vehicles through
16 which CPM and IPM paid kickbacks to physicians for referring patients to the
17 pharmacies run by CPM and IPM, and for prescribing lucrative medications to their
18 patients.  Financial documents produced in *State Fund v. Drobot Sr., et al.* show that
19 this was true for Defendants, who did not bear any costs of medications or
20 operational costs, but were simply paid a percentage of profits each month (or, in
21 many cases, large "advances" which were often later written off).  The amounts paid
22 under these pharmacy agreements did not reflect the fair market value of the
23 services provided.  For example, in 2006, Defendant Dr. Capen and CPM were both
24 paid around $2 million *each* for drugs that cost CPM only $500,000.  The pharmacy
25 agreements also often drove the Defendants to write prescriptions at an alarming,
26 implausible rate.  For example, Dr. Capen purportedly wrote over 30,000
27 prescriptions in 2006, and averaged 123 prescriptions *per day* in March of that year,
28 indicating that he was writing prescriptions for medications not dispensed or

- 73 -

COMPLAINT OF PLAINTIFF STATE FUND

overprescribing medications to his patients.  Similarly, in 2005, Defendant Dr. Khalid Ahmed entered into an agreement with PSPM pursuant to which he would be paid $450,000 *per month* for medication and surgery referrals to the Co-Conspirator Entities.  In 2006, he purportedly wrote nearly 23,000 prescriptions, and averaged 92 prescriptions per day in March of that year.  He was paid nearly $2.7 million in "advances" for writing those prescriptions in 2006, for drugs that cost CPM only $327,039.  When the Drobots were questioned about the dispensing agreements, they regularly invoked their Fifth Amendment rights against self-incrimination.

171.   This conduct violates the restrictions placed on provider dispensaries set forth in California Bus. & Prof. Code § 4170.  Moreover, by illegally operating physician dispensaries, CPM and IPM also acted as pharmacies under California Bus. & Prof. Code § 4037, which defines "pharmacy" as "includ[ing], but not limited to, any area, place, or premises…from which the controlled substances, dangerous drugs, or dangerous devices are furnished, sold, or dispensed at retail." Yet neither CPM nor IPM ever had pharmacy licenses, nor were they licensed medical providers.

172.   CPM and IPM also acted as wholesalers, despite the fact that CPM never had a wholesaler license, and IPM's wholesaler license expired on September 1, 2012, according to California state public records.

173.   Under California Bus. & Prof. Code § 4043, "wholesaler" means and includes a person who acts as a wholesale merchant, broker, jobber, customs broker, reverse distributor, agent, or a nonresident wholesaler, who sells for resale, or negotiates for distribution, or takes possession of, any drug or device included in California Bus. & Prof. Code § 4022.  A wholesaler license is required by any business that distributes, brokers, or transacts the sale or return of dangerous drugs or dangerous devices into or within California to other wholesalers, practitioners, or pharmacies.

5018471

174.   Here, CPM and IPM, not the physicians, purchased the drugs from the pharmaceutical repackagers.  They also controlled all, or nearly all, aspects of the pharmacy operations for the physicians.  At the very least, then, CPM and IPM acted as "brokers" for the acquisition of pharmaceuticals for the physicians, meaning that under California Bus. & Prof. Code § 4160, they required a license from the California Board of Pharmacy to operate.

175.   According to California state public records, after a 2005 inspection of CPM, the California Board of Pharmacy on October 28, 2005 ordered CPM to cease and desist operations so long as CPM did not have a license.  In response, CPM assured the California Board of Pharmacy that it had ceased operations and had transferred its contracts to IPM.  CPM also stated that it intended to operate "as a broker, the same as IPM," and thus was applying for a wholesale license.

176.   Above is an excerpt from a letter to the California Board of Pharmacy dated December 6, 2005, where CPM represented that "all operations did cease [as of October 28, 2005] and all contracts were assigned or transferred to IPM in order that we would be compliant with the Board's orders."

COMPLAINT OF PLAINTIFF STATE FUND

1
2
3
4
5
6
7
8
9
10
11
12



2005 DEC -7 PM 5:40

VIA FEDERAL EXPRESS

December 6, 2005

California State Board of Pharmacy
400 R Street, Suite 4070
Sacramento, CA  95814-6237

Re:    Application for Wholesaler/Broker Permit

Dear Sir or Madam:

California Pharmacy Management, LLC ("CPM") is a sister company to Industrial Pharmacy
Management, LLC ("IPM").  IPM currently holds Permit No. WLS 4639.  On October 28, 2005
your office conducted an inspection of the IPM offices and operations.  It was determined by the
Board that CPM was operating without the appropriate permit and that all operations should
cease until CPM applied for a permit.  A copy of the inspection report is attached for your
reference.

All operations did cease at that time and all contracts were assigned or transferred to IPM in
order that we would be compliant with the Board's orders.  CPM has now decided that it desires
to move forward with other operations and that it will need to obtain a permit from the Board.
CPM will not operate until the Board issues such a permit.  Upon issuance of the permit, CPM
will act as a broker, the same as IPM.  To that end, I am submitting the following documents in
support of CPM's Application for Wholesaler License:

13
14
15
16
17

177.   Despite this representation to the Pharmacy Board, CPM never ceased operation—indeed, it billed State Fund for over 7,000 prescriptions from October 28, 2005 through the end of 2005 alone.  No license was ever issued to CPM, yet CPM continued its operations, including billing State Fund, through 2012.

18
19
20
21

178.   On information and belief, MMG also ran pharmacies out of physicians' offices and used the physicians' names to submit bills to State Fund. According to California state public records, MMG, like CPM, was never licensed in any capacity by the Board of Pharmacy when it submitted these bills to State Fund.

22
23
24
25
26
27

179.   CPM, IPM, and MMG misrepresented the services they provided and their right to collect payment.  Lacking the required license and/or authority, these Pharmacy Entities misrepresented their right to collect from State Fund in furtherance of their scheme to overbill State Fund for prescriptions.  State Fund reasonably relied on the misrepresentations in receiving, processing, paying, and settling the invoices and bills from these entities.  Each entity requested payment

28

1    from State Fund through the United States mail and/or interstate wires, and

2    payments were delivered via the U.S. Postal Service or wires.

3         180.   On information and belief, Defendants conspired with the Pharmacy

4    Entities to devise the fraudulent scheme to bill without license or authority, and

5    receive and control profits from it.  Defendants entered into dispensing management

6    agreements that allowed the Drobots and Pharmacy Entities to operate what

7    amounted to unlicensed pharmacies in Defendants' offices.  Defendants knew that

8    the Drobots and Pharmacy Entities controlled all, or nearly all, aspects of the

9    pharmacy operations for the physicians.  As further detailed below, many

10   Defendants even entered into sham "claims purchase" or "lien purchase" agreements

11   that effectively concealed the extent of this control, knowing that these would be

12   submitted to State Fund.

13                    **2.    Corporate Practice of Medicine**

14        181.   The Medical Practice Act, California Bus. and Prof. Code section 2052,

15   provides: "Any person who practices or attempts to practice, or who holds himself

16   or herself out as practicing...[medicine] without having at the time of so doing a

17   valid, unrevoked, or unsuspended certificate...is guilty of a public offense."

18   California Bus. and Prof. Code section 2400, within the Medical Practice Act,

19   provides in pertinent part: "Corporations and other artificial entities shall have no

20   professional rights, privileges, or powers."

21        182.   The policy expressed in Business and Professions Code against the

22   corporate practice of medicine is intended to prevent unlicensed persons, like

23   Defendants, from interfering with or influencing the physician's professional

24   judgment.  For example, the following types of decisions and activities should not

25   be delegated to an unlicensed person, including the Pharmacy Entities: (1)

26   determining what diagnostic tests, medications, or treatments are appropriate for a

27   particular condition; (2) determining the need for referrals to, or consultation with,

28   another physician/specialist; (3) selection and hiring/firing of health staff and

medical assistants; (4) decisions regarding coding and billing procedures for patient care services; (5) determining the selection of medical equipment and medical supplies for the medical practice; and (6) arranging for, advertising, or providing medical services rather than only providing administrative staff and services for a physician's medical practice (i.e., non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business).

183.   Here, the Drobots and Pharmacy Entities interfered with or influenced the physicians' professional judgment, including that of Defendants, by paying them for patient referrals and for prescribing medications or tests (or using devices) that would yield the greatest profit margins, regardless of whether those decisions were in the best interests of their patients.  Indeed, as discussed in paragraphs 26 and 27, *supra*, PSPM wrote a letter to doctors in 2006 reminding them that PSPM controlled all referrals from the doctors, including surgeries, pain management, pharmaceuticals, and psychiatric evaluations.  The letter explicitly states that "[a]ccording to our management agreement all referrals from your office are to be coordinated by PSPM."  PSPM then goes on to specifically demand referrals for: pain management physicians, psychological and psychiatric consultations, MRIs, and durable medical equipment.

184.   The Pharmacy Entities similarly took control of the physicians' pharmacy programs through their "Physician Office Dispensing Program Management Agreements."  Indeed, on information and belief, and as evidenced by financial statements produced in *State Fund v. Drobot Sr., et al.* with regard to Defendants and Provider Co-Conspirators, the physicians committed almost nothing in the way of financial, capital, or human resources to the pharmacy program.  Instead, the Pharmacy Entities purchased the medications from vendors of their choosing, selected, hired, and supervised the pharmacy technicians and other health staff for the pharmacies, dispensed the drugs through their employees, controlled which drugs would be listed on the formularies, and submitted bills to State Fund

1  for collection.  When the costs of certain pharmaceuticals escalated (*e.g.*,
2  Wellbutrin), making them less lucrative from Drobot Jr.'s perspective, he
3  unilaterally decided that those pharmaceuticals needed to be removed from the
4  formularies.

5      185.   Moreover, documents produced in *State Fund v. Drobot Sr., et al.*
6  demonstrate that the Pharmacy Entities went so far as to actually form or attempt to
7  form sham corporations for the medical providers in order to collect against State
8  Fund.  In a letter dated February 1, 2005, CPM explained to a medical provider that
9  in order to avoid issues with collecting on bills submitted to State Fund, CPM had
10 "formed a new California Professional Corporation for [the provider] at no expense
11 to [the provider] and [ ] obtained a new EIN for the new corporation."  The letter
12 included a list of forms that were "necessary to complete the formation of" the
13 corporation and offered to "maintain the Corporation's Minute book in our office."
14 Drobot Jr. is copied on this letter and the letter is signed by Randolph Taylor, who,
15 according to Drobot Sr., served as a paralegal for Drobot Sr.'s former counsel,
16 Michael Tichon.

17     186.   Produced documents in *State Fund v. Drobot Sr., et al.* also show that
18 the Pharmacy Entities and Drobot Jr.—through newly created entities—sought to
19 expand their control over physician decision making by branching into urinary drug
20 testing and ancillary durable medical equipment ("DME") services.

21     187.   On information and belief, Drobot Jr., through IPM or his more
22 recently formed entity, Advanced Practice Services, would coordinate and control
23 physicians' "UDT testing" within their practices in much the same way they
24 controlled the pharmaceutical dispensing.  IPM or Advanced Practice Services
25 would dictate what testing the providers should perform and place a "UDT
26 technician" in a provider's facility.  Moreover, produced documents show the
27 conspirators, or entities controlled by them, making set monthly payments to
28 physicians in exchange for their agreeing to perform a certain number of UDT tests

- 79 -

1   per month, regardless of patient need.  And other emails show Drobot Jr.

2   encouraging Defendant Catanzarite to perform more UDT testing, again regardless

3   of need.  In response, Catanzarite assures Drobot Jr. that he would be "investigating

4   what is going on with the UDT testing" at his facility.  Another Drobot Jr. entity,

5   Advanced Lab, would submit bills to State Fund for the lab services.

6       188.   When the Pharmacy Entities' CFO, Matthew Umbs, was asked about

7   these UDT entities in a deposition, counsel for the Pharmacy Entities instructed him

8   not to answer.  Umbs also refused to answer questions about his own recently

9   formed urinalysis laboratory, US Lab LLC, for which the Planning Commission of

10  the City of Newport Beach recently approved a conditional use permit for the

11  laboratory located at 20377 Acacia Street, the same address listed for many of the

12  Defendants (as described above).

13      189.   Similarly, Umbs recently testified at his deposition that another entity

14  owned by Drobot Jr., Advanced Pharmacy Services, received "commissions" from

15  DME companies whenever such companies sold their products (e.g., back braces) to

16  certain "customers" –presumably physicians associated with Pharmacy Entities.

17  Drobot Sr. also has a DME company, PSPM-DME, Inc., to which State Fund has

18  paid over $4 million.  On information and belief, Pharmacy Entities' exercised

19  control over physicians' professional judgment through these types of arrangements,

20  which were simply vehicles through which the Pharmacy Entities paid kickbacks to

21  physicians for referring patients to the Pharmacy Entities (and other Drobot-

22  controlled entities), for medications, UDT testing, and DME.

23      190.   Defendants each knowingly relinquished control over their medical

24  practices to the Drobots and Pharmacy Entities, who were not licensed medical

25  providers (or even licensed pharmacies), by allowing them to operate pharmacies in

26  the physician's office and direct or influence Defendants as to which

27  pharmaceuticals could and could not be prescribed, and/or which UDT testing or

28  DME should be provided.  These medical providers thus assisted the Drobots and

Pharmacy Entities in their violation of the California Corporate Practice of Medicine Doctrine, codified in California Bus. & Prof. Code §§ 2400 and 2052.  Accordingly, the agreements under which the Pharmacy Entities billed State Fund were illegal because they allowed for the corporate practice of medicine by unlicensed lay corporations.

### 3.    Payment of Referral Fees and Fee-Splitting Agreements

191.   On information and belief, as discussed above, the Pharmacy Entities paid kickbacks to medical providers, including Defendants, in the form of "advances" for the purchase of pharmaceuticals under the "Physician Office Dispensing Program Management Agreements" and through illegal fee-splitting agreements.  In reality, the Pharmacy Entities, not the physicians, purchased the pharmaceuticals from repackagers and other suppliers (often obtaining substantial "rebates" in light of their ownership interests in or other associations with these repackagers/suppliers, thereby increasing profit margins).  Physicians did not incur any significant out-of-pocket expense in connection with these pharmaceutical purchases because CPM and IPM wrote the checks for such purchases using funds from a bank account controlled by them.

192.   In other words, the physicians, including Defendants, kept the sizable monthly advances as payment for referring patients to the pharmacies run by the Pharmacy Entities in the physicians' offices.  On information and belief, additional kickbacks were paid to physicians pursuant to the fee-splitting provisions in the Physician Office Dispensing Program Management Agreements after the Pharmacy Entities were reimbursed by State Fund.  The fee-splitting provisions typically provided that the physicians were entitled to 50% of the collections after costs.  Many also specified a minimum, "guaranteed" monthly payment for the physicians.

193.   The Drobots asked medical providers to sign sham medical lien purchase agreements to satisfy State Fund's requests for proof that the Pharmacy Entities had the right to collect directly on the claims submitted by them, all the

while assuring the medical providers that the fee-splitting arrangement would stay intact despite the purported "sale" of the claims to the Pharmacy Entities.  Financial statements produced in *State Fund v. Drobot Sr., et al.* as to Defendants and their Provider Co-Conspirators show that these "lien purchase agreements" provided to State Fund were false and fraudulent.  While the agreements signed by the Defendants and the Pharmacy Entities, and provided to State Fund, purport to provide that Pharmacy Entities will purchase Defendants' claims, the financial statements show that this did not occur.  Instead, the Pharmacy Entities' relationship with Defendants continued as it had before, with Defendants receiving either "advances," a percentage of profits, or both after the date of the lien purchase agreements.  Defendants never intended to enforce or abide by the terms of "lien purchase agreements," and signed them only to facilitate the fraudulent billing of the Pharmacy Entities.[11]

194.   Moreover, doctors were encouraged to sign CPM/IPM contracts with the promise that spinal surgery referrals (to be performed at Pacific Hospital) would be made as consideration for the contract (e.g., Drobot Jr.'s emails to Dr. Richard Mulvania).  CPM/IPM also "subsidized" PSPM and Pacific Hospital by paying kickbacks to medical providers, including Defendants Dr. Khalid Ahmed, Jeffrey Catanzarite, and Dr. Ismael Silva, as well as Provider Co-conspirators Dr. Ian Armstrong, Dr. Timothy Hunt, Dr. Philip Sobol, and Alan Ivar, for the referral of patients to Pacific Hospital.  PSPM and FMM provided another "bridge" between the Pharmacy Entities Enterprise and the Surgical Entities Enterprise.  On

---

[11] In some cases, some Defendants did begin accepting payment for purported "claims purchases" after the "lien purchase" agreements were signed with different entities. However, these "claims purchases" were not bona fide, and the amounts paid often bore no reasonable economic relationship to the claims purchased. Instead, these "claims purchases" were disguised kickbacks paid for referring patients to the pharmacy programs or referring patients to or performing surgeries at Pacific Hospital.

1  information and belief, in recruiting Defendants and other co-conspirators to

2  participate in their scheme, the Drobots and Dr. Bernadett marketed the strength of

3  the overall enterprise as a "full-service" operation, whereby patients could be

4  recruited at all points of service—from pain management to medications to

5  diagnostic and urinary testing to DME to spinal fusion surgery.  PSPM's

6  management allowed it (and related Drobot Sr. entity FMM) to control the medical

7  practices of both PSPM-managed and other Drobot-affiliated physicians from all

8  angles.

9      195.   Had State Fund known that the claims submitted by the Pharmacy

10 Entities were the byproduct of illegal kickback and fee-splitting arrangements, it

11 would not have paid on those claims.

12     196.   In addition to the prohibitions against such referral fees and kickbacks

13 contained in California Bus. & Prof. Code §§ 650, 652, and 652.5 and California

14 Insurance Code §§ 750 and 754, California Lab. Code § 139.3 specifically prohibits

15 this conduct in the worker's compensation context, including, but not limited to, the

16 referral of patients for clinical laboratory, diagnostic imaging, and "pharmacy

17 goods" to entities in which the physician has a "financial interest" and payment for a

18 referred evaluation or consultation.  California Lab. Code § 139.3(f) also provides,

19 "No insurer, self insurer, or other payor shall pay a charge or lien for any goods or

20 services resulting from a referral in violation of this section."  Many medical

21 providers, including Defendants, submitted certifications to State Fund along with

22 their claims for reimbursement that they had not violated California Lab. Code §

23 139.3 or had "not offered, delivered, received or accepted any rebate, refund,

24 commission, preference, patronage, dividend, discount or other consideration,

25 whether in the form of money or otherwise, as compensation or inducement for any

26 referred examination or evaluation," or otherwise stating their compliance with the

27 law and/or that the bills contained no material omissions.

28

5018471

1    197.   Furthermore, since the contracts between the medical providers and
2  Pharmacy Entities violated California Bus. & Prof. Code §§650, 652, 652.5, 2400,
3  2052, 4022, 4037, 4043, 4160, and 4170, Cal. Ins. Code §§ 750, 754, and 1871.4,
4  California Lab. Code § 139.3, 3215, and 3820, and Penal Code 549 and 550, among
5  other laws, they are illegal.  As mentioned above, illegal contracts are void and
6  unenforceable; the Pharmacy Entities therefore had no standing to submit the bills to
7  State Fund or receive payment for them.

8              B.   **Overbilling and Pricing Manipulation**

9    198.   The Pharmacy Entities—acting as the purported "assignees" of medical
10  providers, including Defendants—engaged in an overbilling scheme against State
11  Fund, similar to that of the Surgical Entities, only with medications.  From 2002 to
12  the present, the Pharmacy Entities (and Defendants through the Pharmacy Entities)
13  have billed over half a million prescription drugs to State Fund.  State Fund has paid
14  out over $60 million based on these bills.

15              **1.   Background on Drug Pricing**

16    199.   All drugs intended for retail sale are identified by an eleven-digit
17  National Drug Code ("NDC") that is listed with the FDA.  The NDC is used to
18  identify the drug delivered to the patient.  The first five digits of the NDC identify
19  the company that manufactured and/or packaged the drug, the middle four digits
20  identify the drug ingredient and dosage, and the last two digits identify package size.

21    200.   Once a drug gets repackaged by a repackager it gets assigned a new
22  NDC.  The first five NDC digits are changed to correspond to the repackager.  Thus,
23  when a repackager sells a drug to a retailer and that drug gets dispensed to a patient,
24  the reported NDC identifies the repackager, not the manufacturer.

25    201.   Each NDC has associated with it pricing benchmarks reported by the
26  manufacturer or repackager that are published in commercial publications.  The two
27  benchmarks relevant to this action are the wholesale acquisition cost ("WAC") and
28  average wholesale price ("AWP").

202.   A drug's wholesale acquisition cost ("WAC") is the baseline price at which the drug's manufacturer sells the drug to wholesalers/repackagers.  While WAC may not represent a wholesaler's actual acquisition cost (as wholesalers may obtain modest discounts off the WAC), it is the baseline price at which the manufacturer sells the drug to wholesalers.  Due to a competitive market, drug wholesaler margins on their sales to retailers tend to be thin.  As a result, the WAC serves as the *de facto* baseline price for two different transactions: (1) the price a wholesaler pays the manufacturer to acquire the drug, and (2) the price a retailer pays a wholesaler to acquire the drug.

203.   A drug's average wholesale price or "AWP" is the nominal price at which wholesalers sell that drug to retailers, including pharmacies and physicians who operate in-office dispensaries.  Historically, a drug's AWP is set directly or indirectly by its manufacturer.  The Red Book, a trade publication that publishes AWPs and other data for thousands of drugs, explains that "[w]hen the manufacturer does not provide an AWP or markup formula from which AWP can be calculated, the AWP will be calculated by applying a standard 20% markup over the manufacturer supplied WAC."  A repackager is also free to report its own AWPs for any drugs it repackages.  Since each NDC comes with its own AWP, any firm that repackages can set both a new NDC and a new AWP.

204.   AWP is important because it is used as a baseline for reimbursement by end payors, including State Fund, to retailers for drugs provided to patients.  This results in a system where the amount retailers pay wholesalers for drugs is pegged to the drug's WAC, but the amount retailers get paid (*i.e.*, receive in reimbursement) is pegged to the drug's AWP.  The amount by which a drug's AWP exceeds its WAC creates a "spread" between the actual cost of the drug to the retailer and the reimbursement paid to the retailer by an insurer.

## 2.   Conspirators' Pricing Manipulation Schemes

205.   Pharmacies and repackagers can increase their profits by increasing the "spread."  Given the proliferation of NDC codes and generic medications, it becomes difficult to track the actual prescription and the actual price.

206.   Since they began billing State Fund, the Pharmacy Entities have engaged in a massive overbilling scheme whereby they billed up to ten or more times the price of basic-over-the-counter medication.  As discussed above, in 2006, CPM billed approximately $8 million for drugs prescribed by Defendant Dr. Capen; it purchased those drugs for only $500,000.  Excessive amounts were charged for tablets, and occasionally, the same provider billed the same prescription twice on the same day.  For example, IPM consistently billed $3.50 for 20 mg of omeprazole (an antacid) per tablet.  Omeprazole is available, over the counter, for approximately $0.40 per tablet.

207.   As with medical procedures and the Surgical Entities, State Fund indicates to the billing provider that if it disagrees with the amount of the payment for prescriptions, it should send additional documentation in support of the claimed amount.  Despite such requests, the Pharmacy Entities typically did not (and do not) submit any additional documentation to justify the excess billing.  Instead, the Pharmacy Entities routinely send additional bills to State Fund and take other actions to collect additional amounts, as detailed below.

208.   CPM and IPM have billed for compound medications as well, which are generally topical creams that contain more than one drug in the ingredients.  CPM consistently billed the entire costs of these medications based on the highest-priced drug in the combination, even when that drug represents the smallest percentage (for example, 10% or less) of the total ingredients.  A spreadsheet of examples of this misconduct is lodged with the Court (titled "CPM – Overbilling Compounds").

209.   State Fund reasonably relied on the Pharmacy Entities' and Defendants' fraudulent bills and invoices in paying for the services and prescriptions.  Based on State Fund's review of billing runs and particular bills, the bills submitted by the Pharmacy Entities and Defendants contained false statements, primarily that the alleged cost of prescriptions provided to covered workers was the actual or reasonable cost of those pharmaceuticals.  On information and belief, each co-conspirator in the Pharmacy Entity Enterprise knew that these bills contained false statements, which were made to induce State Fund to grossly overpay for the prescriptions provided.

210.   The bills and accompanying forms submitted by the Pharmacy Entities and Defendants (as well as other medical providers) also contained false certifications by the providers and/or material omissions or misrepresentations.

211.   On information and belief, Defendants conspired with the Drobots in devising the fraudulent scheme, and received and controlled profits from it.

### 3.   2001-2007 Overbilling Through AWP Manipulation

212.   A more particular kind of overbilling scheme was carried out by the Pharmacy Entities, Drobot Sr. and Drobot Jr., and Defendants who cooperated with CPM and/or IPM in submitting bills for pharmaceuticals to State Fund at any time from 2001 to 2007 ("AWP Defendants"), in an attempt to exploit the then-existing regulatory structure which, like the spinal implant structure, often based charges on middleman charges.

213.   From 2001 to 2007, the "spread" between a drug's AWP and WAC had a predictable standard dictated by industry custom.  For most drugs, the market understood and expected a spread of about 20%.  For example, a particular NDC might have a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP typically 1.20 times its WAC (*e.g.*, $120).  A retailer who bought this drug at WAC and sold it at AWP would pocket the $20—the spread.  The standard spread

1  thus allowed retailers a 20% return on each drug they dispense (and sometimes

2  more).**12**

3      214.   From 2001-2007, the Pharmacy Entities, the Drobots, and AWP

4  Defendants, on information and belief, enacted a complex scheme where the

5  Drobots and Pharmacy Entities acquired or partnered with repackagers, allowing

6  them to engineer spreads over 600% by having the repackagers report wildly

7  inflated AWPs and/or by having the repackagers provide them with steep rebates or

8  discounts.  The conspirators, including AWP Defendants, and the repackagers they

9  conspired with knew these inflated AWPs were nowhere near the "average

10 wholesale price" paid by retailers, nor were they remotely tethered to the drugs'

11 WACs.  Once these inflated AWPs were published, the Pharmacy Entities billed

12 State Fund and others based on these fraudulent AWPs, allowing the conspirators to

13 reap returns in excess of 600% per transaction.  AWP Defendants also had

14 knowledge of the massive spread between the acquisition prices of the drugs they

15 were prescribing and those drugs' reported AWPs, since AWP Defendants were

16 provided with financial statements by the Pharmacy Entities, which contained the

17 costs of goods sold for each month.

18     215.   For drugs prescribed before March 2007, the amount a retailer could

19 charge for drugs depended on whether its NDC was listed in the Medi-Cal fee

20 schedule.  For NDCs not listed in the Medi-Cal fee schedule, California law

21 generally authorized payment for generic drugs at 1.4 times the drug's AWP; brand

22 name drugs were generally paid at 1.1 times the drug's AWP.

23     216.   Because State Fund and other workers' compensation insurers were

24 required by law to reimburse retailers based on AWP for drugs whose NDC was not

25  _____

26 **12** A retailer who pays exactly WAC (*e.g.*, $100) and bills exactly AWP (*e.g.*, $120) would see a 20% profit.  But retailers often pay *below* WAC (due to discounts on the WAC from the manufacturer to wholesaler, passed on to the retailer).  And retailers often bill *above* AWP—until 2007, California generally allowed retailers to bill generic drugs at 1.4 times AWP.

1    listed in the Medi-Cal fee schedule, State Fund relied on AWP data published in

2    commercial publications such as the *Red Book*.  This reliance was well known to the

3    Drobots and Pharmacy Entities, who, on numerous occasions, actively induced State

4    Fund and others to rely on the *Red Book*'s published AWPs.  When State Fund

5    denied payment on one of IPM's many excessive bills, CPM often responded with

6    data taken from the *Red Book* showing the relevant AWP (which State Fund later

7    discovered during its investigation was fraudulently inflated).

8         217.   The conspirators conducted a scheme in which the repackagers under

9    their control vastly overstated the AWPs of many drugs in the data they reported to

10   *Red Book* and other drug pricing publications.  After the inflated AWPs were

11   published, the Pharmacy Entities would continue to pay the same price to acquire

12   their drugs, but they would now charge State Fund much more, claiming that

13   reimbursement was pegged to the published AWPs.  This artificial, fraudulent

14   inflation of reported AWP data led to enormous spreads, which, on information and

15   belief, Pharmacy Entities split with physicians, including AWP Defendants, as part

16   of the payment of kickbacks for referrals and for the use of CPM or IPM's services

17   and pharmacy technicians.

18        218.   The kickback fees incentivized providers, including AWP Defendants,

19   to only order drugs through CPM or IPM's preferred repackagers (who offered the

20   opportunity for huge profit margins through inflated AWPs and sizeable rebates

21   and/or discounts) and to direct their patients fill their prescriptions at the pharmacies

22   run by the Pharmacy Entities in the providers' offices.

23        219.   CPM frequently chose to buy from the repackager DRx.  This choice

24   was deliberate.  In his deposition, Drobot Sr. admitted that he and Drobot Jr.

25   invested in Essence Group Holdings, Inc., the parent company of DRx and another

26   pharmaceutical repackager, Wellinx.  On information and belief, the Drobots

27   exerted control over DRx by demanding rebates on pharmaceuticals in exchange for

28   access to the medical providers' (including Defendants') pharmaceutical business,

- 89 -

1  which the Drobots controlled through CPM, IPM, and MMG.  The Drobots had

2  arranged for DRx to report fraudulently high AWPs to the *Red Book*.  The Pharmacy

3  Entities would order from DRx drugs with wildly inflated AWPs and then bill

4  insurers at least 1.4 times these AWPs.

5        220.   This scheme to systematically overbill State Fund and other insurers by

6  fraudulently reporting inflated AWPs ran from 2001 through March 2007.  It

7  effectively ended in March 2007 after California scrapped its AWP-based

8  reimbursement model for repackagers (the effect is not retroactive, however, so

9  claims with dates of service before March 2007 continue to be reimbursed under the

10  AWP-based formula).  However, the Pharmacy Entities continue to contract with

11  pharmaceutical repackagers to receive "rebates" or "refunds" based on the volume

12  of drugs they were able to broker and dispense with the cooperation of medical

13  providers, including the AWP Defendants.

14                **4.   <u>Specific Examples</u>**

15        221.   After acquiring an ownership share in Essence Group Holdings

16  Corporation, the parent company of DRx and Wellinx, the Drobots, Pharmacy

17  Entities and their coschemers began to falsify the AWP data that DRx reported to

18  the *Red Book*.

19        222.   For instance, DRx reported an AWP of $185.40 for 60 tablets of 150

20  mg Ranitidine.  Yet an invoice from DRx produced in another litigation reveals that

21  DRx actually sold 60 tablets of 150mg Ranitidine to CPM for just $5.26 during the

22  same period.  Assuming DRx sold Ranitidine to CPM at its wholesale acquisition

23  cost, the AWP-WAC spread comes out to 3,424%—many, many times over the

24  standard industry markup.  DRx also reported an AWP of $177.00 for 60 tablets of

25  350mg Carisoprodol.  A relatively contemporaneous DRx invoice shows DRx sold

26  the same amount of the same medication for $8.12, a spread of 2,079%.

27        223.   The $185.40 AWP for DRx's Ranitidine is over nine times the drug's

28  federal upper limit ("FUL") of $20.47—the maximum amount a state Medicaid

1  program is permitted to reimburse providers for the drug.  Before 2007, a drug's
2  FUL was calculated as 150% of the lowest published AWP for therapeutically
3  equivalent products (*e.g.,* the same generic drug from a different manufacturer or
4  repackager).  The same drug has recently been available over the counter for $0.135
5  per 150mg tablet, amounting to $8.10 for 60 tablets.  IPM billed $259.56 (1.4 times
6  AWP) for a drug it had purchased for $5.26 and that retails for $8.10—a 4,900%
7  markup over CPM's actual acquisition cost, and a 3,200% markup over the drug's
8  retail price.

9       224.  As another example, on or shortly after October 26, 2006, CPM and its
10 co-conspirators used the United States mail in furtherance of their scheme to
11 defraud.  CPM submitted a bill to State Fund (Claim #01114173) via the U.S. Postal
12 Service for drugs one of its physicians had prescribed and dispensed to a patient at
13 Pacific Hospital for $815.34, which CPM and other conspirators knew
14 misrepresented the amount of reimbursement to which CPM was entitled.

15      225.  All the drugs for this particular bill have NDCs beginning with
16 "55045," indicating that DRx had supplied all the dispensed drugs.  Pharmacy
17 Entities used DRx's fraudulently reported AWPs to charge State Fund excessive
18 amounts for the drugs dispensed.  In doing so, the Pharmacy Entities knowingly
19 misrepresented DRx's AWPs, which they knew to be fraudulently inflated and false.
20 For example, CPM billed State Fund $255.30 for Carisprodol by multiplying DRx's
21 fraudulent AWP—$177.00—by 1.4 and adding a $7.50 dispensing fee.  DRx's
22 reported AWP for Carisprodol is over 20 times higher than what it actually charges
23 CPM for the drug: $8.12.

24      226.  As another example on this bill, CPM billed State Fund $267.06 for
25 Ranitidine by multiplying DRx's fraudulent AWP—$185.40—by 1.4 and adding a
26 $7.50 dispensing fee.  DRx's reported AWP for Ranitidine is over 34 times higher
27 than what it actually charges CPM for the drug: $5.26.

28

5018471

COMPLAINT OF PLAINTIFF STATE FUND

227.   The conspirators knew and intended that the submitted invoice misrepresented the pharmaceuticals' AWPs, and each knew that the reported AWPs were grossly misleading by industry standards.  Financial records produced by the Pharmacy Entities in *State Fund v. Drobot Sr. et al.* show that AWP Defendants received CPM financial statements showing a tremendous disparity between the cost of the goods (pharmaceuticals) sold by CPM, and the amount billed by CPM for those drugs.  *See*, *e.g.*, ¶¶ 15, 170.  The Drobots, and AWP Defendants reported and/or billed the fraudulent AWPs in order to induce State Fund to overpay for drugs prescribed by the Defendants (and other CPM physicians).  CPM, with the knowledge and assistance of AWP Defendants, caused the fraudulent bills—based off grossly inflated AWPs—to be mailed to State Fund.  State Fund reasonably relied on the misrepresentations in these fraudulent bills in issuing payment on the bills.  As CPM, AWP Defendants, the Drobots and their co-conspirators expected, these payments were delivered via the U.S. Postal Service.

228.   CPM thus partnered with repackagers such as DRx and Wellinx to offer physicians drugs at one price, while billing State Fund at much higher prices, using those repackagers' fraudulently inflated AWPs.  Lodged with the Court is a spreadsheet with representative examples of CPM overbilling State Fund based on the repackagers' fraudulent AWPs (titled "CPM – AWP Manipulation").  Each example is identified by claim number, date of service, NDC, repackager (DRx or Wellinx), and amount billed.  Exhibit 3 is a spreadsheet (Predicate Acts – Pharmacy) that among other things, shows representative billings by each of the AWP Defendants, listing the Defendant, billing entity (CPM), date of service, and amount billed.

229.   Based on the management agreements with PSPM and FMM as well as with CPM and IPM directly, the difference between the actual cost of the drug and the reimbursement paid—the spread—is split between CPM and the prescribing physician.  As a result of this fee-splitting arrangement, CPM provided the

physicians it contracted with, including Defendants, significant incentives.  For certain drugs, the enormous spread between the drugs' actual cost and their reported AWPs gave physicians a significant incentive to prescribe and dispense these drugs—even when better alternatives existed—in order to share in the outsized profits.  Moreover, many of the patients referred to CPM/IPM for medications were referred to Pacific Hospital for treatments as well, making the illegal kickback scheme even more lucrative when the patients were induced to have prescriptions filled by the Pharmacy Entities.

230.   The Pharmacy Entities, Drobots, and the AWP Defendants hid their scheme by using privately held out-of-state repackagers, such as DRx and Wellinx, to manipulate AWPs for CPM's benefit, and by concealing their ownership interests in these repackagers.  The Pharmacy Entities, Drobots, and the AWP Defendants meanwhile wielded DRx's and Wellinx's fraudulent AWPs to demand excessive payments from insurers.

231.   At all relevant times (i.e., 2001-2007), the Drobots owned and controlled CPM, pursuant to California and Secretary of State records.  Drobot Jr. was the President of CPM.  As President, Drobot Jr. managed and operated CPM's affairs.  In managing and operating CPM's affairs, Drobot Jr. collaborated with his father Drobot Sr. as well as with the Administrative Entities.  The AWP Defendants knowingly facilitated the Pharmacy Entities operations.

C.   **The Global Settlements with Certain Pharmacy Entities.**

232.   State Fund entered into certain settlement agreements (the "Global Settlements") with some of the Pharmacy Entities related to liens those entities brought before the WCAB based on their billings to State Fund.  The Global Settlements with CPM, IPM, and LBPP contained "Representations & Warranties" clauses providing that each party to the agreement "is not aware of any duress, menace, *fraud*, coercion, or undue influence which has caused any Party to enter into this Agreement."  The settlement agreements specifically contemplate that

Pharmacy Entities had the authority to settle claims on behalf of medical providers, including many Defendants, because they had the right, title, or interest to the claims at issue.

233.   State Fund is seeking rescission of the settlement agreements because of the fraud perpetrated on it in the course of submitting fraudulent bills and fraudulently inducing State Fund to settle them.  The inflated prices, as alleged above, were meant to make State Fund pay far larger amounts on these claims than otherwise warranted.  If State Fund had known the true nature of Pharmacy Entities' businesses and the scope of the fraudulent enterprise, it would not have settled with these defendants.  State Fund relied on Pharmacy Entities' representations that they had authority to collect and settle the claims at issue—as stated in the agreements themselves—and relied on Pharmacy Entities' representations that they were not aware of any fraud causing State Fund to enter into the settlement agreements.

234.   Yet, Pharmacy Entities were fully aware of their fraudulent activities and billing practices.  Not only were Pharmacy Entities paying illegal kickbacks to providers, engaging in the corporate practice of medicine, and running pharmacies and purchasing pharmaceuticals without licenses, among other things, they were also intentionally misrepresenting and concealing the nature of their arrangements with medical providers from State Fund.

235.   Indeed, before paying bills submitted by the Pharmacy Entities and before entering into the Global Settlements, State Fund demanded that the Pharmacy Entities provide copies of their contracts with providers, including many Defendants, to demonstrate the Pharmacy Entities' right to collect from State Fund. Pharmacy Entities deliberately determined to withhold or alter certain agreements with medical providers—e.g., those which showed the amount of guaranteed "advances" being paid to medical providers in exchange for their pharmaceutical business—to "protect the innocent."  Furthermore, other documents show the Drobots asking medical providers, including many Defendants, to sign sham

5018471

medical lien purchase agreements to satisfy State Fund's requests, all the while assuring the medical providers that the fee-splitting arrangement would stay intact despite the purported "sale" of the claims to the Pharmacy Entities.

## VII.   STATE FUND UNCOVERS THE CONSPIRATORS' WELL-CONCEALED FRAUD

236.   Along with Defendants, the Surgical and Pharmacy Entities and other co-conspirators involved in this scheme have concealed the fraudulent schemes from State Fund by submitting the same or similar bills for procedures and materials over the course of years.  Defendants and their co-conspirators never indicated they had inflated the costs of procedures or materials in their bills to State Fund.  They continued to represent that they were billing State Fund for their actual and reasonable costs.  The Surgical and Pharmacy Entities also did not disclose the connections between and among their related entities, repeatedly discontinuing entities and forming others, while using different tax identification numbers, knowing that State Fund, operating in good faith in the workers' compensation system, could not keep track of morphing entities and schemes.  The Surgical and Pharmacy Entities also did not disclose the true contractual relationships with medical providers, including Defendants, or the involvement of the Administrative Entities.  Indeed, the Plea Agreement with Drobot Sr. indicates that their undetected schemes had been perpetrated against a number of workers' compensation insurers since at least 1998.

237.   Defendants and their co-conspirators also filed Liens at the WCAB on the basis of their fraudulent bills, similarly contending before the WCAB that the bills were legitimate and that the entities were legally entitled to full payment.

238.   As noted, the workers' compensation system provides for, among other things, accelerated treatment and submission and payment of bills, and in certain circumstances, penalties against an insurer when payment of a bill is delayed.  State Fund's limited resources as a public enterprise fund and non-profit state agency,

along with the massive number of bills it receives each day, make the early detection of fraud—especially complex schemes involving multiple sophisticated entities—difficult, if not impossible. State Fund had no reasonable opportunity to investigate the Defendants' and entities' individual bills or the schemes as a whole, and had no reason to suspect the extent and systemic nature of the fraud conducted by the conspirators.

239.   On April 5, 2013, as reported by numerous publications and media outlets, the corporate offices of Pacific Hospital and IPM were served with search warrants by federal and state authorities, including but not limited to the United States Postal Service, the Federal Bureau of Investigation, the Internal Revenue Service, the investigatory arm of the United States Department of Defense, and the California Department of Insurance. The search warrants remain under seal in this Court, so that State Fund still does not know the details, except for those disclosed in the Plea Agreement.

240.   On the basis of these reports, State Fund has conducted (and continues to refine) an in-depth review of billings from and payments to the Surgical and Pharmacy Entities, including reviews of ownership structure, control by the Drobots and Dr. Bernadett, and patterns of claims. The investigation included the review of thousands of bill runs, thousands of individual bills, and thousands of other records including Secretary of State documents, medical regulations and schedules, and industry and trade publications. The initial complaint in *State Fund v. Drobot Sr., et al*. was filed on June 24, 2013. Moreover, a *qui tam* action against some of the conspirators (including Pacific Hospital and Drobot Sr.) was unsealed in Sacramento Superior Court in late July 2013.

241.   Accordingly, State Fund has discovered the various fraudulent schemes described above. These schemes are extensive and go far beyond the traditional relationship of providers and insurers in the workers' compensation system. Given the mass of data and complexity of the schemes, State Fund's investigation is

- 96 -

continuing.  The Entity Conspirators' billings demonstrate a systematic course of conduct to defraud State Fund, in violation of the core purpose of the workers' compensation system: the quick and efficient treatment of injured workers.  The Entity Conspirators' fraudulent schemes, facilitated and assisted by Defendants and Marketer Defendant, make health care more expensive and less efficient for workers' compensation claimants, and negatively impact honest providers.

242.   Furthermore, it was only through discovery in *State Fund v. Drobot Sr., et al*., primarily the production of emails, financial records, and other documents in late 2014 and 2015, that State Fund became aware of facts supporting State Fund's allegations regarding Defendants' facilitation, cooperation, and assistance of the Surgical and Pharmacy Enterprises in carrying out this racketeering activity.  As a result of the active fraudulent concealment of the conspiracy, State Fund asserts the tolling of the applicable statute of limitations affecting the causes of action by State Fund.

## FIRST CAUSE OF ACTION
## (Civil RICO 18 U.S.C. § 1962(d))
### (Agreement by Defendants to Join Surgical Entity Enterprise)
**A. Drobots and Dr. Bernadett, Surgical Entities, and Administrative Entities Formed an Association-in-Fact Enterprise.**

243.   State Fund incorporates by reference the allegations in paragraphs 1-19, 22-164, and 236-242 of this Complaint as though fully set forth herein.

244.   State Fund, Pacific Hospital, International Implants, Long Beach Pain, PSPM, FMM, Dr. Bernadett, Drobot Sr., and Drobot Jr. are each "persons" as defined in 18 U.S.C. § 1961(3).

245.   The Drobots and Dr. Bernadett, Surgical Entities, and Administrative Entities (in this First Cause of Action, shortened to "Surgical Conspirators"),

- 97 -

1   including their employees and agents, formed an association-in-fact enterprise

2   within the meaning of 18 U.S.C. § 1961(4), the "Surgical Entity Enterprise."

3       246.   The Surgical Entity Enterprise is an ongoing organization consisting of

4   both corporations and individuals that associated for common and shared purposes,

5   including: (a) the fraudulent billing and overbilling of spinal implants through the

6   use of illegal kickbacks and fee-splitting; (b) the fraudulent billing and overbilling

7   of other medical services using sham contracts designed to hide the corporate

8   practice of medicine; (c) deriving increased profits from the activities of the

9   enterprise; and (d) concealing the fraudulent nature of the enterprise's activities.

10  *See supra* paragraphs 133-164.  Lodged with the Court is a spreadsheet containing

11  non-exhaustive, representative samples of predicate acts committed in furtherance of

12  the alleged fraudulent schemes titled: Pacific Hospital – Spinal Hardware.

13      247.   Drobot Sr. owns and/or controls each of the Surgical Entities.

14  Specifically, Drobot Sr. owns and/or controls Pacific Hospital and Long Beach Pain

15  (and is an officer and director of both), as well as International Implants.  Moreover,

16  International Implants registered the same business address with the California

17  Secretary of State as the Pharmacy entities now under Drobot Jr.'s control, including

18  CPM, IPM, Coastal, and LBPP, as well as the Administrative Entities, PSPM and

19  FMM.  Dr. Bernadett owned and/or controlled each of the Surgical Entities from at

20  least 2005-2010.  Specifically, Dr. Bernadett owned and/or controlled Pacific

21  Hospital and Long Beach Pain, as well as International Implants and PSPM.  Drobot

22  Jr., according to Pacific Hospital testimony, also worked in the Purchasing

23  Department of Pacific Hospital, used Healthsmart Corp. and Pacific Hospital email

24  addresses, referred patients to spinal surgeons for surgery at Pacific Hospital,

25  facilitated the payment of kickbacks to medical providers, and directed the

26  Pharmacy Entities at the same address as many Surgical Entities.  Thus, on

27  information and belief, State Fund alleges that the Drobots and Dr. Bernadett

28

5018471

1 │ coordinated with one another and with the Surgical Entities to implement and

2 │ disguise the enterprise's schemes.

3 │     248.  The enterprise functioned as a continuing unit as evidenced by the

4 │ numerous, ongoing transactions between its members.  For example, since 2007

5 │ International Implants has provided Pacific Hospital with over 75% of Pacific

6 │ Hospital's spinal implant equipment, with numerous fraudulent invoices being

7 │ exchanged between the entities and distributed to State Fund.  Indeed, patients have

8 │ been shuffled back and forth between the surgical and pharmacy sides, with over

9 │ $30 million of the over $60 million paid by State Fund to the Pharmacy Entities

10 │ representing patients who were also used in the Surgical schemes.  Further, over

11 │ 8,700 claims submitted to State Fund involved treatment by both a Pharmacy Entity

12 │ and a Surgical Entity.

13 │        **1.**    **The Drobots and Dr. Bernadett, Surgical Entities, and**

14 │               **Administrative Entities Each Conducted the Enterprise's**

15 │               **Affairs**

16 │     249.  International Implants supplied Pacific Hospital with fraudulent

17 │ invoices, knowing that the invoices would be used in furtherance of the enterprise's

18 │ scheme to overbill spinal implants.  Pacific Hospital participated in the enterprise by

19 │ submitting fraudulent invoices and bills containing false certifications by

20 │ Defendants to State Fund, in furtherance of the enterprise's scheme to overbill

21 │ spinal implants.  Long Beach Pain participated in the affairs of the enterprise by

22 │ submitting fraudulent bills to State Fund and other insurers, in furtherance of the

23 │ enterprise's scheme to overbill medical services.  *See supra* paragraphs 133-164.

24 │ Drobot Sr. owns and directs the activities of Pacific Hospital (at least until it was

25 │ recently sold), Long Beach Pain, and International Implants; Abrazos Healthcare,

26 │ Inc. (the parent corporation of Pacific Hospital) and International Implants have

27 │ registered the same business address with the California Secretary of State as the

28 │ Pharmacy entities now under Drobot Jr.'s control, including CPM, IPM, Coastal,

- 99 -

COMPLAINT OF PLAINTIFF STATE FUND

and LBPP, as well as the Administrative Entities, PSPM and FMM.  Emails show Drobot Jr. facilitated the payment of kickbacks, referred spine patients to doctors in connection with getting them to sign management agreements with IPM/CPM (for surgeries to be performed at Pacific Hospital), and according to Pacific Hospital testimony, also worked in the Purchasing Department of Pacific Hospital.  Thus, State Fund alleges that, on information and belief, working with one another, the Drobots and Dr. Bernadett directed their respective entities in carrying out the enterprise's schemes.

250.   The Administrative Entities participated in both enterprises by "leasing" or providing employees to facilitate and conceal that the Surgical and Pharmacy Entities were engaging in kickbacks, the corporate practice of medicine, and illegal fee-splitting.  The Administrative Entities' contracts were designed to, and did, hide the true nature of what the fraud in which the other co-conspirators, including Defendants, were engaged from State Fund and other insurers.

## 2.   **The Surgical Entity Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail and Wire Fraud Violations**

251.   The Surgical Entity Enterprise engaged in a pattern of racketeering activity by committing multiple acts of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  Pacific Hospital and Long Beach Pain each caused the fraudulent use of United States mail and interstate wires by sending thousands of fraudulent bills and invoices via U.S. Postal Service or electronically, in furtherance of the scheme to overbill spinal surgeries, including spinal implants, and other medical services.  International Implants caused the fraudulent use of United States mail by providing Pacific Hospital with fraudulent invoices, intending and foreseeing that the invoices would be mailed in furtherance of the enterprise's scheme to overbill spinal implants. Defendants generated the fraudulent bills and allowed them to be submitted under their names as licensed

1   medical professionals, knowing the bills would be submitted to State Fund through

2   the U.S. Postal Service or electronically.

3        252.   The Drobots and Dr. Bernadett engaged in a pattern of racketeering

4   activity by directing the Surgical Entities to use the United States mail and interstate

5   wires in furtherance of the overbilling schemes, in violation of 18 U.S.C. § 1341 and

6   18 U.S.C. § 1343.  In furtherance of the enterprise's overbilling schemes, Drobot Sr.

7   arranged for: International Implants to mail and wire fraudulent invoices to Pacific

8   Hospital; Pacific Hospital to mail and wire fraudulent bills and invoices to State

9   Fund; Long Beach Pain to mail and wire fraudulent bills to State Fund; and Pacific

10  Hospital, through the Administrative Entities, to mail and wire illegal payments to

11  medical providers, including Defendants, and marketers, including Marketer

12  Defendant.  Drobot Jr. acted in furtherance of the enterprise's schemes through his

13  patient referrals and by facilitating the payment of kickbacks to providers, along

14  with his involvement with the Administrative Entities.  The conspirators made these

15  arrangements intending to defraud State Fund and others by making them overpay

16  for spinal surgeries, including spinal implants, and other medical services.

17       253.   The Surgical Entities also used, and caused the use of, the United States

18  mail and interstate wires to submit other correspondence and documents in

19  furtherance of the Surgical Entity Enterprise, including communications designed to

20  conceal the enterprise's fraudulent activities.

21          **3.**     **The Surgical Entity Enterprise Affected Interstate**

22                  **Commerce**

23       254.   The Surgical Entity Enterprise could not have been carried out without

24  the United States mail or interstate wires, which were used for the submission of the

25  fraudulent bills, correspondence about them, and payment on them.

26       255.   Further, on information and belief, the Surgical Entity Enterprise's

27  schemes cheated State Fund and other workers' compensation insurers out of

28  hundreds of millions of dollars.  The cost of this fraud is passed on, at least in part,

5018471

to employers who purchase workers' compensation insurance in California.  Many employers with California employees have their principal place of business outside California.  Many employers are also publicly traded companies, with shareholders spread across the United States.  The Surgical Entity Enterprise's racketeering injured both in-state and out-of-state employers and their shareholders, therefore affecting interstate commerce.  Provider fraud affects the premiums charged for workers' compensation insurance for these multi-state and international employers.

256.   The spinal implants were shipped by interstate commerce carriers, including United States mail services.  On information and belief, many of the spinal implants were manufactured outside of California and shipped into California.

257.   As alleged in a prior RICO action brought by CPM against another insurer, the interstate nature of many companies and the mobility of employees means that the business of workers' compensation insurance, even for only California workers, dramatically impacts interstate commerce.  This is confirmed by the federal nature of the investigation revealed earlier this year, with participation by the United States Postal Service as well as the Federal Bureau of Investigation.

### 4.   State Fund Relied on the Surgical Entity Enterprise's Misrepresentations and Suffered Financial Injury As a Result.

258.   In carrying out their fraudulent schemes, the Surgical Conspirators knew that State Fund would rely on the accuracy of the Surgical Entities' misrepresentations in order to set proper reimbursement amounts.

259.   In addition, the Surgical Conspirators knew that State Fund reimburses medical providers in accordance with the California Labor Code and regulations promulgated thereunder.  The Surgical Conspirators were keenly aware of these laws and regulations, and made specific misrepresentations intending and foreseeing

1 | that State Fund would rely on these misrepresentations in complying with law,

2 | causing the Surgical Entities to be overpaid.

3 |     260.  State Fund reasonably relied on the misrepresentations of the Surgical

4 | Conspirators, which were knowingly facilitated and assisted by Defendants as set

5 | forth below, and indeed essential to the enterprise's success.  These violations of 18

6 | U.S.C. § 1962(c) directly and proximately caused State Fund substantial injury to

7 | business and property by causing State Fund to overpay many millions of dollars in

8 | inflated reimbursements for spinal implants and other medical services.  State Fund

9 | would not have made these overpayments had the conspirators not engaged in their

10 | pattern of racketeering activity.  This racketeering activity also caused State Fund to

11 | incur out-of-pocket costs and related expenses that would otherwise not have been

12 | incurred.

13 |     261.  As a direct and proximate result of this unlawful racketeering activity,

14 | State Fund suffered damages in an amount to be proven at trial.  However, as

15 | alleged above, State Fund would not have done business with Defendants or their

16 | co-conspirators had it known of the well-concealed fraud, so that State Fund claims

17 | all amounts it paid to Defendants, Surgical Entities, and Defendants' other co-

18 | conspirators under these false pretenses as damages, since Defendants and their co-

19 | conspirators had no right to it.[13]

20 |     262.  Under the provisions of 18 U.S.C. § 1964(c), Surgical Conspirators are

21 | jointly and severally liable to State Fund for three times the damages that State Fund

22 | has suffered as alleged in the previous paragraph, plus the costs of bringing this suit,

23 | including reasonable attorneys' fees.  Because, as discussed below, Defendants are

24 | liable for conspiring with these individuals and entities under 18 U.S.C. § 1962(d),

25 | Defendants are accordingly jointly and severally liable to State Fund for this amount

26 | as well.

27 | 
28 |     [13] State Fund is seeking these damages from Defendants' co-conspirators in *State Fund v. Drobot Sr., et al.*

B. **Defendants' Liability for Civil RICO Conspiracy Under 18 U.S.C. § 1962(d).**

263.   State Fund incorporates by reference the allegations in paragraphs 1-19, 22-164, 236-242, and 243-262 of this Complaint as though fully set forth herein.

264.   Defendants are each "persons" as defined in 18 U.S.C. § 1961(3).

1. **Each Defendant Knew of and Agreed to Facilitate the Surgical Entity Enterprise's Criminal Purpose.**

265.   Defendants and their co-conspirators formed an agreement to violate 18 U.S.C. § 1962(c).  Each of these Defendants knew of the nature of Surgical Entity Enterprise's conspiracy to defraud State Fund by paying kickbacks for referrals and overbilling State Fund for spinal implants and other medical procedures while taking active steps to conceal the fraud.

266.   Each Defendant agreed to join this conspiracy, agreed to commit at least two predicate acts, and each agreed to commit, facilitate, or participate in a pattern of racketeering activity in furtherance of the conspiracy.

2. **Each Defendant Committed Predicate Acts In Furtherance of the Enterprise's Criminal Purpose.**

267.   During the existence of the conspiracy, each of the Defendants and Surgical Conspirators agreed to the commission of multiple predicate acts in furtherance of the conspiracy to defraud and overbill State Fund, and committed, facilitated, or participated in the commission of at least two predicate acts.

268.   Pacific Hospital agreed to and did commit multiple instances of mail and wire fraud in furtherance of the conspiracy by mailing and wiring fraudulently inflated bills and invoices.  International Implants agreed to facilitate Pacific Hospital's pattern of racketeering by supplying Pacific Hospital with fraudulent invoices.

5018471

269.   Long Beach Pain, under the same ownership as the other Pharmacy Entities, agreed to and did commit multiple instances of mail and wire fraud by mailing and wiring fraudulent bills.

270.   The Drobots and Dr. Bernadett agreed to and did commit multiple instances of mail and wire fraud by directing Surgical Entities to commit the predicate acts above, intending and foreseeing that the acts of mail and wire fraud would follow in the ordinary course of business.  The Drobots and Dr. Bernadett also agreed to and did conduct the enterprise's affairs.  Among other things, on information and belief, the Drobots and Dr. Bernadett conducted the enterprise's affairs by devising its schemes, obtaining profits from them, and meeting with the Surgical Entities' employees and medical providers in order to direct the schemes.

271.   Defendants agreed and did commit multiple instances of mail and wire fraud by committing and facilitating the predicate acts above, intending and foreseeing that the acts of mail and wire fraud would follow in the ordinary course of business. Defendants also agreed to and did conduct the enterprise's affairs. Among other things, Defendants conducted the enterprise's affairs by generating fraudulent documents, making material misrepresentations to State Fund, accepting kickbacks from the Surgical Entities, Pharmacy Entities and others, and meeting and/or communicating with the Drobots and Dr. Bernadett and employees of the Surgical and Pharmacy Entities in order to further the schemes.

272.   Marketer Defendant agreed and did commit multiple instances of mail and wire fraud by committing and facilitating the predicate acts above, intending and foreseeing that the acts of mail and wire fraud would follow in the ordinary course of business.  Marketer Defendant also agreed to and did conduct the enterprise's affairs.  Among other things, Marketer Defendant conducted the enterprise's affairs by arranging for surgeries to be performed by the Defendants, directing the Defendants to use fraudulently-inflated hardware, accepting and paying kickbacks, and meeting and/or communicating with the Drobots and Dr. Bernadett,

1  Defendants, and employees of the Surgical and Pharmacy Entities in order to further
2  the schemes.

3       273.   Specific examples of predicate acts committed in furtherance of the
4  conspiracy are provided in paragraphs 133-164 and in the spreadsheet lodged with
5  the Court.

6       **3.    State Fund Suffered Injury From the Predicate Acts**
7             **Committed In Furtherance of the Enterprise's Criminal**
8             **Purpose**

9       274.   The predicate acts of mail and wire fraud that Defendants agreed to,
10  facilitated, and did commit directly and proximately caused State Fund to suffer
11  substantial injury to its business and property, as alleged in greater detail above.

12      275.   Under the provisions of 18 U.S.C. § 1964(d), Defendants are jointly
13  and severally liable to State Fund for three times the damages that State Fund has
14  suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

15              **SECOND CAUSE OF ACTION**
16          **(Civil RICO Conspiracy 18 U.S.C. § 1962(d))**
17  **(Agreement By Defendants[14] to Join Pharmacy Entity Enterprise)**

18      276.   State Fund incorporates by reference the allegations in paragraphs 1-17,
19  20-118, 181-269, and 290-312 of this Complaint as though fully set forth herein.

20      277.   State Fund, the Drobots, each of the Administrative Entities, each of
21  Defendants, and each of the Pharmacy Entities are "persons" as that term is defined
22  in 18 U.S.C. § 1961(3).

23
24
25
26
27      _____
       **[14]**   For purposes of this Section only, the term "Defendants" shall *not* include
28  the Marketer Defendant, Dr. Chambi, or Dr. Shortz.

5018471

**A. The Drobots, Dr. Bernadett, Pharmacy Entities, and Administrative Entities Formed an Association-in-Fact Enterprise.**

278.   The Drobots, Dr. Bernadett, Pharmacy Entities, Administrative Entities and their employees and agents (for purposes of this second cause of action, "Pharmacy Conspirators") formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the Pharmacy Entity Enterprise).

279.   The Pharmacy Entity Enterprise is an ongoing business organization consisting of both corporations and individuals that are and have been associated for common or shared purposes, including: (a) running pharmacies and purchasing and selling drugs for those pharmacies without a license to do so and collecting reimbursements; (b) overbilling for drugs sold, including past manipulation of AWPs; (c) entering into fraudulent contracts and engaging in the corporate practice of medicine, and misrepresenting their right to bill State Fund; (d) deriving increased profits from the activities of the enterprise; (e) the payment of kickbacks for referrals for surgical and pharmaceutical services at preferred facilities; and (f) concealing the fraudulent nature of the enterprise's activities.  *See supra* paragraphs 165-242.  Lodged with the Court are spreadsheets, originally lodged in *State Fund v. Drobot Sr., et al.*, containing non-exhaustive, representative samples of predicate acts committed in furtherance of the alleged fraudulent schemes involving bills submitted from CPM, IPM, MMG, LBPP, and Coastal.  Exhibit 3 is a spreadsheet providing representative samples of predicate acts committed in furtherance of the alleged fraudulent schemes involving bills submitted from CPM and IPM on behalf of, and with the cooperation and assistance of, Defendants.

280.    The Drobots own and control each of the Pharmacy Entities, or owned and controlled them in the past.  Drobots coordinated with one another, with Dr. Bernadett, and with Pharmacy Entities to implement and disguise the enterprise's schemes.  Drobot Jr., who now owns and controls the Pharmacy Entities,

coordinated with Drobot Sr., who formerly owned CPM and IPM, to implement the enterprise's scheme to run pharmacies and purchase and sell drugs without the required licenses.  Dr. Bernadett, along with the Drobots, approved and facilitated the payment of kickbacks and other illegal fees to Defendants through the Pharmacy Entities.  As noted above, CPM replaced IPM, and Coastal apparently replaced or took over for LBPP, and IPM used LBPP in its business.

281.   The Drobots also coordinated with repackagers, owned by Drobot Sr. and Drobot Jr. or partnering with them, in implementing the enterprise's scheme of reporting and disseminating fraudulent AWPs and overbilling for drugs.  The Drobots and the Pharmacy Entities further coordinated with the repackagers in arranging for these drugs to be shipped to physicians and patients.  The enterprise functioned as a continuing unit as evidenced by the numerous, ongoing transactions between its members.  For example, from 2001 through at least 2007, DRx provided drugs to Pharmacy Entities and/or the physicians with whom the Pharmacy Entities contracted.  The enterprise's functioning as a continuing unit is further evidenced by the Drobots' common ownership and/or control over each of the Pharmacy Entities and the repackagers with whom they conspired, and the medical providers' continued involvement.

282.   The Administrative Entities and CPM/IPM also entered into contracts with providers, including Defendants, at the guidance and direction of the Drobots and Dr. Bernadett, which led to unlicensed activity, the illegal corporate practice of medicine and improper fee-splitting and kickbacks.

1.    **The Pharmacy Conspirators Each Conducted the Affairs of the Enterprise**

283.   Each Pharmacy Conspirator participated in the affairs of the Pharmacy Entity Enterprise.  For example, to conceal the enterprise's fraudulent activities, each Pharmacy Entity, acting under the direction of the Drobots, implemented practices of paying kickbacks and overbilling certain medications.

284.   The Drobots and Dr. Bernadett conducted the affairs of the Pharmacy Entity Enterprise by devising the enterprise's schemes and operating the enterprise's members in furtherance of those schemes.  Drobots own and control each of the Pharmacy Entities.  For example, Drobot Jr. is currently the owner and the President and CEO of IPM/CPM; in this capacity, he directed and managed CPM's participation in the Pharmacy Entity Enterprise.  Drobot Jr. further conducted the affairs of the Pharmacy Entity Enterprise by entering into contracts with physicians and repackagers (such as DRx and Aidarex) on IPM/CPM's behalf.  Drobot Sr. conducted the affairs of the Pharmacy Entity Enterprise by owning CPM/IPM and directing its activities at least until 2010, as well as acquiring DRx, on information and belief, in order to manipulate its AWPs.  *See supra* paragraphs 47-61, 123-132, 219, 221-231.  Dr. Bernadett conducted the affairs of the enterprise by approving and facilitating the payment of kickbacks and other illegal fees to medical providers, including Defendants, through the Pharmacy Entities.

285.   The Pharmacy Entity Enterprise has or had additional connections to the Surgical Enterprise as well.  Patients have been shuffled back and forth between the surgical and pharmacy sides, with over $30 million of the $60 million paid by State Fund to the Pharmacy Entities representing patients who were also used in the Surgical Scheme.  Over 8,700 claims submitted to State Fund involved treatment by both a Pharmacy Entity (or by physicians with whom they contracted) and a Surgical Entity.

## 2.   **The Pharmacy Entity Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail and Wire Fraud Violations**

286.   The Pharmacy Conspirators engaged in a pattern of racketeering activity by committing multiple acts of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.  Each Pharmacy Entity caused the fraudulent use of United States mail or interstate wires by sending, via U.S. Postal

Service or electronically, bills where it misrepresented its right to reimbursement for drugs on which it had no right to collect.  Each Pharmacy Entity also caused the fraudulent use of United States mail or interstate wires by sending fraudulently inflated bills; some of these bills contained further misrepresentations in the form of falsified AWP data.  Pharmacy Entities mailed and wired their fraudulent bills intending to defraud State Fund and others, making them overpay for the drugs sold.

287.   The Drobots and Dr. Bernadett engaged in a pattern of racketeering activity by directing Pharmacy Entities and their repackagers to use the United States mail and interstate wires in furtherance of the enterprise's schemes, in violation of 18 U.S.C. § 1341 and § 1343.  In furtherance of the enterprise's schemes, Drobots and Dr. Bernadett arranged for, among other things: Pharmacy Entities to misrepresent, via interstate mail and wire, their right to reimbursement for drugs they had no right to sell; Pharmacy Entities to enter into improper contracts and activities with providers as well as Administrative Entities which provided for the illegal corporate practice of medicine, illegal fee-splitting, kickbacks, and unlicensed pharmacy work; and Pharmacy Entities to overbill State Fund via interstate mail and wire.  The Drobots and Dr. Bernadett made these arrangements intending to defraud State Fund and others, making them overpay for the drugs sold.

288.   Pharmacy Entities shared patients and providers with the Surgical Entity Enterprise.  On information and belief, the Pharmacy Conspirators by contract agreed to share certain proceeds from the enterprise's activities with physicians who referred patients to the pharmacies run by the Pharmacy Entities in the physicians' offices.  The Pharmacy Conspirators thus provided physicians, including Defendants, with a strong financial incentive to prescribe drugs and refer the patients to the Pharmacy Entities—an incentive that often counseled against the best interests of the physicians' patients, resulting in bills for medically unnecessary pharmaceuticals.

289.   The Pharmacy Entities also used and caused the use of the United States mail and interstate wires to submit other correspondence and documents in furtherance of the Pharmacy Entity Enterprise, including communications and contractual agreements with medical providers, including Defendants, designed to conceal the enterprise's fraudulent activities.

### 3.    The Pharmacy Entity Enterprise Affected Interstate Commerce

290.   The Pharmacy Entity Enterprise could not have been carried out without the United States mail and interstate wires, which were used for the submission of the fraudulent bills, correspondence about them, and payment on them.

291.   Further, on information and belief, the Pharmacy Entity Enterprise's schemes cheated State Fund and other workers' compensation insurers out of millions of dollars.  The cost of this fraud is passed on, at least in part, to employers who purchase workers' compensation insurance in California.  Many employers with California employees have their principal place of business outside California.  Many employers are also publicly traded companies, with shareholders spread across the United States.  The Pharmacy Entity Enterprise's pattern of racketeering injured both in-state and out-of-state employers and their shareholders, therefore affecting interstate commerce.  Provider fraud affects the premiums charged for workers' compensation insurance for these multi-state and international employers and entities.

292.   As alleged in a prior RICO action brought by CPM against another insurer, the interstate nature of many companies and the travel and transport of employees means that the business of workers' compensation insurance, even for California workers, dramatically impacts interstate commerce.  This is confirmed by the federal nature of the investigation revealed earlier this year, with participation by the United States Postal Service as well as the Federal Bureau of Investigation.

293.   CPM/IPM also partnered with at least one medical group in Indiana, OrthoIndy, and used LBPP to dispense prescription medications to individuals living there.  IPM's website also lists an apparent business office in Maryland, and promotes itself as a nationwide manager of prescriptions for physicians.

**4.**   <u>**State Fund Relied on the Pharmacy Entity Enterprise's Misrepresentations and Suffered Financial Injury as a Result**</u>

294.   In carrying out their fraudulent schemes, the Pharmacy Conspirators knew that State Fund would rely on the accuracy of the conspirators' misrepresentations in order to set proper reimbursement amounts.

295.   The Pharmacy Conspirators knew that State Fund reimburses medical providers in accordance with the California Labor Code and regulations promulgated thereunder.  The Pharmacy Conspirators were aware of these laws and regulations and made specific misrepresentations intending and foreseeing that State Fund would rely on these misrepresentations in order to comply with law, causing Pharmacy entities to be overpaid.

296.   State Fund reasonably relied on the Pharmacy Conspirators' misrepresentations.  The Pharmacy Conspirators' violations of 18 U.S.C. § 1962(c) directly and proximately caused State Fund substantial injury to business and property by causing State Fund to overpay millions of dollars in inflated reimbursements for the drugs that Pharmacy Entities illegally sold.  State Fund would not have made these payments had the conspirators not engaged in their pattern of racketeering activity.  This racketeering activity also caused State Fund to incur out-of-pocket costs and related expenses that would not have otherwise been incurred.

297.   As a direct and proximate result of this unlawful racketeering activity, State Fund suffered damages in an amount to be proven at trial.  However, as alleged above, State Fund would not have done business with the Pharmacy Entities had it known of the well-concealed fraud, so that State Fund claims all amounts it

5018471

1  paid to the Pharmacy Entities under these false pretenses as damages, since the

2  Pharmacy Entities had no right to these funds.

3       298.  Under the provisions of 18 U.S.C. § 1964(c), each of the Drobots and

4  Dr. Bernadett, each of the Pharmacy Entities, and each of the Administrative

5  Entities are jointly and severally liable to State Fund for three times the damages

6  that State Fund has suffered, plus the costs of bringing suit to recover those

7  amounts, including reasonable attorneys' fees.[15]  Because, as discussed below,

8  Defendants are liable for conspiring with these individuals and entities under 18

9  U.S.C. § 1962(d), Defendants are accordingly jointly and severally liable to State

10  Fund for this amount as well.

11      C.  **Defendants' Liability for Civil RICO Conspiracy Under 18 U.S.C.**

12        **§ 1962(d).**

13       299.  State Fund incorporates by reference the allegations in paragraphs 1-17,

14  20-132, 165-242, and 276-298 of this Complaint as though fully set forth herein.

15       300.  State Fund, the Drobots and Dr. Bernadett, each of the Administrative

16  Entities, each of Defendants, and each of the Pharmacy Entities are "persons" as that

17  term is defined in 18 U.S.C. § 1961(3).

18      **1.**  **Each Defendant Knew of and Agreed to Facilitate the**

19        **Pharmacy Entity Enterprise's Criminal Purpose**

20       301.  Defendants and the Pharmacy Conspirators formed an agreement to

21  violate 18 U.S.C. § 1962(c).  Each conspirator knew of the Pharmacy Entity

22  Enterprise's conspiracy to defraud State Fund by submitting fraudulent bills and

23  overbilling State Fund for drugs that the enterprise purchased from distributors for

24  the unlawful pharmacies and illegally sold through those pharmacies while taking

25  active steps to conceal the fraud.  Each conspirator agreed to join this conspiracy,

26

27        [15] State Fund is seeking these damages from Defendants' co-conspirators in

28  *State Fund v. Drobot Sr., et al.*

5018471

1  and each agreed to commit, facilitate, or participate in a pattern of racketeering
2  activity in furtherance of the conspiracy.

3          **2.      Each Conspirator and Defendant Committed Predicate Acts**
4                  **In Furtherance of the Enterprise's Criminal Purpose.**

5          302.   During the existence of the conspiracy, each of the Defendants agreed
6  to the commission of multiple predicate acts in furtherance of the conspiracy to
7  overbill State Fund, and committed, facilitated, or participated in the commission of
8  at least two predicate acts.

9          303.   Each of the Pharmacy Entities agreed to and did mail or wire State
10 Fund bills for drugs it had illegally purchased and sold, and had no right to collect
11 on.  Each did so with intent to defraud State Fund, in furtherance of the conspiracy.
12 Each of the Pharmacy Entities also agreed to and did mail or wire State Fund bills
13 with fraudulently inflated drug prices.  Each did so with intent to defraud State
14 Fund, in furtherance of the conspiracy.

15         304.   Through the Drobots, Dr. Bernadett and Administrative Entities, the
16 Pharmacy Entities shared patients and doctors with the Surgical Entity Enterprise.
17 The Drobots and Dr. Bernadett agreed to and did commit multiple instances of mail
18 and wire fraud by directing Pharmacy Entities to commit the predicate acts above,
19 intending and foreseeing that the acts of mail and wire fraud would follow in the
20 ordinary course of business.  The Drobots and Dr. Bernadett also agreed to and did
21 conduct the enterprise's affairs.  Among other things, the Drobots and Dr. Bernadett
22 conducted the enterprise's affairs by devising its schemes, obtaining profits from the
23 schemes, and conducting meetings with medical providers and the Pharmacy
24 Entities' employees in order to direct the schemes.

25         305.   Defendants agreed and did commit multiple instances of mail and wire
26 fraud by committing the predicate acts above, intending and foreseeing that the acts
27 of mail and wire fraud would follow in the ordinary course of business.  Defendants
28 also agreed to and did conduct the enterprise's affairs.  Among other things,

Defendants conducted the enterprise's affairs by generating the fraudulent documents, accepting kickbacks from the Entity Conspirators and others, making material misrepresentations to State Fund, and meeting with the Drobots and Dr. Bernadett and employees of the Pharmacy Entities in order to further the schemes.

306.   Specific examples of predicate acts committed in furtherance of the conspiracy are provided in paragraphs 20-132 and 165-242, and in the spreadsheets lodged with the Court, including Exhibit 1, which includes a spreadsheet of predicate acts committed by Defendants.

### 3.   State Fund Suffered Injury From the Predicate Acts Committed In Furtherance of the Enterprise's Criminal Purpose

307.   The predicate acts of mail and wire fraud that Defendants agreed to and did commit directly and proximately caused State Fund to suffer substantial injury to its business and property, as described in more detail above.

308.   Under the provisions of 18 U.S.C. § 1964(d), the Pharmacy Conspirators and Defendants are jointly and severally liable to State Fund for three times the damages that State Fund has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

### (Fraud)

309.   State Fund incorporates by reference the allegations in paragraphs 1-242, 243-262, and 263-308 of this Complaint as though fully set forth herein.

310.   As alleged in detail above, Defendants and their co-conspirators made material misrepresentations to State Fund, and/or concealed and/or suppressed material facts from State Fund.  Defendants signed bills and reports (and/or allowed the Entity Conspirators to sign bills on their behalf), which were submitted to State Fund, and which contained certifications, either explicit or implicit, that the bills and

1 reports submitted were not the product of fraud or illegal referral and kickback fees,

2 and/or did not contain material misrepresentations or omissions.

3     311.   The misrepresentations and omissions by Defendants were material and

4 were false and misleading, and Defendants knew they were material and were false

5 and misleading at the time they were made or, at a minimum, Defendants acted with

6 reckless disregard for the truth or falsity of the representations or omissions.

7     312.   Defendants misrepresented, concealed and/or suppressed these facts

8 with the intent to deceive and influence the actions of State Fund, including

9 intending to have State Fund pay the fraudulent billings, as well as to stop any

10 investigation of the challenged practices.

11     313.   State Fund reasonably and justifiably relied to its detriment on each

12 Defendant's misrepresentations and omissions.  At the time State Fund acted in

13 reliance on Defendants' misrepresentations and omissions State Fund was unaware

14 of the representations' falsity and of the facts Defendants concealed and suppressed.

15 State Fund would have acted differently if it had known the true facts.  In particular,

16 State Fund would not have paid the fraudulent claims submitted by Defendants and

17 their co-conspirators with Defendants' assistance and knowledge, and State Fund

18 would have contested (or contested further) those false billings.

19     314.   As a direct and proximate result of Defendants' misrepresentations and

20 omissions, State Fund suffered damages in an amount to be proven at trial, but in an

21 amount not less than the monies paid to the Defendants, Surgical Entities, and

22 Pharmacy Entities because of their fraudulent schemes with respect to spinal

23 surgeries and other medical services including "other types of surgeries, magnetic

24 resonance imaging, toxicology, durable medical equipment, [] other services,"

25 medications, and overbilling.

26     315.   As explained above, State Fund was induced by the foregoing

27 fraudulent schemes to enter into settlement agreements with certain of the Surgical

28 Entities on various dates, including but not limited to the Global Settlements and

5018471

settlement agreements dated April 20, 2004 and September 1, 2009 with Surgical Defendants ("Surgical Settlement Agreements").  State Fund's consent to enter into these settlement agreements was obtained by Defendants' and their co-conspirators' fraud, including the misrepresentations and omissions articulated above.  With respect to the Surgical Settlement Agreements, Drobot Sr. has admitted to perpetrating fraud on insurance carriers, including State Fund, since 1998.

316.   With respect to the Pharmacy Global Settlements, these misrepresentations and omissions included, but were not limited to, the sham agreements signed by many of the Defendants intended to disguise the true nature of Defendants' financial arrangements with their co-conspirators, as well the bills and reports underlying the claims to be settled, which were originally submitted to State Fund, and which contained certifications, either explicit or implicit, that the bills and reports submitted were not the product of fraud or illegal referral and kickback fees, and/or did not contain material misrepresentations or omissions.

317.   These misrepresentations by Defendants and their co-conspirators were made with the intent to induce State Fund to rely thereon, and State Fund did in fact rely thereon.  State Fund would not have settled these claims if it had known Defendants' and their co-conspirators' fraudulent activities and billings and that Defendants had engaged in the foregoing misrepresentations and omissions.

318.   Indeed, collectively, the contracts between the Defendants (and other medical providers) and the Surgical, Pharmacy, and Administrative Entities violated California Bus. & Prof. Code §§650, 652, 652.5, 2400, 2052, 4022, 4037, 4043, 4160, and 4170, Insurance Code §§ 750, 754, and 1871.4, California Penal Code §§ 549 and 550, and California Lab. Code §§ 139.3 and 3215, among other laws. Accordingly, they are illegal and therefore void and unenforceable; these entities had no standing to submit the bills to State Fund or receive payment for them.

319.   Consequently, the settlement agreements constitute void and/or voidable contracts, and State Fund seeks rescission of them (including the return to

1 State Fund of payments plus interest), or if rescission is not available, damages in an
2 amount to be proven at trial.

3    320.   In making the above false statements, Defendants acted with a
4 conscious disregard for the rights of State Fund, and thus are guilty of oppression,
5 fraud, and malice pursuant to California Civil Code § 3294.  State Fund is entitled to
6 recover punitive damages from Defendants in an amount to be proven at trial.

7                          **FOURTH CAUSE OF ACTION**
8                     **(Business & Professions Code § 17200)**

9    321.   State Fund incorporates by reference the allegations in paragraphs 1-
10 242, 243-262, 263-308, and 309-320 of this Complaint as though fully set forth
11 herein.

12    322.   The Defendants' and their co-conspirators' schemes involving
13 fraudulent misrepresentations and omissions to State Fund constitute unlawful,
14 unfair, or fraudulent business acts and practices, under what is commonly known as
15 the California Unfair Competition Law ("UCL"), California Bus. & Prof. Code
16 §§ 17200 *et seq.*

17    323.   Each Defendant violated Section 17200's prohibition against engaging
18 in an unlawful act or practice through conduct that violates, among other things,
19 RICO, 18 U.S.C. § 1962, as described herein.  Through the unfair and improper
20 practices of Defendants and their co-conspirators, State Fund suffered injury by
21 virtue of Defendants' and those co-conspirators' billing.

22    324.   Defendants further violated Section 17200's prohibition against
23 engaging in an unlawful act or practice through conduct that violates, among other
24 things:

25    325.   California Bus. & Prof. Code §§ 2400 and 2052 by entering into illegal
26 contracts that would allow the Drobots, Dr. Bernadett, and the Entity Conspirators
27 to exercise lay or corporate control over medical decisions without the required
28 license, which runs afoul of the corporate practice of medicine doctrine;

326.   California Lab. Code § 139.3, 3215, 3820, directly or by aiding and abetting and conspiring with co-conspirators to enter into illegal fee-splitting arrangements and receiving monetary incentives for referrals of patients for clinical laboratory, diagnostic imaging goods, pharmacy goods, evaluations, and consultations, among other services and treatments;

327.   California Bus. & Prof. Code §§ 650, 650.1, 652, and 652.5, directly or by aiding and abetting violations by other providers, by entering into illegal fee-splitting arrangements and by receiving monetary incentives to refer patients to the Entity Conspirators, other preferred facilities, or any other co-conspirator, to prescribe and dispense particular drugs or provide particular services, and to use particular devices, hardware, implants, or equipment from specified suppliers;

328.   California Insurance Code §§ 750,  754, and 1871.4 and Penal Code 549 and 550, directly or by aiding and abetting and conspiring in the presentation and negotiation of false or fraudulent claims and by aiding and abetting in the offer or payment of, as well as soliciting, accepting, or receiving, referral fees for the referral of patients to Pacific Hospital, other preferred facilities, or other operations controlled and/or owned by Defendants' co-conspirators, *e.g.*, the physician office dispensing programs "managed" by the Pharmacy Entities, so that those co-conspirators could submit insurance claims to State Fund for reimbursement, or soliciting, accepting, or referring any business to or from any other co-conspirators with the knowledge that, or with reckless disregard for whether, the co-conspirator for or from whom the solicitation or referral was made, or the individual or entity who was solicited or referred, intended to violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code.

329.   California Bus. & Prof. Code §§ 4022, 4037, 4043, 4160, and 4170, by aiding and abetting co-conspirators in the operation of a pharmacy, pharmaceutical wholesaler, and prescriber dispensary and the submission of claims for

5018471

1   reimbursement without the required licenses, and by dispensing drugs in violation

2   section 4170.

3         330.   In addition to being unlawful and fraudulent, each of Defendants and

4   co-conspirators' schemes to defraud State Fund constituted unfair business acts and

5   practices under § 17200.

6         331.   Defendants' and co-conspirators' unfair and unlawful practices were

7   performed in California.  For example, the fraudulent billings were sent to and

8   received by State Fund in California.

9         332.   State Fund has suffered injury to its business and property as a direct

10   and proximate result of Defendants' unfair and unlawful practices.

11         333.   Defendants have fraudulently received up to millions of dollars from

12   State Fund as a direct and proximate result of their unfair and unlawful practices.

13   Defendants have been unjustly enriched, and it would be inequitable to allow

14   Defendants to retain the monies they obtained from State Fund through fraud or

15   other unfair practices.  Disgorgement should be awarded so as to achieve substantial

16   justice between the parties.

17                             **PRAYER FOR RELIEF**

18         WHEREFORE, State Fund prays for judgment against all Defendants as

19   follows:

20         1.      For compensatory damages in an amount to be proven at trial, and

21   treble damages under the RICO statute in the first cause of action (Surgical Entity

22   Enterprise/Civil RICO);

23         2.      For compensatory damages in an amount to be proven at trial, and

24   treble damages under the RICO statute in the second cause of action (Pharmacy

25   Entity Enterprise/Civil RICO);

26         3.      For an award of compensatory damages in an amount to be proven at

27   trial, plus an award of punitive and exemplary damages pursuant to the third cause

28   of action (fraud);

5018471

4.      For restitution and disgorgement of unjust enrichment, plus interest, pursuant to all appropriate causes of action;

5.      For an award of attorneys' fees and costs, pursuant to all appropriate causes of action; and

6.      For such other and further relief as the Court may deem just and proper.

Dated:  August 11, 2015                    HUESTON HENNIGAN LLP


                                           By: /s/ John C. Hueston
                                               John C. Hueston
                                               Attorneys for Plaintiff State
                                               Compensation Insurance Fund

5018471

# **JURY TRIAL DEMAND**

As it did in its initial and First Amended Complaint and Second Amended Complaint, State Fund continues to demand a trial by jury of all issues so triable on the claims alleged herein.

DATED:  August 11, 2015                Respectfully submitted,

                                        HUESTON HENNIGAN LLP


                                        By: /s/ John C. Hueston
                                            John C. Hueston
                                            Attorneys for Plaintiff State
                                            Compensation Insurance Fund

5018471